IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIBERTARIAN NATIONAL COMMITTEE, INC., )<br>    1444 Duke Street )<br>    Alexandria, VA 22314 )<br>)<br>              Plaintiff, )<br>)<br>          v. )<br>)<br>FEDERAL ELECTION COMMISSION, )<br>    999 E Street, N.W. )<br>    Washington, DC 20463 )<br>_____) | Case No. _____<br><br>COMPLAINT |

## COMPLAINT

Plaintiff Libertarian National Committee, Inc., by and through undersigned counsel, complains of Defendant as follows:

### INTRODUCTION

"You can't take it with you."

Accordingly, many people leave instructions for the disbursement of their worldly possessions and money upon their passing—instructions that our legal system aims to honor. Those instructions, often called a "last will and *testament*," are inherently expressive, conveying the decedent's desires to advance particular charitable and ideological goals. Often times, those instructions direct the funding of political parties.

Consistent with this longstanding American tradition, Joseph Shaber bequeathed $235,575.20, without restrictions, to the Libertarian National Committee. But the LNC cannot access this money, at least not for the purposes that would best help it communicate with voters, elect its candidates, and achieve its political objectives.

1

Defendant Federal Election Commission applies the federal annual contribution limits to political party committees, 52 U.S.C. §§ 30116, 30125 ("the Party Limit"), against decedents' bequests, infringing upon the speech rights of both donors and donees. And while the Party Limit is currently $33,400, that limit only applies where a particular contribution might be used for general communication and party-building. Conversely, the Government would allow the Party to accept as much as $100,200 per year from Shaber's bequest provided it was used for each of three Government-approved purposes: a national convention, attorneys, or a headquarters building. *See* 52 U.S.C. § 30116(a)(1)(B) and (a)(9). In other words, the Government imposes a content-based restriction on a national party's speech: a party can only spend $33,400 of a donor's money on general political speech, but nearly ten times that amount on Government-favored purposes.

Applying any contribution limits to Joseph Shaber's bequest is unconstitutional.

And the content-based restrictions on how the Libertarian Party may use its funds are also unconstitutional, on their face, and as applied against Shaber's bequest.

## THE PARTIES

1.      Plaintiff Libertarian National Committee, Inc. ("LNC") is the national committee of the Libertarian Party of the United States. The LNC is a not-for-profit organization incorporated under the laws of the District of Columbia, which maintains its headquarters in Alexandria, Virginia. The LNC has 12,235 current dues paying members, in all 50 states and the District of Columbia. Approximately 399,302 registered voters identify with the Libertarian Party in the 27 states in which voters can register as Libertarians. Throughout the Nation, 141 officeholders (including holders of non-partisan offices), are affiliated with the Libertarian Party. The LNC's purpose  is to field national Presidential tickets, to support its state party affiliates in running

candidates for public office, and to conduct other political activities in furtherance of a libertarian public policy agenda in the United States.

2.     Defendant Federal Election Commission ("FEC") is the federal government agency charged with administrating and enforcing the federal campaign finance laws, including the laws challenged in this action.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over the matter pursuant to 28 U.S.C. §§ 1331 and 2201, and 52 U.S.C. § 30110, pursuant to which the matter should be immediately certified to the United States Court of Appeals for the District of Columbia Circuit for consideration en banc.

4.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e).

## STATEMENT OF FACTS

*Legislative and Regulatory Background*

5.     Title 52 U.S.C. § 30116(a)(1) provides, in pertinent part, that "no person shall make contributions– (B) to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $ 25,000, or, in the case of contributions made to any of the accounts described in paragraph (9), exceed 300 percent of the amount otherwise applicable under this subparagraph with respect to such calendar year."

6.     Title 52 U.S.C. § 30116(a)(9) describes three "separate, segregated account[s]" referenced in 52 U.S.C. § 30116(a), to which individuals may, pursuant to that section, contribute "300 percent of the amount otherwise applicable" under that section. These accounts are:

(A)     an account "which is used solely to defray expenses incurred with respect to a

presidential nominating convention (including the payment of deposits) or to repay

loans the proceeds of which were used to defray such expenses, or otherwise to

restore funds used to defray such expenses, except that the aggregate amount of

expenditures the national committee of a political party may make from such

account may not exceed $ 20,000,000 with respect to any single convention;"

(B)     an account "which is used solely to defray expenses incurred with respect to the

construction, purchase, renovation, operation, and furnishing of one or more

headquarters buildings of the party or to repay loans the proceeds of which were used

to defray such expenses, or otherwise to restore funds used to defray such expenses

(including expenses for obligations incurred during the 2-year period which ends on

the date of the enactment of this paragraph);" and

(C)     an account "which is used to defray expenses incurred with respect to the preparation

for and the conduct of election recounts and contests and other legal proceedings."

7.      Pursuant to 52 U.S.C. § 30125, enacted as part of the "Bipartisan Campaign Reform

Act of 2002," no political committee can "solicit, receive or direct to another person a contribution,

donation, or transfer of funds or any other thing of value, or spend any funds, that are not subject to

the limitations, prohibitions, and reporting requirements" of 52 U.S.C. § 30116(a)(1). The

Libertarian Party is not one of the two parties referenced in the "Bipartisan" Act's title.

8.      The FEC has previously taken the litigating position in this Court, which this Court

has accepted, that the limitation on the amounts that political committees may "solicit" is not

violated if the funds are subject to the Party Limit when they are actually received; *e.g.,* a political

4

party may solicit bequests in any amount, provided that it does not, in any year, accept funds from

said bequests in excess of the Party Limit.

9.      Pursuant to 52 U.S.C. § 30116(c), the contribution limits set forth in 52 U.S.C. §

30116(a)(1) are indexed for inflation. The current annual limit on contributions to political parties is

$33,400.00.

10.     Although the term "person," as used in 52 U.S.C. § 30116(a)(1), is not specifically

defined to include an individual's testamentary estate, Defendant FEC has determined that the

definition should be so extended. *See*, *e.g.* FEC Advisory Opinions 2015-05,  2004-02, 1999-14.

11.     Accordingly, the national committees of political parties may not receive bequests

exceeding the federal contribution limits applicable to living individuals. In the event such bequests

are made, defendant FEC does not permit national party committees to receive such bequests into

escrow funds over which they exercise control, including control over the direction of the funds'

investment strategies or choice as to the amount of any withdrawals made in any particular year.

*The Libertarian National Committee*

12.     The Libertarian Party may be the largest "third" party in the United States, but it is

generally unable to effectively recruit and advocate for its candidates. Founded in 1971, the party

has yet to elect a federal office holder. Unlike its two major competitors, the Libertarian Party's

national committee is forced to spend the bulk of its resources securing access to the ballot, leaving

comparatively little for actual campaigning—an expensive activity in and of itself. The situation is

self-perpetuating, as a party's ability to solicit donations depends in part on having adequate

financial resources on hand. Donors, voters, and prospective political candidates who might be

attracted to the party's ideology are nonetheless dissuaded from supporting the party by its lack of

resources.

13.     Accordingly, the LNC has comparatively less use for funds intended to support national conventions, a headquarters building, or attorney fees. The LNC's needs in these areas is not commensurate with the needs of the two major political parties whose elected officials were exclusively responsible for enacting the segregated account structure of 52 U.S.C. § 30116(a)(9). The LNC needs, and would prefer, to spend its funds in order to directly speak to the electorate about its ideology and political mission, to support its candidates, and to build its institutional capability, including its ability to regularly qualify for the ballot in various states.

14.     But for the Party Limits, the LNC would accept sums in excess of the annual contribution limit, from living donors as well as from testamentary bequests, and spend those funds for its general expressive purposes, including expression in aid of its federal election efforts. LNC would accept and spend such sums in amounts that are otherwise within the limits it could accept and spend for the segregated account purposes of 52 U.S.C. § 30116(a)(9).

*The Shaber Bequest*

15.     Between 1988 and 2011, Joseph Shaber sporadically made small donations to the LNC, in amounts as low as $10 and rarely exceeding $50. The most that Mr. Shaber donated to LNC at any time during this period was $300 in March, 1997. Between June, 2011 and November, 2012, Shaber donated $100 per month to the LNC, an amount he twice supplemented by $100 during this period.

16.     Unbeknown to the LNC, it was made a beneficiary of the Joseph Shaber Revocable Living Trust U/T/D February 11, 2010 ("the trust").

17.     On August 23, 2014, Joseph Shaber passed away, rendering the trust irrevocable. LNC's share of the trust's estate is $235,575.20.

18.     LNC would accept and spend the entire amount of the Shaber bequest for its general

expressive purposes, including expression in aid of its federal election efforts.

19.     Owing to Defendant FEC's application of federal contribution limits, Plaintiff LNC

could not accept this entire bequest at once, as it would use at least some if not all of the money on

federal election efforts and for its other desired expressive purposes. Rather, the LNC accepted a

single payment of $33,400 in 2015, and agreed that the remaining $202,175.20 would be placed in

an escrow.

20.     The escrow account is established pursuant to an agreement among Alexina Shaber,

a trustee of the trust, the LNC, and the escrow agent, First International Bank & Trust of Phoenix,

Arizona, attached hereto as Exhibit A. The agreement provides, inter alia, that the escrow agent is to

invest the funds in bank accounts or certificates of deposit, and to annually disburse the funds to

LNC at the maximum amount permitted by the FEC. The agreement explicitly provides, however,

that the LNC may challenge the legal validity of the contribution limit, and demand payment of the

full amount remaining in the account should its challenge succeed. LNC has received its 2016

disbursement.

## COUNT I
### VIOLATION OF U.S. CONST. AMEND. I – RIGHT OF FREE SPEECH
### APPLICATION OF CONTRIBUTION LIMITS AGAINST THE SHABER BEQUEST

21.     Paragraphs 1 through 20 are incorporated as though fully re-stated herein.

22.     A unilateral, revocable promise to donate money to a political party at some

indeterminate future time upon one's death does not readily create the appearance or possibility of

*quid pro quo* corruption justifying restrictions upon the size of bequests to political parties. Such

bequests, by their nature, cannot effectively circumvent contribution limits to political candidates

because the donor often has no idea which candidates might benefit from the contribution, no

candidate can predictably rely on receiving the money from a bequest, and neither candidates nor political parties risk offending the donors of bequests once the money is received.

23.     Although the Libertarian Party is the nation's third-largest political party in terms of elected officeholders, ballot access, and participation in federal, state, and local elections, the Libertarian Party has never seen one of its candidates elected to federal office. No current federal office holder is affiliated with the Libertarian Party. The Libertarian Party is thus not in any position to deliver political favors in exchange for promises of future bequests.

24.     The Supreme Court has previously upheld the Party Limit against a facial challenge, applying a relaxed standard of review on the theory that individuals contributing to political parties are typically engaged in associational, rather than expressive conduct. However, individuals acting in a testamentary capacity are not exercising their associational rights, but their right of free speech in desiring to leave a political legacy, a circumstance that the Supreme Court has not previously considered. Laws restricting the solicitation and acceptance of testamentary contributions must therefore be strictly scrutinized under the First Amendment.

25.     Even if the testamentary donation could be viewed as an associational rather than primarily expressive act, the Party Limit's application to testamentary bequests does not "leav[e] persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Buckley* v. *Valeo*, 424 U.S. 1, 28 (1976) (per curiam).

26.     In the absence of the Party Limit's application to the Shaber bequest, the LNC would substantially improve its ability to advocate and achieve electoral success by taking immediate control over the balance of the Shaber funds.

27.     Considering the unenforceable nature of promises to make testamentary bequests; the lack of coordination, let alone a quid-pro-quo relationship, between Joseph Shaber or anyone related to him and the Libertarian Party; the Libertarian Party's critical need for funds given its distant third-party status; and the Libertarian Party's inability, owing to its lack of elected federal officeholders, to engage in a quid pro quo donor relationship even if it were inclined to make such arrangements, application of 52 U.S.C. §§ 30116(a)(1)(B) and 30125 to Joseph Shaber's bequest to the LNC violates the First Amendment speech and associational rights of the LNC and its supporters. Such application  significantly hampers the LNC in its ability to attract and advocate for its candidates and does not serve any valid governmental interest.

COUNT TWO
VIOLATION OF U.S. CONST. AMEND. I – RIGHT OF FREE SPEECH
CONTENT-BASED RESTRICTIONS OF 52 U.S.C. §§ 30116, 30125

28.     Paragraphs 1 through 27 are incorporated as though fully re-stated herein.

29.     The Party Limit discriminates against LNC based on the content of LNC's speech. LNC is allowed to accept only $33,400 per year from individuals if it would use that money for general expressive purposes, but it can accept individual donations in the amount $100,200 to speak through a convention, to promote itself via the establishment of a headquarters building, and to pay attorneys to speak on its behalf. The LNC could even accept any combination of these $100,200 donations, in addition to the $33,400 limit for general expressive purposes.

30.     Content-based restrictions on speech are subject to strict scrutiny. Yet there is not even a rational basis to imagine that a $33,401 donation for general expressive purposes might corrupt the political process, but a $100,200 donation for a political party's lawyers, a $100,200 donation for a political party's convention, a $100,200 donation for a political party's headquarters building, a $300,600 donation to a political party for all three purposes—or even a $334,000

9

donation to a political party for general purposes and the maximum amount for each of the favored

purposes—would not be corrupting.

31.     Because they favor, on their face, the acceptance of funds based on the content of a

political party's speech, 52 U.S.C. §§ 30116(a)(1)(B) and 30125 violate the First Amendment

speech and associational rights of the LNC and its supporters.

COUNT THREE
VIOLATION OF U.S. CONST. AMEND. I – RIGHT OF FREE SPEECH
CONTENT-BASED RESTRICTIONS OF 52 U.S.C. §§ 30116, 30125
AS APPLIED TO THE SHABER BEQUEST

32.     Paragraphs 1 through 31 are incorporated as though fully re-stated herein.

33.     Plaintiff LNC could accept the entire balance of the Shaber bequest immediately if it

agreed to spend the bulk of the money on attorney fees, a convention, or a building. Because LNC

prefers to spend that money to express itself generally, it can access only a small portion of the

Shaber bequest every year.

34.     Accordingly, 52 U.S.C. §§ 30116(a)(1)(B) and 30125 violate the First Amendment

speech and associational rights of the LNC and its supporters.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff Libertarian National Committee, Inc. requests that judgment be

entered in its favor and against Defendant as follows:

1.     An order permanently enjoining Defendant, its officers, agents, servants, employees,

and all persons in active concert or participation with it who receives actual notice of the injunction,

from enforcing 52 U.S.C. §§ 30116 and 30125, either generally or in relation to the Shaber

Bequest;

2.     Declaratory relief consistent with the injunction;

10

3.      Costs and attorneys' fees pursuant to any applicable statute or authority; and

4.      Any other further relief as the Court deems just and appropriate.

Dated: January 25, 2016                    Respectfully submitted,

                                           Alan Gura (D.C. Bar No. 453449)
                                           Gura & Possessky, PLLC
                                           916 Prince Street, Suite 107
                                           Alexandria, VA 22314
                                           703.835.9085/Fax 703.997.7665


                                    By: /s/ Alan Gura
                                        Alan Gura

                                        Attorney for Plaintiff

EXHIBIT  A

## ESCROW AGREEMENT

This escrow agreement (Agreement) made this 15ᵗʰ day of September, 2015, by ALEXINA SHABER (Trustee), as Trustee of the Joseph Shaber Revocable Trust dated February 11, 2010 (the Trust), LIBERTARIAN NATIONAL COMMITTEE, INC., a District of Columbia nonprofit corporation doing business as the Libertarian Party® (LP), located at 2600 Virginia Avenue, N.W., Suite 200, Washington, DC 20037 and FIRST INTERNATIONAL BANK & TRUST, a North Dakota banking corporation (Escrow Agent), located at 2231 East Camelback Road, Phoenix, Arizona, 85016, based on the following facts.

A.    The Trust became irrevocable upon the death of the Settlor Joseph Shaber on August 23, 2014.  LP is named as a beneficiary of the Trust.  The Trustee, through counsel, has determined that LP's full share of the Trust Estate is $235,575.20 (LP's Share), which the Trustee must distribute to the LP.

B.    LP is the governing body of the national Libertarian Party®, and the owner of the federally-registered trademark, Libertarian Party®.  LP has been officially recognized by the Federal Election Committee (FEC) as the national political party committee of the Libertarian Party®.   As a national political party committee, contributions by the Estate to LP are currently limited under Federal campaign finance law to the sum of not more than $33,400 per calendar year, as adjusted for inflation by the FEC in the future or as otherwise changed by law or court decision in the future (Contribution Limit).

C.    Because LP's Share exceeds the Contribution Limit, the Trustee and LP have agreed that the Trustee will fulfill her obligation to distribute LP's Share by depositing in escrow with Escrow Agent LP's Share (Escrow Fund).  The Trustee and LP acknowledge that the Trustee already distributed $33,400 of LP's Share to LP for the 2015 calendar year.

D.    The Trustee and LP desire to designate Escrow Agent as the escrowee of the Escrow Fund.

## ACCORDINGLY, TRUSTEE, LP AND ESCROW AGENT AGREE:

1.    **Escrow Agent**.  The Trustee and LP designate Escrow Agent, and Escrow Agent agrees to act, as escrowee for the purposes and upon the conditions set forth in this Agreement.

2.    **Deposit of Escrow Fund**. The Trustee of the Trust shall deliver LP's Share to the Escrow Agent and upon such delivery all duty, responsibility and liability of the Trustee to LP shall terminate.  LP shall deliver to the Trustee a duly executed receipt and release, a copy of which is attached hereto as <u>Exhibit A.</u>  All interest accruing on the

Escrow Fund shall be deemed part of the Escrow Fund.  Escrow Agent shall invest the Escrow Fund in the name of Escrow Agent, for the benefit of LP, with all interest taxable to LP, in bank accounts or certificates of deposit fully insured by the Federal Deposit Insurance Corporation.  LP agrees to sign and deliver such W-9 forms or other statements as Escrow Agent may reasonably request.

3.     **Distribution of Escrow Fund; Termination of Escrow.**  The Escrow Agent shall distribute the Escrow Fund only in increments equal to the Contribution Limit.  Counsel for LP shall notify the Escrow Agent in writing on or before February 28 of each calendar year, commencing in calendar year 2016, of the bi-annually adjusted Contribution Limit.  Such notification shall contain a statement that distribution of the bi-annually adjusted Contribution Limit to LP from the Escrow Fund does not violate any applicable Federal or State laws and regulations.  A check payable to LP, shall be mailed via regular United States mail to LP on or before January 15 of each calendar year, commencing in calendar year 2016.  LP understands that under no circumstances may it request or require that the Escrow Agent pay to LP in any calendar year an amount that would exceed the Contribution Limit.  Escrow Agent understands that LP may challenge the legal validity of the Contribution Limit in federal court.  In the event that LP is successful in that challenge,  LP may be able to certify to the Escrow Agent that the entire balance of the Escrow Fund can be paid to LP.  This Agreement shall terminate automatically when the entire Escrow Fund has been delivered to LP.  The provisions of this Agreement that release the Escrow Agent from liability and/or limit the liability of the Escrow Agent and/or indemnify the Escrow Agent from liability and other provisions which by their nature contemplate rights and obligations of the parties to be enjoyed or performed after the expiration or termination of this Agreement will survive until their purposes are fulfilled.

4.     **Liability of Escrow Agent.**  Upon distributing the Escrow Fund and performing its obligations and services under this Agreement, Escrow Agent shall be released from any further liability under this Agreement.  Escrow Agent shall have no obligation under this Agreement except to exercise good faith and ordinary care, and its good faith shall be conclusively presumed where it relies upon: (i) advice of counsel; or (ii) any document it believes to be genuine.  Escrow Agent may act upon receipt of any certificate or other written document, and shall have no responsibility to determine or inquire into or otherwise corroborate the happening or occurrence of any event or condition described in such certificate or document or to determine whether the distribution of any amounts from the Escrow Fund complies with applicable Federal or State laws and regulations, including those related to campaign finance.

In the event of any disagreement or controversy under this Agreement or if Escrow Agent in good faith is in doubt as to what action it should take with respect to the Escrow Fund, Escrow Agent shall have the absolute right at its election to take any or all of the following actions:

2

(a)     Hold the Escrow Fund until the Escrow Agent and LP agree upon the proper disposition of it; or

(b)     Hold the Escrow Fund until Escrow Agent receives a court order concerning the disposition of the Escrow Fund in form and substance satisfactory to Escrow Agent; or

(c)     File an interpleader action in an appropriate court naming LP and all other claimants and interested parties as parties, and deposit the Escrow Fund with the clerk of such court in full satisfaction of its responsibilities under this Agreement.

(d)     Exercise any other rights or remedies available to it at law or in equity.

In any such event, Escrow Agent shall be reimbursed from the Escrow Fund for its reasonable attorneys' fees in taking such actions.

5.     **Indemnity; Exculpation.**   LP shall indemnify, hold harmless, and, at Escrow Agent's option, defend Escrow Agent from and against any loss, liability, claim or expense, including, without limitation, reasonable attorney fees and court costs arising as a result of Escrow Agent's acceptance of the Escrow Fund or the performance of Escrow Agent's duties under this Agreement unless such loss, liability, claim or expense is finally adjudicated to have resulted from the bad faith or gross negligence of Escrow Agent.   Such indemnity, hold harmless and defense obligations shall survive Escrow Agent's resignation or removal and shall survive the termination of this Agreement.   In no event shall Escrow Agent be liable, directly or indirectly, for any (a) diminution in the value of the Escrow Fund; (B) damages or expenses arising out of Escrow Agent's performance of this Agreement, other than damages and expenses that result from Escrow Agent's failure to act in accordance with this Agreement, or actions taken in bad faith or gross negligence; or (c) special or consequential damages, even if Escrow Agent has been advised of the possibility of such damages.

6.     **Resignation.**   Escrow Agent may resign for any reason, or without reason, in its sole discretion by giving thirty (30) days written notice to LP.   Thereafter, and after payment of Escrow Agent's fees and expenses incurred to that point, or the offset of such fees against the distributions payable to LP under this Agreement, Escrow Agent shall deliver the Escrow Fund to a successor Escrow Agent, as appointed in writing by LP.   If no such written notice of appointment is received by Escrow Agent within thirty (30) days after the notice of resignation, Escrow Agent is unconditionally and irrevocably authorized and empowered to pay over and distribute the Escrow Fund to such bank or trust company in the State of Arizona as Escrow Agent shall determine in its sole discretion and which has consented to act as escrow agent on substantially the same terms as set forth in this Agreement, or if none is available or willing to serve as Escrow Agent,

to file an interpleader action as described in Subsection 4(c) and deposit the Escrow Fund with the clerk of the court as described in that Subsection.

7.     **Escrow Fee.** Escrow Agent agrees to act as the Escrow Agent pursuant to this Agreement in return for a $ ~~2,000.00~~/year fee, plus reimbursement of Escrow Agent's attorneys' fees to review this Agreement (estimated at no more than $ ~~2,000.00/yr~~ ), which shall be paid by LP upon signature of this Agreement by all parties. If Escrow Agent is ever in good faith in doubt of its obligations to carry out its duties under this Agreement, Escrow Agent may consult its attorneys for advice regarding carrying out its duties under this Agreement and may offset the amount of reasonable attorneys' fees thereby incurred from the distributions payable to LP under this Agreement. If any fees or other sums owed to Escrow Agent under this Agreement are not paid promptly when due, Escrow Agent may offset such sums against the distributions payable to LP under this Agreement.

8.     **Successors and Assigns.** This Agreement shall bind and benefit the Estate, LP and Escrow Agent, and their respective successors, heirs, personal representatives, and assigns.

9.     **Notices and Amendments.** Any and all notices or notifications provided to the Escrow Agent by counsel for LP relating to the Escrow Fund shall be made in writing, certified by legal counsel for LP. All notices or other communications to be given under this Agreement shall be deemed to have been duly given, made, and received when delivered personally or mailed by certified mail, return receipt requested and first class postage prepaid, to the parties' addresses set forth above, or to such other addresses as may be designated by a similar written notice. No amendment of this Agreement, in whole or in part, shall be effective unless in writing signed by the parties to this Agreement.

10.     **Choice of Law and Forum.** This Agreement shall be governed, construed and enforced in accordance with the laws of the State of Arizona. Any and all actions concerning any dispute arising hereunder shall be filed and maintained in a State or Federal court sitting in Maricopa County, Arizona. The parties hereby consent to the jurisdiction of any such court and consent to venue in any such court.

11.     **Counterparts.** This Agreement may be signed in two or more counterparts, which together shall comprise one and the same instrument. Faxed or scanned signatures on this Agreement shall be deemed to have the same legal effect as original signatures.

12.     **Entire Agreement**. This Agreement embodies the entire agreement of the parties with respect to the subject matter of this Agreement. All prior discussions are merged in this Agreement.



The parties have signed this Agreement and intend it to be effective as of the date set forth above.

_____

ALEXINA SHABER, Trustee of the
Joseph Shaber Revocable Trust dated
February 11, 2010


LIBERTARIAN NATIONAL
COMMITTEE, INC. d/b/a the
Libertarian Party®

By _____

Its _Executive  Director_____


FIRST  INTERNATIONAL  BANK  &
TRUST

By _____

Its  President  —  Trust Department_____

5

The parties have signed this Agreement and intend it to be effective as of the date set forth above.

_____
ALEXINA SHABER, Trustee of the
Joseph Shaber Revocable Trust dated
February 11, 2010

LIBERTARIAN NATIONAL
COMMITTEE, INC. d/b/a the
Libertarian Party®

By _Wes Benedict_____

Its _Executive Director_____

FIRST INTERNATIONAL BANK &
TRUST

By _____

Its _President – Trust Department___

The parties have signed this Agreement and intend it to be effective as of the date set forth above.

_____ TTE
ALEXINA SHABER, Trustee of the
Joseph Shaber Revocable Trust dated
February 11, 2010

LIBERTARIAN NATIONAL
COMMITTEE, INC. d/b/a the
Libertarian Party®

By _____

Its _Executive Director_____

FIRST INTERNATIONAL BANK &
TRUST

By _____

Its _President – Trust Department_____

5

## EXHIBIT A

Receipt and release

## JOSEPH SHABER REVOCABLE LIVING TRUST

## RECEIPT, RELEASE, AND INDEMNITY AGREEMENT
### of the
### Libertarian National Committee, Inc.
### (The National Libertarian Party)

The Libertarian National Committee, Inc. (LNC), a beneficiary of the Joseph Shaber Revocable Living Trust U/T/D February 11, 2010 (the Trust), hereby acknowledges the Trustee's obligation to deposit the sum of $202,175.20, with Escrow Agent pursuant to that certain Escrow Agreement dated September 15, 2015. The LNC acknowledges that the said sum, together with the sum of $33,400 previously received by it, constitutes the LNC's full and final distributive share of the Trust.

The LNC acknowledges that it has received an Accounting of the administration of the Trust Estate. The LNC has reviewed the Accounting, and acknowledges that it is a complete and satisfactory accounting of the Trustee's administration of the Trust Estate. The LNC has no objections to any of the items of expenditure listed thereon, and believes that the Accounting is correct. In consideration of this full and final distribution having been made of the LNC's share, the LNC hereby grants the Trustee a full discharge regarding the administration of the Trust Estate, and releases the Trustee from all further responsibility regarding the administration of the Trust Estate.

The LNC agrees to indemnify and hold the Personal Representative harmless from any and all claims of creditors and income taxes of the decedent, and1 of the estate and the trust

//

//

//

//

estate, to the extent of its proportionate share of the trust estate, and to the extent only of the amount received by the LNC.

Signed and agreed this _22_ day of _September_, 2015.

LIBERTARIAN NATIONAL COMMITTEE, INC.
1444 Duke Street
Alexandria, Virginia  22314

By: _Wes Benedict_

Wes Benedict, Executive Director
Its Authorized Agent