UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LIBERTARIAN NATIONAL COMMITTEE, INC., <br><br> Plaintiff, <br><br> v. <br><br> FEDERAL ELECTION COMMISSION, <br><br> Defendant. | Civil Action No. 16-121 (BAH) <br><br> Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

The plaintiff, the Libertarian National Committee ("LNC"), was left a testamentary bequest by Joseph Shaber in 2015 in the amount of $235,575.20 but was allegedly unable to accept the bequest in full due to restrictions imposed by the Federal Election Commission Act ("FECA"), *see* 52 U.S.C. §§ 30116 and 30125. The LNC challenges certain aspects of the statutory scheme as unconstitutional and seeks certification of the constitutional issues it raises to the D.C. Circuit *en banc*, pursuant to 52 U.S.C. § 30110.[1] The defendant, the Federal Election Commission ("FEC"), has moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) on the ground that LNC lacks standing to bring this suit. This potential Article III issue must be addressed before certifying any question to the D.C. Circuit under § 30110. *See Holmes*, 823 F.3d at 70 ("If the requirements of Article III of the Constitution are satisfied, the district court must 'immediately' 'certify all questions of constitutionality of this Act to the United

---

[1] Pursuant to 52 U.S.C. § 30110, "the national committee of any political party" may bring an action "in the appropriate district court" challenging the constitutionality of a FECA provision. Section 30110 further provides that the district court "immediately shall certify" any non-frivolous constitutional challenge to FECA to the court of appeals *en banc*. *Id.*; *see also Holmes v. FEC*, 823 F.3d 69, 71 (D.C. Cir. 2016) ("[D]istrict courts do not certify 'frivolous' constitutional questions to the *en banc* court of appeals." (quoting *Cal. Med. Ass'n v. FEC*, 453 U.S. 182, 192 n.4 (1981))).

1

States court of appeals for the circuit involved . . . sitting *en banc*.'"); *see also Republican Party of La. v. FEC*, 146 F. Supp. 3d 1, 8 (D.D.C. 2015) ("This Court may properly dismiss [the plaintiffs'] claims [under analogous Bipartisan Campaign Reform Act] without convening a three-judge panel if [the plaintiffs] lack standing to bring those claims."); *Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 943 (D.C. Cir. 2012) (describing standing as a "threshold jurisdictional question" (quoting *Byrd v. EPA*, 174 F.3d 239, 243 (D.C. Cir. 1999))). For the reasons set out below, the FEC's motion will be denied.

## I. BACKGROUND

The challenged statutory framework is summarized before discussing the particular facts underlying this suit and the LNC's claims.

### A. FECA's Limits on Contributions to Political Committees

Under FECA, "no person," including, *inter alia*, a testamentary estate,[2] "shall make contributions . . . to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000." 52 U.S.C. § 30116(a)(1). FECA was amended in 2014 to allow individuals to make additional donations of up to three hundred percent of the annual contribution limit set out in § 30116(a)(1) for each of three specified purposes: (1) "expenses incurred with respect to a presidential nominating convention;" (2) "expenses incurred with respect to the construction, purchase, renovation, operation, and furnishing of one or more headquarters buildings of the party;" and (3) "expenses incurred with respect to the

---

[2] The FEC has interpreted the word "person" as used in § 30116(a)(1) to include an individual's testamentary estate, *see, e.g.*, Pl.'s Opp'n, Ex. C ("FEC Advisory Op. 2015-05"), ECF No. 12-3. The LNC does not challenge this interpretation of the statute, and, in a recent case involving these same parties, this Court explained that the FEC's interpretation is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Def. Council, Inc.*, 467 U.S. 837 (1984). *See LNC v. FEC* ("*LNC I*"), 930 F. Supp. 2d 154, 165 (D.D.C. 2013) ("The FEC's interpretation of the statute to include a testamentary bequest appears reasonable, is not seriously challenged by the LNC in its briefs, and is entitled to deference under *Chevron* . . . .").

preparation for and the conduct of election recounts and contests and other legal proceedings." *Id.* § 30116(a)(9)(A)–(C). Donations accepted for the three enumerated purposes under § 30116(a)(9) must be funneled into a "separate, segregated account" and not comingled with other funds. *Id.*

The contribution limits set forth in § 30116(a)(1) are adjusted for inflation in odd-numbered years such that, at the time this Complaint was filed, the annual limit on a general account contribution was $33,400, and the annual limit on a segregated account contribution for each of the three segregated accounts was $100,200. *See id.* § 30116(c). Accordingly, in 2015, the total amount that a party's political committee could accept from any person, including a testamentary estate, was $334,000.

### B.  Bequest to the LNC by Joseph Shaber

The LNC is "the national committee of the Libertarian Party of the United States." Compl. ¶ 1. Its mission is "to field national [p]residential tickets, to support its state party affiliates in running candidates for public office, and to conduct other political activities in furtherance of a libertarian public policy agenda in the United States." *Id.* From 1988 to 2011, Mr. Shaber made small, periodic donations to the LNC. *Id.* ¶ 15. "Unbeknown to the LNC, it was made a beneficiary of the Joseph Shaber Revocable Living Trust U/T/D February 11, 2010." *Id.* ¶ 16. Upon his death on August 23, 2014, Mr. Shaber's trust became irrevocable, with the LNC's share amounting to $235,575.20. *Id.* ¶ 17. No restrictions were placed on how the LNC could utilize the bequest, and the trustee maintains that it is "entirely up to the LNC how it wishes to apply the distribution." *See* Def.'s Mot. Dismiss at 6–7, ECF No. 9 (quoting Letter from Trustee's Counsel to FEC (dated June 15, 2015), available online at http://saos.fec.gov/ aodocs/1317218.pdf (last visited Dec. 27, 2016)).

On February 23, 2015, the trustee distributed $33,400 of the bequest to the LNC's general account. *Id.* ¶ 19. LNC asserts that it "would [have] accept[ed] and spen[t] the entire amount of the Shaber bequest for its general expressive purposes" but for FECA's contribution limits. *Id.* ¶¶ 18–19. On May 6, 2015, the trustee requested an advisory opinion from the FEC as to whether the remainder of the bequest could be placed in a third-party escrow account for annual disbursements pursuant to § 30116(a)(1). The FEC approved the trustee's request on August 11, 2015. *See generally* FEC Advisory Op. 2015-05. In January 2016, the LNC accepted another $33,400 of the Shaber bequest from escrow for deposit into the party's general purpose account. Compl. ¶ 20. Thus, as of the filing of the complaint, approximately $168,775.20 of the bequest remained in escrow. *See* Def.'s Mot. Dismiss at 7; Pl.'s Opp'n Def.'s Mot. Dismiss ("Pl.'s Opp'n") at 20, ECF No. 12 (referencing $168,000 in escrow).

### C.      The LNC's Claims

The LNC's complaint alleges in three counts that application of the § 30116 contribution limits to the Shaber bequest "violates the First Amendment speech and associational rights of the LNC and its supporters," *id.* ¶ 27 (Count I), and that the segregated accounts scheme, which allows parties to accept larger donations for three specified purposes only, amounts to a content-based restriction on speech, both on its face and as applied to the Shaber bequest *id.* ¶¶ 31, 34 (Counts II and III); *see also* Pl.'s Opp'n at 8 ("[P]rivileging large donations based on their purposes—as if a party would be corrupted by a $33,401 donation for general purposes, but not a $312,000 donation for conventions, buildings, and lawyers[—]is an irrational content-based speech restriction."). The LNC seeks "[a]n order permanently enjoining [the FEC] . . . from enforcing 52 U.S.C. §§ 30116 and 30125, either generally or in relation to the Shaber [b]equest," in addition to "[d]eclaratory relief consistent with the injunction." *Id.*, Prayer for Relief ¶¶ 1–2.

## II. LEGAL STANDARD

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Indeed, federal courts are "forbidden . . . from acting beyond our authority," *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008), and, therefore, have "an affirmative obligation 'to consider whether the constitutional and statutory authority exist for us to hear each dispute,'" *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 196 (D.C. Cir. 1992)).

Federal Rule of Civil Procedure 12(b)(1) is the proper vehicle for moving to dismiss a complaint due to lack of subject matter jurisdiction. Absent subject-matter jurisdiction over a case, the court must dismiss it, Fed. R. Civ. P. 12(h)(3); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006), and the burden of establishing any jurisdictional facts to support the exercise of the subject matter jurisdiction rests on the plaintiff, *see Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010); *Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007). A court "may consider materials outside the pleadings" in determining whether jurisdiction exists. *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *see also Belhas v. Ya'Alon*, 515 F.3d 1279, 1281 (D.C. Cir. 2008) (examining materials outside the pleadings in ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction).

With regard to standing, Article III of the Constitution restricts the power of federal courts to hear only "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "The doctrine of standing gives meaning to these constitutional limits by 'identify[ing] those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus*,

134 S. Ct. 2334, 2341 (2014) (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) ("'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997))). As the Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements." *Defs. of Wildlife*, 504 U.S. at 560. First, the plaintiff must have suffered an "injury in fact," *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations and internal quotation marks omitted). Second, there must be "a causal connection between the injury and the conduct complained of," *i.e.*, the injury alleged must be fairly traceable to the challenged action of the defendant. *Id.* Finally, it must be likely that the injury will be redressed by a favorable decision. *Id.* at 561. In analyzing whether a party has standing, the Court "must be 'careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiff[] would be successful in [its] claims.'" *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003)).

## III.  DISCUSSION

In considering the FEC's motion to dismiss the LNC's complaint for lack of standing, a recent case in this Court involving the same parties is instructive since, in that case, the LNC was found to have standing to challenge the predecessor provision to § 30116(a). *See LNC v. FEC ("LNC I")*, 930 F. Supp. 2d 154, 163 (D.D.C. 2013) (Wilkins, J.).[3] The *LNC I* Court explained that "[t]he LNC satisfies the core elements of Article III's case-or-controversy requirement,

---

[3]    FECA was transferred from Title 2 to Title 52 on September 1, 2014. Thus, *LNC I* refers to 2 U.S.C. § 441a(a)(1), which is currently codified at 52 U.S.C. § 30116(a)(1).

6

because it alleges an injury connected to the FEC's conduct—the prevention of obtaining immediate control of the entire . . . bequest—that would be redressed by a favorable decision." *Id.*

The FEC advances two arguments in an apparent effort to show why *LNC I*'s standing analysis does not apply here, but neither argument is persuasive.[4] First, relying on the 2014 amendment to § 30116, which established the segregated accounts scheme and therefore increased the total amount a person may donate to a political committee in a given year, the FEC asserts that the LNC's injury is self-inflicted because the LNC *could* accept the full bequest but has chosen not to. Second, and in the alternative, the FEC argues that even if not self-inflicted, the alleged injury, which the FEC construes as a competitive disadvantage vis-à-vis the two major political parties, is not a valid injury in fact under binding precedent, that actors in the political marketplace, not FECA, caused LNC's claimed competitive disadvantage, and that a favorable decision from this Court is not likely to redress the claimed injury. The FEC's arguments are addressed *seriatim*.

### A.     Self-Inflicted Injury

"[S]elf-inflicted harm doesn't satisfy the basic requirements for standing" since it is neither a "cognizable" injury nor "fairly traceable to the defendant's challenged conduct." *Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzalez*, 468 F.3d 826, 831 (D.C. Cir. 2006); *accord Afifi v. Lynch*, 101 F. Supp. 3d 90, 110 (D.D.C. 2015); *Ellis v. Comm'r of IRS*, 67 F. Supp. 3d 325, 336–37 (D.D.C. 2014), *aff'd sub nom. Ellis v. C.I.R.*, 622 Fed. App'x 2 (D.C. Cir. 2015). According to the FEC, the LNC has *chosen* not to accept the entire Shaber bequest even though it could and, consequently, any injury suffered by the LNC is self-inflicted and

---

[4]     Notably, while referencing *LNC I* for various propositions, the FEC fails to engage with *LNC I*'s most pertinent holding that the LNC had standing to challenge the contribution limits applicable to testamentary estates.

thereby insufficient to establish standing. Def.'s Mot. Dismiss at 10–14. As support, the FEC points out that § 30116(a) permits the LNC to accept immediately the entire balance of the bequest by funneling funds beyond the general spending account into the special-purpose segregated accounts. *See id.* at 11. Indeed, FECA allows a committee of a national party to accept, in addition to $33,400 for general spending, $100,200 for the party's presidential nominating convention, $100,200 for work on the party headquarters, and $100,200 for legal fees, which, when combined, far exceeds the balance in the escrow account. *See id.* ("FECA allows the LNC in 2016 to receive a total of $334,000 from any one donor."). Accordingly, the FEC contends that the alleged harm flows from the LNC's choice not to deposit the funds into segregated accounts.[5]

The FEC's argument papers over the nuance in the LNC's claims. The LNC does not argue that the amended statutory scheme allowing a party to accept a contribution as large as $334,000 prohibits the LNC from accepting the entire Shaber bequest in one lump sum. Rather, the LNC alleges that the harm is due to the restriction on the political committee's inability to accept the entire bequest for *general expressive purposes* when the bequest became available in 2015. *See* Compl. ¶¶ 18–19; Pl.'s Opp'n at 8 ("LNC's injury is that it cannot accept money—from Shaber's bequest *and from other donors*—for spending *as it wishes*.") (emphasis in

---

[5]   The FEC's reliance on *Sykes v. FEC*, 335 F. Supp. 2d 84, 87 (D.D.C. 2004), *see* Def.'s Mot. Dismiss at 10–11; Def.'s Reply at 7, is misplaced. According to the FEC, "[i]n the campaign finance context, any harm allegedly arising from a political actor's voluntary choice not to accept contributions that FECA allows it to accept is a self-inflicted injury that cannot support standing." Def.'s Mot. Dismiss at 10. In *Sykes*, the plaintiff, a Green Party candidate for Senate, challenged FECA's tacit authorization of out-of-state campaign contributions. *Sykes*, 335 F. Supp. 2d at 85. He argued that FECA's silence as to out-of-state contributions injured his opportunity to compete in the Senate race, *id.* at 88–89, even though he had not actually received any out-of-state contributions, *id.* at 87. This Court held, *inter alia*, that the plaintiff had not established an injury in fact and therefore lacked standing to sue because he had challenged FECA's "*failure to restrict* out-of-state contributions" as opposed to "[a] portion[] of FECA which *directly restricted* his own campaign activity." *Id.* at 89 (emphasis in original). Here, § 30116 "directly restrict[s]" the LNC's ability to accept the Shaber bequest. Accordingly, the discussion in *Sykes* about the standard for asserting an injury in fact does not support the FEC's position.

original). Thus, the fact that the LNC could accept the entire bequest by utilizing its segregated accounts does not eliminate the alleged harm. The precise harm alleged confers a sufficient injury in fact to sustain standing. *See Wagner v. FEC*, 717 F.3d 1007, 1010 n.1 (D.C. Cir. 2013) ("Our constitutional jurisdiction is clear. Because Appellants declare that they would make political contributions but for section 441c [52 U.S.C. § 30119's predecessor provision], they have Article III standing. Section 441c allegedly deprives them of a legally protected interest (making a political contribution) that an order of this court declaring section 441c unenforceable would remedy."); *Republican Party of La. v. FEC*, ___ F. Supp. 3d ___, No. 15-cv-1241, 2016 WL 6601420, at *4 (D.D.C. Nov. 7, 2016) (three-judge panel) ("The state party's inability to use corporate funds in its possession for additional [federal election activity] in which it would like to engage qualifies as a concrete injury.").

The FEC, however, advances an additional theory as to why the LNC's injury is self-inflicted. *See* Def.'s Mot. Dismiss at 12. The FEC suggests that "LNC's public disclosure reports show that it actually spends significant amounts on expenses for which Segregated Account funds may be used" and, therefore, the LNC "could have spent the entire bequest during this election cycle had it chosen to do so." *Id*. According to the FEC, "the LNC spent in excess of $940,000 on its Alexandria building headquarters" during the 2014 election cycle, *id*., and spent $120,000 on its 2014 national convention, *id*. at 12–13. At the time the FEC moved to dismiss this case, "the LNC has spent approximately $63,000 on its headquarters" during the 2016 election cycle. *Id*. at 13; *see also* Def.'s Notice Supplemental Jurisdictional Facts at 2, ECF No. 18 ("Since the parties completed briefing, the LNC has filed public disclosure reports with the FEC confirming that it has in fact spent at least as much money on segregated account purposes in 2016 as it would have received from the bequest."). Based on these spending sums,

the FEC posits that "[i]f the LNC were to accept the remaining $168,775.20 of the Shaber bequest into its Segregated Accounts and spend it on its convention, building, or legal expenses, that same amount from the LNC's General Account would become available for other purposes—including advocacy and elections." *Id.* at 13–14. The FEC thus contends that the LNC's alleged injury "is not an injury in fact but a mere 'self-inflicted budgetary choice.'" *Id.* at 14 (quoting *Envtl. Integrity Project v. McCarthy*, 13-cv-1306, 2015 WL 5730427, at *8 (D.D.C. Sept. 29, 2015)).

The FEC's argument has some surface-level appeal, but does not stand up to scrutiny. The LNC's precise injury is that it was not permitted to accept the Shaber bequest in full, when it became available, to spend on federal election activities. *See* Compl. ¶ 18 ("LNC would accept and spend the entire amount of the Shaber bequest for its general expressive purposes, including expression in aid of its federal election efforts."). Since the bequest became available in 2015, the LNC's 2014 and 2016 expenditures are of no moment.[6] Likewise, as the LNC points out, "FECA's limits apply per annum," Pl.'s Opp'n at 13, so the LNC's total spending in a given election cycle is a red herring. What matters is that in 2015, LNC spent no money on a presidential nominating convention, $72,827.11 on its headquarters, and $7,260.61 on legal proceedings, totaling $80,872.72 in segregated purpose spending. Decl. of Robert Kraus, Operations Director, Libertarian National Committee, Inc. ¶¶ 5–7, ECF No. 13. On these undisputed attestations, if the LNC had accepted the entire bequest when it became available by

---

[6] The LNC contends that even if the entire bequest has been accepted into segregated accounts, it still would not have freed up the same amount of money for expressive purposes. *See* Pl.'s Resp. Notice of Supplemental Jurisdictional Facts at 2, ECF No. 19 ("Worse still, the FEC's math doesn't add up."). The Court need not resolve this factual dispute given that the LNC's 2016 expenditures are irrelevant for standing purposes. The Court also need not address the LNC's argument that "the FEC bars political parties from making strategic withdrawals from testamentary bequest trusts," Pl.'s Opp'n at 9, and thus would not permit the LNC to accept the bequest into segregated accounts in order to free up funds in the general account for other purposes. Even if the FEC did prohibit this, the dispositive and undisputed allegation here is that the LNC did not spend an amount equivalent to the remaining bequest funds on segregated account purposes in 2015.

10

taking $33,400 of the bequest into its general account and the remainder (approximately $168,000, *see* Def.'s Mot. Dismiss at 7; Pl.'s Opp'n at 20) into segregated purpose accounts, the LNC would have accepted more into its segregated purpose accounts than it spent on its building, presidential nominating convention, and legal expenses in 2015. Due to this overage, accepting the entire bequest would not have freed up the full value of the Shaber bequest for engaging in federal election activities and resulted in the alleged injury in 2015. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). The FEC's argument that the LNC's injury was self-inflicted thus fails.

### B.   Competitive Disadvantage

The FEC argues that "[e]ven if the LNC's choice to forego [sic] immediate acceptance of the Shaber bequest is not to blame for its claimed competitive injury, that alleged injury cannot support the LNC's standing for three independent reasons." Def.'s Mot. Dismiss at 15. First, under *Buckley v. Valeo*, 424 U.S. 1, 48 (1976) and *McConnell v. FEC*, 540 U.S. 93, 227 (2003), "LNC's claim that it is competitively disadvantaged and so must use the Shaber bequest to achieve electoral success fails to allege a valid injury in fact." *See* Def.'s Mot. Dismiss at 15. Second, the LNC's alleged competitive disadvantage is not caused by FECA but by decisions of private actors in the political marketplace. *Id.* at 15–17. Finally, a favorable decision by this Court would not remedy the alleged injury but instead would exacerbate the injury by giving the major parties access to more money. *Id.* at 17–19.

These arguments are predicated on the FEC's characterization of the LNC's alleged injury as stemming from a "competitive disadvantage . . . against its major party rivals." *Id.* at 2. In suggesting that the LNC's alleged injury is a competitive disadvantage, the FEC cherry-picks

11

certain phrases from the LNC's complaint referencing the party's interest in competing with other parties. *See* Def.'s Mot. Dismiss at 8 (citing Compl. ¶¶ 12–14, 26). The Complaint does allege that, "[u]nlike its two major competitors, the Libertarian Party's national committee is forced to spend the bulk of its resources securing access to the ballot, leaving comparatively little for actual campaigning—an expensive activity in and of itself." Compl. ¶ 12; *see also id.* ¶ 13 ("[T]he LNC has comparatively less use for funds intended to support national conventions, a headquarters building, or attorney fees."). Further, the Complaint alleges that "[i]n the absence of the Party Limit's application to the Shaber bequest, the LNC would substantially improve its ability to advocate and achieve electoral success by taking immediate control over the balance of the Shaber funds." *Id.* ¶ 26.

The Court agrees with the LNC that "the Commission does not afford the Complaint a fair reading." Pl.'s Opp'n at 18; *see also id.* at 19 ("The Libertarian Party certainly does *not* argue that the First Amendment requires a level electoral playing field, free of the advantages that speakers may have owing to their resources." (emphasis in original)). The phrases the FEC relies on are included in the Complaint to explain why the LNC sought to accept the entire bequest into its general purpose account when the bequest became available and why accepting the bequest into the segregated accounts was not an adequate substitute. *See id.* at 19. As noted above, the LNC clearly articulates the injury suffered to be the inability to accept the entire Shaber bequest, when it became available in 2015 to engage in election activities, including various forms of expressive conduct. *See* Compl. ¶¶ 14, 18–19. Accordingly, the FEC's arguments that the LNC's alleged injury is not cognizable, not caused by the FEC, and not redressable are premised on a mischaracterization of the alleged injury and therefore fail.[7]

---

[7] The LNC suggests that the FEC's arguments sound more in mootness than standing and then proceeds to argue that the claims asserted here fall within the "capable of repetition, yet evading review" exception to mootness.

## IV. CONCLUSION

The LNC has standing to challenge FECA provisions that restricted immediate access to the full amount of a bequest for expressive activities. That the LNC could accept the entire bequest by depositing the funds into segregated accounts does not alter this analysis because the LNC alleges that it wishes to use the funds for expressive activities. Accordingly, the FEC's motion to dismiss is denied. The parties shall submit jointly, within twenty days, a schedule to govern further proceedings in this matter.

Date: January 3, 2017

_____
BERYL A. HOWELL
Chief Judge

---

*See id.* at 14–18 (citing *Honeywell Int'l v. NRC*, 628 F.3d 568, 576 (D.C. Cir. 2010)). The FEC argues in reply that "[b]ecause the LNC lacks standing, its assertion that its claims are capable of repetition yet evading review is beside the point." Def.'s Reply at 9 n.4. Mootness has been an issue in past litigation between these two parties concerning FECA's contribution limits. *See generally LNC v. FEC*, No. 13-5088, Order (D.C. Cir. Mar. 26, 2014), ECF No. 1485531 (en banc) (unpublished). In the earlier case, however, the LNC had accepted or was able to accept the entire bequest—into its general account—by the time the case reached the D.C. Circuit. *See* FEC's Suggestion of Mootness at 1, *LNC I*, No. 13-5088 (D.C. Cir. Feb. 3, 2014) ("As of January 1, 2014, however, the LNC has either already received, or can immediately accept the entire bequest."). Here, thousands of dollars remain in escrow, waiting to be distributed into the LNC's general account. Accordingly, the LNC's claims are not moot, *see Judicial Watch, Inc. v. Kerry*, No. 16-5015, 2016 WL 7439010, at *2 (D.C. Cir. Dec. 27, 2016) (reversing the district court's dismissal on mootness grounds because the plaintiff "ha[d] not 'been given everything [they] asked for'" (quoting *Noble v. Sombrotto*, 525 F.3d 1230, 1241 (D.C. Cir. 2008))), and the Court need not address the LNC's arguments concerning the capable of repetition yet evading review exception to mootness.