IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                         )
LIBERTARIAN NATIONAL                     )
COMMITTEE, INC.,                         )     Case No. 1:16-CV-0121-BAH
                                         )
          Plaintiff,                     )
                                         )
     v.                                  )
                                         )
FEDERAL ELECTION COMMISSION,             )
                                         )
          Defendant.                     )
_____  )

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION TO CERTIFY FACTS AND QUESTIONS

Plaintiff Libertarian National Committee, Inc., respectfully submits its Memorandum of

Points and Authorities in Support of its Motion to Certify Facts and Questions to the Court of

Appeals.

Dated: September 5, 2017          Respectfully submitted,

                                  Alan Gura (D.C. Bar No. 453449)
                                  Gura PLLC
                                  916 Prince Street, Suite 107
                                  Alexandria, VA 22314
                                  703.835.9085/Fax 703.997.7665


                            By: /s/ Alan Gura_____
                                Alan Gura

TABLE OF CONTENTS

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    I.      LNC Has Standing to Asserts Its Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    II.     The Certification Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    III.    Applying Contribution Limits to Shaber's Bequest Violates LNC's
          First Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    IV.    The Cromnibus Contribution Limit Regime, Owing to Its Expressive
          Purpose Restrictions, Violates the LNC's First Amendment Rights. . . . . . . . . . . . . 15

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

TABLE OF AUTHORITIES

Cases

*Ariz. Free Enter. Club's Freedom Club PAC* v. *Bennett*,
    564 U.S. 721 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Brown* v. *Entm't Merchs. Ass'n*,
    564 U.S. 786 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Buckley* v. *Valeo*,
    424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

*Buckley* v. *Valeo*,
    519 F.2d 817 (D.C. Cir. 1975) (en banc) (per curiam). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Catholic Leadership Coalition of Tex.* v. *Reisman*,
    764 F.3d 409 (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Dean* v. *Blumenthal*,
    577 F.3d 60 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Farris* v. *Seabrook*,
    677 F.3d 858 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Goosby* v. *Osser*,
    409 U.S. 512 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hodel* v. *Irving*,
    481 U.S. 704 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Holmes* v. *FEC*,
    823 F.3d 69 (D.C. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Independence Inst.* v. *FEC*,
    816 F.3d 113 (D.C. Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Libertarian Nat'l Comm., Inc.* v. *FEC*,
    930 F. Supp. 2d 154 (D.D.C. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12-14

*Libertarian Nat'l Comm., Inc.* v. *FEC*,
    950 F. Supp. 2d 58 (D.D.C. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12

*Libertarian Nat'l Comm., Inc.* v. *FEC*,
    No. 13-5088 (D.C. Cir. Mar. 26, 2014) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Long Beach Area Chamber of Commerce* v. *City of Long Beach*,
    603 F.3d 684 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*McConnell* v. *FEC*,
    540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*McCutcheon* v. *FEC*,
    134 S. Ct. 1434 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

Order, *Libertarian Nat'l Comm., Inc.* v. *FEC*,
    No. 13-5094 (D.C. Cir. Feb. 7, 2014) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Police Dep't of Chicago* v. *Mosley*,
    408 U.S. 92 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Reed* v. *Town of Gilbert*,
    135 S. Ct. 2218 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Republican Nat'l Comm.* v. *FEC*,
    698 F. Supp. 2d 150 (D.D.C. 2010) (three-judge panel) . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Republican Party of La.* v. *FEC*,
    219 F. Supp. 3d 86 (D.D.C. 2016) (three-judge panel) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Richmond Newspapers* v. *Virginia*,
    448 U.S. 555 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Shapiro* v. *McManus*,
    136 S. Ct. 450 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Speechnow.org* v. *FEC*,
    599 F.3d 686 (D.C. Cir. 2010) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-15

*Texans for Free Enter.* v. *Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States* v. *Marcavage*,
    609 F.3d 264 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States* v. *Stevens*,
    559 U.S. 460 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Virginia*,
    518 U.S. 515 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Washington State Grange* v. *Washington State Republican Party*,
  552 U.S. 442 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Wis. Right to Life State PAC* v. *Barland*,
  664 F.3d 139 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Constitutional Provisions

U.S. Const. amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Statutes

28 U.S.C. § 1915(e)(2)(B)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

52 U.S.C. § 30110 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

52 U.S.C. § 30116(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 17, 18, 21

52 U.S.C. § 30125. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21

Other Authorities

David Horton, *Testation and Speech*, 101 Geo. L. J. 61 (2012). . . . . . . . . . . . . . . . . . . . . . . 14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION TO CERTIFY FACTS AND QUESTIONS

PRELIMINARY STATEMENT

This case presents two First Amendment issues of first impression. May federal political

contribution limits apply to a testamentary bequest in the absence of any evidence of corruption?

And may Congress regulate the content of a political party's expression under the guise of

combating corruption?

This Court recently certified a question raising the as-applied testamentary bequest issue to

the en banc D.C. Circuit, only to have the question mooted (through no fault of the plaintiff). As this

sort of dispute is perennial, the time has come to certify another such question. The expressive

restriction issue, however, is new. It arises from the 2014 "cromnibus" amendment to the Federal

Election Campaign Act ("FECA") that greatly expanded the contribution limits to political parties

(a feature not here at issue) while imposing novel restrictions on the expressive purposes for which a

political party may solicit and expend donations.

The key facts are not expected to be contested. Respectfully, they should be determined, and

the case certified for the D.C. Circuit's consideration.

* * *

Ten years ago, the Libertarian National Committee ("LNC") received two surprises—one

good, the other less so. Raymond Groves Burrington, a Tennessee gentleman practically unknown to

the party (he had long-ago donated $25), had died and left it a much-needed $217,734 in his last

will and testament. That was the good surprise.

Alas, the party then learned that the Federal Election Commission would not allow it to take

immediate hold of Burrington's entire gift. The party had done nothing for Burrington, beyond

earning his loyalty through the ordinary pursuit of its political mission, and it could do no more for

Burrington, owing to his passing. And yet the FEC, ever-concerned with the prospect that the

Libertarian Party would exchange access to its federal officeholders for a promise to donate money

at some indeterminate future point, imposed the Federal Election Campaign Act's ("FECA") annual

contribution limit to Burrington's gift. The money was placed in an escrow account that the party

was barred from managing (the FEC forbids any form of control over money that cannot be

accepted), from which the party could withdraw only the maximum contribution limit each year

until it was exhausted.

      LNC sued. This Court rejected certification of a First Amendment challenge to FECA's

application against testamentary bequests as a categorical matter, but certified an as-applied

challenge with respect to Burrington's bequest, given the complete absence of any evidence of a quid

pro quo arrangement. *Libertarian Nat'l Comm., Inc.* v. *FEC*, 930 F. Supp. 2d 154 (D.D.C. 2013),

*reconsideration denied*, 950 F. Supp. 2d 58 (D.D.C. 2013) ("*LNC I*"). The D.C. Circuit

summarily affirmed the dismissal of the party's categorical challenge. Order, *Libertarian Nat'l*

*Comm., Inc.* v. *FEC*, No. 13-5094 (D.C. Cir. Feb. 7, 2014) (per curiam). And before the Court

could hear the certified as-applied question, the bequest escrow account paid out its last dollar,

leading the D.C. Circuit to dismiss the question as moot. Order*, Libertarian Nat'l Comm., Inc.* v.

*FEC*, No. 13-5088 (D.C. Cir. Mar. 26, 2014) (en banc) (per curiam).

      As promised then, the party did not need to wait long for a similar dispute to arise. On

August 23, 2014, another Libertarian donor virtually unknown to the party, Joseph Shaber, passed

away, leaving the party $235,575.20.

      But history repeats itself with a twist. In the time between Shaber's passing and the final

settlement of his estate, with the government hours away from running out of money and Congress

deadlocked over a new budget, there emerged a new form of must-pass stopgap funding legislation: the "cromnibus," part continuing resolution, part omnibus budget bill—loaded with nuggets the normal examination of which was politically unworthy of a government shutdown. On pages 1,599-1,602 of this 1,603-page cromnibus there appeared for the first time anywhere a 900% (!) expansion of FECA's contribution limits to political parties, but with new content-based limits on the parties' expression, coincidentally tailored to the special needs of the incumbent parties.

No less remarkable was the FEC's initial response to LNC's complaint about this arrangement: an argument that the LNC was not truly injured because it could have circumvented the law, using segregated purpose accounts to free-up fungible unrestricted money. That motion to dismiss, correctly denied in part because the LNC did not have sufficiently high segregated purpose expenses to evade the limits, admits the cromnibus scheme's fundamental irrationality as a corruption-fighting measure. And the standard of review here is much higher than rational basis. Discovery and factual development have since cemented the cromnibus scheme's constitutional defects. It would fail any standard of review, and it is substantially overbroad.

Accordingly, LNC respectfully asks this Court to certify three questions to the en banc D.C. Circuit:

1. Does imposing annual contribution limits against the bequest of Joseph Shaber violate the First Amendment rights of the Libertarian National Committee?

2. Do 52 U.S.C. §§ 30116(a)(1)(B) and 30125, on their face, violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend its money?

3. Does restricting the purposes for which the Libertarian National Committee may spend the bequest of Joseph Shaber violate the Committee's First Amendment rights?

3

STATEMENT OF FACTS

A full recitation of the LNC's proposed facts for certification, Exhibit A, and of the evidence cited for each proposed facts, is not required for purposes of deciding this motion. A short summary of selected facts, however, is useful.

Federal law restricts the annual contributions that individuals may give the LNC, the national committee operating the Libertarian Party. A base contribution limit of $33,900 per year to each national party committee currently applies, but individuals may also contribute triple that amount to be dedicated for each of three separate purposes: a party's headquarters building, presidential nominating conventions, and election contests and other legal proceedings. Exh. A, Proposed Facts ("PF") 1-11. Accordingly, the total annual contribution that an individual may provide the LNC is currently $339,000. PF 10. The FEC applies these regulations to testamentary bequests. PF 19-20.

The different segregated purposes have different expressive functions and values. A presidential convention would focus on a presidential race; an election contest pertains to the outcome of a particular race; and a party headquarters building assists the party's expressive mission in a generalized way, while also displaying signs and imparting an architectural statement. PF 12-17. Potential donors may forego contributions to a committee, or reduce the amount of their contribution, if the uses of their contributions are restricted. PF 18.

The expressive purpose restrictions were enacted as part of a last-minute "cromnibus" budget package. Congress made no fact-finding related to these restrictions, and the legislative record is silent as to how they might relate to any anti-corruption interests. The segregated convention purpose provision was intended to offset Congress's earlier decision to terminate public funding for presidential nominating conventions. PF 21-29.

4

There does not exist any documentary evidence comparing the corrupting potential of restricted, segregated expressive purpose contributions with the corrupting potential of unrestricted, general purpose contributions. PF 26.

The FEC rejects the premise that a contribution of any particular dollar value is "corrupting" but that lower values are not "corrupting." PF 30. Larger contributions to political parties are generally more likely to lead to actual or apparent quid pro quo arrangements and can do so regardless of how the funds are ultimately used. PF 31. All contributions to political parties can create the risk of corruption or its appearance regardless of the way that money is ultimately spent. PF 32. The FEC takes the position that "Congress *could have* permissibly concluded" that unrestricted donations to a political party warrant greater limitations than restricted donations, PF 33, but admits that parties may value restricted, higher contributions more than unrestricted, lower contributions, PF 38-40. The FEC has declined to "describe," in a factual sense, "how the separate, segregated accounts provided for in 52 U.S.C. § 30116(a)(9) are consistent with the purposes of the Federal Election Campaign Act. PF 34. The FEC does not know Congress's reasons for enacting this scheme. PF 35.

Because money is fungible, donations received for a segregated purpose potentially free up other money that would have been spent out of a party's general account, to be used for unrestricted purposes. PF 36, 37. So long as a party would have spent a sufficient amount on a segregated purpose, a segregated purpose donation is effectively an unrestricted donation. PF 41. A particular within-limit contribution to a committee's segregated purpose account could appear as corrupt as or more corrupt than a lower contribution to that committee's general account that exceeds the general account limit. PF 42. It is also possible that a particular contribution below the general account limit may have an appearance of corruption that exceeds that of a higher contribution to a segregated

account. PF 43. The RNC and DNC have accepted many millions of dollars into their cromnibus segregated purpose accounts, thereby liberating equivalent millions of funds that would have otherwise been spent on those purposes, for other, unrestricted purposes. PF 44-50.

The LNC's spending needs and priorities differ markedly from those of its two larger competitors. The LNC's spending on ballot access, for example, is a pressing need, while the LNC uses comparatively little money on presidential nominating conventions, a headquarters building, and election contests. PF 52-68.

Unbeknown to the LNC, it was made a beneficiary of the Joseph Shaber Revocable Living Trust U/T/D February 11, 2010. When Shaber passed away over four years later, rendering the trust irrevocable, the LNC became the beneficiary of a bequest totaling $235,575.20 which it was to have "outright." There is no evidence that Shaber attempted to time his bequest, and the size of his gift to the LNC was itself contingent on various factors, such as the fluctuation in the value of Shaber's property and whether he would have grandchildren at the time of his death. There is no evidence of any quid pro quo relationship relating to Shaber's bequest to the LNC. When the bequest became available to the LNC in 2015, it needed and desired the entirety of the bequest for general unrestricted purposes. To that end, the LNC accepted what it could without restriction, and placed the rest in an escrow account from which to withdraw the maximum unrestricted amount each year. The LNC also removed Shaber from its membership rolls, as the LNC cannot associate with the deceased. PF 69-91.

The LNC has identified large donors who have already given the maximum base contribution this year for unrestricted purposes, and who stand ready to donate more money this year and in future years, but refrain from doing so owing to the cromnibus expressive purpose restrictions. One of these donors is also preparing to leave the LNC a sizeable bequest that would be

subject to the cromnibus expressive purpose restrictions. Another donor refrains from leaving the LNC a large bequest because of the cromnibus restrictions. PF 92-122. And during the pendency of this litigation, the LNC has become the beneficiary of another unexpected testamentary bequest in an amount exceeding the base contribution limit, but within the total contribution limit. PF 123-131.

The Libertarian Party's ability to influence elections is in some measure related to its ability to raise and expend money. The LNC needs, and would prefer, to spend its funds in order to directly speak to the electorate about its ideology and political mission, to support its candidates, and to build its institutional capability, including its ability to regularly qualify for the ballot in various states. PF 132. But for the segregated purpose restrictions of 52 U.S.C. § 30116(a), the LNC would solicit and receive donations in amounts exceeding the base annual contribution limit (currently $33,900) but within the total annual contribution limit (currently $339,000), and use those donations for LNC's general expressive purposes, apart from expenses related to its headquarters building, legal proceedings, and presidential nominating conventions. LNC refrains from this activity only because it is illegal, and neither the LNC nor anyone who works for it would risk criminal process and sanctions for what would be a futile act. PF 134.

The LNC would utilize donations exceeding the base annual contribution limit (currently $33,900) to express itself to the full limits of the First Amendment in the LNC's best judgment. This expression would include maintaining and improving the party's access to the ballot, promoting awareness of the party and its ideology, and supporting its candidates for state and federal office. PF 135. Among the donations that the LNC would solicit and accept in excess of the base annual contribution limit (currently $33,900) would be donations from donors who have already given the base annual contribution limit but stand ready to give more for unrestricted purposes if it were legal to do so, including the donors and testamentary bequests identified in this litigation. PF 136.

The LNC is confident that it could identify and develop additional donors who would give beyond the base annual contribution limit (currently $33,900), but refrain from doing so because it is illegal to give larger amounts without restriction and they do not perceive sufficient value in donations that carry the government's purpose restrictions. The LNC would also be better able to attract larger testamentary bequests if the donors would know that a larger portion of their bequest would be immediately effective. PF 137. The ability to solicit and receive donations up to the current total contribution limit ($339,000), for use without restriction, would significantly advance the LNC's expressive and political missions. PF 138.

SUMMARY OF ARGUMENT

The courts have jurisdiction to resolve all of the LNC claims in this litigation, all of which easily pass the very low bar for certifying FECA disputes.

With respect to whether contribution limits can apply to the Shaber bequest, the fact that this Court previously certified a virtually identical dispute suffices to show that the dispute is not one that can be dismissed out-of-hand as frivolous. The LNC has a right to accept Shaber's bequest, and the government bears the burden of showing that its contribution limits make constitutional sense under these particular circumstances.

The challenges relating to the cromnibus expressive purpose restrictions are thornier still. The parties can reasonably be expected to dispute whether the law functions as a contribution limit, or an expenditure limit. It is readily apparent that FECA now establishes, post-cromnibus, a content-based restriction on the speech of political parties. It is exceedingly difficult to see how these restrictions would survive the strict scrutiny to which they are subject.

But the restrictions would also fail the heightened "closely drawn" standards reserved for contribution limits, given their pervasive irrationality and lack of evidence supporting their logical

relationship to valid anti-corruption interests. Indeed, the cromnibus restrictions are also overbroad in the sense that they sweep far too broadly, targeting virtually all third-party contributions that would exceed the base limit but still fall within the total contribution limit, without any evidence of anti-corruption concerns.

ARGUMENT

## I.   LNC HAS STANDING TO ASSERT ITS CLAIMS.

As this Court already determined, the LNC has standing to challenge FECA's application to Shaber's bequest because the law barred the LNC from using the entirety of that bequest, as it wished to do, for unrestricted expressive purposes. Opinion, Dkt. 21. FEC maintains that the Court lacks jurisdiction, Answer, Dkt. 22, at ¶ 3 and affirmative defense 1, but the fact remains that nothing the LNC could have done in 2015 would have allowed it to use $235,575.20 that year, without restriction, as a consequence of Shaber's bequest. Indeed, even had the LNC wanted to use the maximum $100,200 allowed in 2015 for the segregated building account to pay down its headquarter's mortgage principal, accounting for the $33,400 allowed for unrestricted uses that year and withdrawing the LNC's 2015 expenses for a presidential nominating convention and legal proceedings would not have approached the totality of Shaber's bequest.[1]

Of course, LNC's claims are not limited to Shaber's bequest. *See* Complaint, ¶¶ 14, 31, Prayer for Relief ¶ 1, 4; Opinion, Dkt. 21, at 4. "LNC's injury is that it cannot accept money—

---

[1]On this score, LNC wishes to correct the record. LNC sometimes incurs small prepaid expenses related to a presidential nominating convention in the year preceding the convention. Sarwark Decl., ¶ 34. In declaring that LNC "spent no money" in 2015 on a presidential nominating convention, LNC's Operations Director, Robert Kraus, inadvertently overlooked an accounting entry reflecting a December 17, 2015 payment in the amount of $340.50 for the purpose of a 2016 convention website. The total amount LNC spent on a presidential nominating convention in 2015 is thus $340.50. Mr. Kraus, and LNC, apologize for the oversight. Kraus Decl., ¶ 2. This oversight, while regrettable, is not material.

9

from Shaber's bequest *and from other donors*—for spending *as it wishes*." *Id.* (quoting Pl.'s Opp'n, Dkt. 12, at 8) (emphasis in original). LNC's injury related to other donors is not speculative. LNC has identified two donors (Rufer and Chastain) who have already given the LNC the base contribution limit this year and who stand ready to donate additional money to LNC for its general expressive purposes, but cannot do so owing to the challenged provisions. They would also exceed the base contribution limit for general expressive purposes in future years.

LNC stands ready to solicit and accept these currently illegal contributions, and it is confident that it could successfully solicit general purpose donations in excess of the base contribution limit from others. Chastain is also in the process of remembering the LNC in his will in an amount exceeding the base contribution limits. A third donor (Redpath) refrains from remembering the LNC in his will because of the cromnibus expressive purpose restrictions. And while this litigation has been pending, another LNC contributor (Clinard) passed away, leaving it an unrestricted bequest exceeding the base contribution limit and thus replicating the Shaber (and Burrington) scenario. And surely the FEC would not deny that FECA has a real impact in limiting contributions that would otherwise be made. Thus, even if the Shaber dispute were to become moot prior to the D.C. Circuit's resolution of the case, the LNC's facial challenge would survive.

The D.C. Circuit has jurisdiction to resolve all aspects of LNC's claims.

II.     THE CERTIFICATION STANDARDS.

The Federal Election Campaign Act provides that

the national committee of any political party . . . may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.

52 U.S.C. § 30110. Accordingly, this Court should (1) identify the constitutional issues raised by

10

the complaint; (2) take evidence; (3) make factual findings; and (4) certify constitutional questions

to the D.C. Circuit. *Buckley* v. *Valeo*, 519 F.2d 817, 818 (D.C. Cir. 1975) (en banc) (per curiam).

The bar to certification is "low." *Holmes* v. *FEC*, 823 F.3d 69, 71 (D.C. Cir. 2016)

(quoting *Shapiro* v. *McManus*, 136 S. Ct. 450, 456 (2015)). While "district courts do not certify

'frivolous' constitutional questions to the en banc court of appeals," *id.* at 71 (citation omitted), "the

*Shapiro* Court stressed [that] the exception for insubstantial claims is narrow." *Independence Inst.*

v. *FEC*, 816 F.3d 113,116 (D.C. Cir. 2016). Certification should be denied "only when the case is

'essentially fictitious, wholly insubstantial, obviously frivolous, and obviously without merit.'" *Id.*

(quoting *Shapiro*, 136 S. Ct. at 456); *Goosby* v. *Osser*, 409 U.S. 512, 518 (1973). The D.C.

Circuit has "analogized the district court's role under § 30110 to that of a district court in

dismissing *in forma pauperis* claims that are 'frivolous or malicious' within the meaning of 28

U.S.C. § 1915(e)(2)(B)(i)." *Holmes*, 823 F.3d at 72 n.4 (citation omitted).

LNC's claims easily pass this low bar.

III.   APPLYING CONTRIBUTION LIMITS TO SHABER'S BEQUEST VIOLATES LNC'S
       FIRST AMENDMENT RIGHTS.

The LNC continues to believe that it is unconstitutional to apply any campaign contribution

limits to testamentary bequests. But that issue is not before the Court. The LNC unfortunately lost

that battle in the previous litigation, and there is no shortage of other, as-yet unadjudicated

constitutional defects to challenge.

The FEC's issue preclusion defense, Answer, Dkt. 22, at 6, is unavailing. "An as-applied

attack . . . does not contend that a law is unconstitutional as written but that its application to a

*particular person* under *particular circumstances* deprived *that person* of a constitutional right."

*United States* v. *Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citations omitted) (emphases

11

added). And as Judge Wilkins also found, the statutory command "to immediately . . . certify *all* questions of the constitutionality of this Act" includes the certification of as-applied challenges concerning particular donations. *Libertarian Nat'l Comm., Inc.* v. *FEC*, 950 F. Supp. 2d 58, 60 (D.D.C. 2013) (internal quotation marks omitted). At *LNC I*'s conclusion, Mr. Shaber still had months to live, and the LNC had no idea that it would become the beneficiary of his trust. If anything, the previous litigation's result—the certification of an as-applied question relating to a particular bequest (even if that question became moot)—supports certification of another as-applied question related to a different bequest.

Starting from where Judge Wilkins left off, assuming that it is generally constitutional to apply campaign contribution limits to testamentary bequests, would it still be constitutional to apply such limits to a particular bequest for which there is no evidence of quid pro quo corruption? That at least one federal judge believed the question is worthy of certification to the en banc D.C. Circuit, shortly before his own ascension to that court, strongly suggests that the question is not "essentially fictitious, wholly insubstantial, obviously frivolous, and obviously without merit." *Shapiro*, 136 S. Ct. at 456 (quotation omitted); *Independence Inst.*, 816 F.3d 113 at116.

While Judge Wilkins rejected the claim that FECA implicated Mr. Burrington's First Amendment rights to have his testamentary bequest effectuated, he found it a meaningful question as to whether the LNC had a First Amendment right to *receive* Burrington's bequest. *LNC I*, 930 F. Supp. 2d at 170-71. This Court noted that in *Dean* v. *Blumenthal*, 577 F.3d 60 (2d Cir. 2009), the Second Circuit vacated a district court opinion rejecting the existence of such a right. For qualified immunity purposes in that matter, it was enough that the right had not been clearly established, but *Dean* was careful to leave the door open. "The Second Circuit in *Dean* did not view as frivolous the

argument that there is a First Amendment right to receive campaign contributions. Neither should this Court." *LNC I*, 930 F. Supp. 2d at 170-71.

Time has only bolstered this reasoning. In *McCutcheon* v. *FEC*, 134 S. Ct. 1434 (2015), for example, the RNC prevailed alongside its donor, Sean McCutcheon, on the argument that it had a First Amendment right "to receive the contributions that McCutcheon and similarly situated individuals would like to make . . . ." *Id.* at 1443. Indeed, *LNC I* might well have relied on *Speechnow.org* v. *FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc) on this point, where the first certified question asked "[w]hether the contribution limits . . . violate the First Amendment by preventing David Keating, SpeechNow.org's president and treasurer, from accepting contributions to SpeechNow.org in excess of the limits . . . ." *Id.* at 690. The D.C. Circuit answered that the contribution limits there at issue indeed "violate[d] the First Amendment . . . by prohibiting SpeechNow from accepting donations in excess of the limits." *Id.* at 696.

The D.C. Circuit is not alone in upholding First Amendment rights to accept political contributions. "[B]oth the contributing and the contributed-to party have sufficient injuries-in-fact to challenge campaign finance restrictions." *Catholic Leadership Coalition of Tex.* v. *Reisman*, 764 F.3d 409, 423 (5th Cir. 2014) (citations omitted); *Texans for Free Enter.* v. *Tex. Ethics Comm'n*, 732 F.3d 535, 537 (5th Cir. 2013) (substantial likelihood of success on claim that law "violates [political committee's] right to free speech by prohibiting it from accepting funds from corporations"); *see also Wis. Right to Life State PAC* v. *Barland*, 664 F.3d 139, 154 (7th Cir. 2011); *Long Beach Area Chamber of Commerce* v. *City of Long Beach*, 603 F.3d 684, 698-99 (9th Cir. 2010), *abrogated in part on other grounds*, *Farris* v. *Seabrook*, 677 F.3d 858, 865 n.6 (9th Cir. 2012).

That the First Amendment protects an antecedent, corollary right to receive money enabling political speech should not be controversial. "[C]ertain unarticulated rights are implicit in enumerated guarantees . . . fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers* v. *Virginia*, 448 U.S. 555, 579-80 (1980) (First Amendment rights of speech and press to access criminal trials). The Supreme Court long ago implied a First Amendment speech right to receive campaign contributions, by confirming that such contributions are a necessary prerequisite for engaging in political advocacy. "[V]irtually every means of communicating ideas in today's [1976] mass society requires the expenditure of money." *Buckley* v. *Valeo*, 424 U.S. 1, 19 (1976) (per curiam). Surely a law barring the receipt of a printing press, broadcasting equipment, or internet server would be viewed as implicating speech rights, even if the physical receipt of such equipment is not, in and of itself, expressive.

None of this is to suggest that LNC would lack standing to assert the expressive aspects of Shaber's bequest. "For obvious reasons, it has long been recognized that the surviving claims of a decedent must be pursued by a third party." *Hodel* v. *Irving*, 481 U.S. 704, 711 (1987). LNC would respectfully disagree with *LNC I* 's determination, 930 F. Supp. 2d at 169-70, that testamentary bequests lack First Amendment protection. *See, e.g.*, David Horton, *Testation and Speech*, 101 Geo. L. J. 61 (2012). But *LNC I*'s point about the deceased's lack of rights is well-taken in this respect: "in the literal sense, the FECA restriction (as enforced by the FEC) on the Burrington bequest is not a 'contribution limit involving significant interference with associational rights [that] must be closely drawn to serve a sufficiently important interest.'" *LNC I*, 930 F. Supp. 2d at 169 (quoting *Speechnow.org*, 599 F.3d at 692). Shaber, too, is not currently "associating"

14

with the LNC. The case concerns, directly, LNC's speech rights with respect to the Shaber bequest, triggering a higher standard of review.

That there exists a First Amendment right to receive contributions for the purpose of engaging in political speech is a question found to be open in *LNC I* and in the Second Circuit, but it appears resolved in the LNC's favor by *Speechnow* and a growing number of other circuits' precedent, to say nothing of *McCutcheon*'s example. The question would then be whether the FEC could meet its burden in applying the contribution limitations as against this bequest, given the complete lack of evidence of any quid pro quo corruption attending Shaber's bequest. The LNC solicited money from Shaber, but not in any unusual manner. Its return on those efforts during Shaber's lifetime was much appreciated, but unspectacular. There is no evidence that Shaber knew when he was going to die and timed his highly-contingent gift (largely, a share of property itself contingent on the prospect of grandchildren) as part of some quid pro quo arrangement. The FEC undertook some discovery seeking proof of a corrupt relationship, and turned up nothing.

The D.C. Circuit might well hold it unconstitutional to apply FECA's contribution limits to Shaber's bequest under these circumstances. As with the previous bequest, it should be afforded the opportunity to do so.

IV.    THE CROMNIBUS CONTRIBUTION LIMIT REGIME, OWING TO ITS EXPRESSIVE PURPOSE RESTRICTIONS, VIOLATES THE LNC'S FIRST AMENDMENT RIGHTS.

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago* v. *Mosley*, 408 U.S. 92, 95 (1972). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed* v. *Town*

15

*of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citations omitted). When a law "defin[es] regulated speech by particular subject matter" or "by its function or purpose," it is content-based and is "subject to strict scrutiny." *Id.* at 2227. And "the First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office." *Ariz. Free Enter. Club's Freedom Club PAC* v. *Bennett*, 564 U.S. 721, 734 (2011) (internal quotation marks and citations omitted).

The cromnibus expressive purpose restrictions directly limit how the LNC may express itself, in preparation for and during political campaigns, based on the subject matter, function, or purpose of the LNC's speech. The LNC is allowed to accept contributions to fund its political activities, but may only use them towards the purposes and in the amounts ordained by Congress. The fact is that buildings, conventions, and lawyers, all convey or enable expression in some way or to some degree. Consider a $33,901 contribution to the LNC: if the LNC speaks as it wishes with that contribution, distributing pamphlets about the party's ideology or supporting a non-presidential candidate, the contribution is illegal. If the LNC spends one dollar of that same contribution broadcasting its presidential nominating convention, hanging a sign on its building, or litigating an election contest, the contribution is legal. A $101,700 donation for any of these latter purposes is perfectly legal; a $101,700 donation to secure the party's ballot line is illegal. And the amount of speech a political party may exercise turns on the content of that speech. Parties with large privileged expenses may circumvent the restrictions, and greatly amplify their voice. Parties lacking large privileged expenses can speak less in the manners and on matters that are suitable and important to them.

Considering the complete lack of congressional fact-finding or any other evidence justifying this last-minute, late-night political deal, and its detachment from any coherent effort to stem

16

corruption or the appearance of corruption, this innovative restriction on core First Amendment activity warrants immediate review by the en banc D.C. Circuit.

The parties could be expected to dispute whether the cromnibus expressive purpose restrictions are effectively expenditure limits, because they limit the purposes to which the LNC may put the money; or contribution limits, because they limit contributions (depending, of course, on the expressive purpose to which they would be utilized). This is a novel question forced by a novel scheme. To be sure, the cromnibus expressive purpose restrictions are expenditure limits—content-based restrictions on speech.

This is not a challenge to any contribution limit. The LNC does not claim in this litigation that the current contribution limit of $339,000 to political parties is too low. Nor would the LNC challenge the contribution limit, in today's legal environment, were it only $33,900. Of course, the LNC's ideological position remains that the FEC and the laws it enforces are *all* unconstitutional. *See* U.S. Const. amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . ."). If the Supreme Court will not recognize that principle, repealing FECA would be a legislative priority for the first Libertarian Party-controlled Congress. But here, the LNC merely seeks to apply the current state of First Amendment precedent.

Even the FEC has grudgingly admitted in discovery that the real contribution limit is $339,000. PF 10. It might have been simpler for Congress to say as much directly, but that is the figure derived by asking the simple question: how many dollars might a person give to the LNC each year? If Suzie can legally give Bobby one apple to put in his backpack, another apple to put in his lunchbox, and a dozen apples to make applesauce, then Suzie can give Bobby fourteen apples, regardless of how much applesauce Bobby would eat. So it is with Section 30116. Donors can put different amounts of money into different bank accounts, but all accounts are owned by the same

17

recipient. And the total amount that can be given per year, by one donor to one national committee of a political party, is $339,000. There is no way around this fact.

This would still be a pure contribution limit case if the multiple bank account scheme had nothing to do with expenditures; for example, had the government simply wanted political parties to spread their deposits across multiple banks to stabilize the banking industry. But again, that isn't the law. If Suzie can legally give Bobby four crayons, but one crayon may be used only in writing her a Valentine's Day card and three crayons may be used only to illustrate book reports, Bobby cannot use any crayons to write Mary a valentine, even if he has no book report due or doesn't care for Suzie. In this scenario, the regulation is not merely a contribution limit of four crayons, but also, a restriction on Bobby's expression. Again, the same concept applies to Section 30116. When a political party can have money, and use it for some expression, but not other expression, that is an expression-restriction, not merely a contribution limit.

The cromnibus expressive purpose restrictions are especially problematic, because they largely, if not only, disable minor parties. The Supreme Court once observed that contribution limitations "would appear to benefit minor-party and independent candidates relative to their major-party opponents because major-party candidates receive far more money in large contributions," *Buckley*, 424 U.S. at 33, but major parties also have far larger expenses. The FEC argued that the cromnibus expressive limitations are meaningless because money is fungible, but only the latter point is true. Parties enlarge their assets only to the extent of their special purpose outlays.

This is not to say that the LNC's claims sound in equal protection, or are based on some yardstick of competitive ability. Rather, as a content-based speech restriction, this state of affairs is irrational, nevermind its inability to meet the rigors of strict scrutiny.

Alternatively, analyzing the cromnibus expressive purpose restrictions as a contribution limit should not aid the FEC in avoiding certification—or defending the cromnibus on the merits. While contribution limits are subject to a lower level of still-heightened scrutiny, the Supreme Court upheld BCRA's pre-cromnibus soft money ban precisely because "large soft-money contributions to national parties are likely to create actual or apparent indebtedness on the part of federal officeholders, *regardless of how those funds are ultimately used*." *McConnell* v. *FEC*, 540 U.S. 93, 155 (2003) (emphasis added). And this Court has repeatedly followed *McConnell*'s logic in turning away as-applied challenges to contribution limits unimpacted by the cromnibus amendments. *See Republican Party of La.* v. *FEC*, 219 F. Supp. 3d 86, 97 (D.D.C. 2016) (three-judge panel), *aff'd*, 137 S. Ct. 2178 (2017) (state party committees); *Republican Nat'l Comm*. v. *FEC*, 698 F. Supp. 2d 150 (D.D.C. 2010) (three-judge panel), *aff'd*, 561 U.S. 1040 (2010). Content-neutrality supported the constitutionality of contribution limits.

But that logic works only if the parties get to decide how to spend their money for expressive purposes. Or, as this Court described the pre-cromnibus state of affairs "[w]ith respect to national political parties," when "BCRA's limits appl[ied] regardless of how a national party might want to use the money." *Republican Nat'l Comm.*, 698 F. Supp. 2d at 153. That was then, this is now: BCRA applies *depending* on how a national party might want to use its money. But if large contributions are corrupting or appear corrupt, then why are some very large contributions suddenly allowed, while much smaller contributions are still forbidden? Since Congress has abandoned the "all large contributions corrupt the same regardless of what's done with them" approach in favor of "it's not corrupting to give ten times as much, if it's spent a certain way," courts treating this as a contribution limitation should expect to see some very good explanations for how the cromnibus

19

regime is "*closely drawn* to meet the sufficiently important governmental interests of avoiding corruption and its appearance." *McConnell*, 540 U.S. at 168-69 (emphasis added).

The D.C. Circuit would be disappointed. The cromnibus has no legislative record to speak of. No one had heard of this scheme until it suddenly found its way into the U.S. Code. Asked to produce "documentary evidence comparing the corrupting potential of restricted, segregated expressive purpose contributions with the corrupting potential of unrestricted, general purpose contributions," the FEC had nothing. PF 26. But under heightened constitutional review, the government's "justification must be genuine, not hypothesized or invented *post hoc* in response to litigation." *United States* v. *Virginia*, 518 U.S. 515, 533 (1996).

Indeed, the FEC's discovery responses make clear that it cannot carry its burden to defend the cromnibus scheme under "closely drawn" scrutiny. After admitting that larger contributions are generally more corrupting than smaller ones regardless of their use, PF 31, the FEC explained that "Congress *could have* permissibly concluded" that the unrestricted contributions warrant greater restrictions, PF 33, though it obviously did no such thing. Or maybe Congress could not have so concluded. The FEC admitted, for example, that "[a] political party may in some circumstances value a contribution with use restrictions more highly than a smaller contribution without such restrictions," PF 38; that "[a] political party may value a higher contribution with use restrictions," PF 39; that a cromnibus-approved segregated purpose contribution "may create the same or greater appearance of corruption as an unrestricted contribution in the amount of $33,901," PF 40; *see also* PF 42; and indeed, "that a particular contribution below the general account limit may have an appearance of corruption that exceeds that of a higher contribution to a segregated account," PF 43.

Topping off these and other defects, the FEC's discovery responses generally confirmed the fact that political parties with sufficiently large cromnibus expenditures thereby circumvent the

limits altogether. Every dollar that a party knows it will spend *anyway* on its building, convention (up to $20 million), or lawyers, is another dollar that the party can use for any reason. So a $300,000 donation to the RNC or DNC is *not* corrupting, because those parties have an approved use for it; but a $35,000 donation to the LNC, which lacks federal officeholders, merits prosecution. Because the anti-corruption goals allegedly served by the cromnibus expressive purpose restrictions "affect First Amendment rights they must be pursued by means that are neither seriously underinclusive nor seriously overinclusive." *Brown* v. *Entm't Merchs. Ass'n*, 564 U.S. 786, 805 (2011) (citation omitted).

The over-inclusiveness also renders the Sections 30116(a) and 30125 unconstitutionally overbroad, as "a substantial number of [their] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States* v. *Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange* v. *Washington State Republican Party*, 552 U.S. 442, 449 n. 6 (2008)). Every prospective contribution between the base limit of $33,900 and the total contribution limit of $339,000 that is not solicited or accepted because it would not offset a sufficient amount of segregated purpose dollars, and every such contribution that is foregone because donors are discouraged from giving uselessly-restricted funds, reflects an unconstitutional application of the provisions. Nearly all contributions between the base and total contribution limits to all but the two major parties are impacted. The LNC is the only "third" party that even maintains a segregated purpose account, PF 44, and it has been of only limited utility.

LNC's facial challenges to the cromnibus expressive purpose restrictions bear further briefing and consideration by the Court of Appeals. As reflected in the second question presented, it, too, passes the "low bar" of certification.

Finally, there need not be much said relating to the LNC's third proposed question, encompassing the LNC's as-applied challenge to the application of the cromnibus expressive purpose restrictions against the Shaber bequest. Even if it is determined that contribution limits can be applied to that particular donation, and even if it is determined that the expressive purpose restrictions do not doom the current statutes, there would still be the question of how the expressive purpose restrictions legitimately advance any governmental interest with respect to Shaber's bequest. That question, too, is far from frivolous.

CONCLUSION

The LNC respectfully requests that the motion be granted, and that its proposed facts and questions be certified to the en banc D.C. Circuit.

Dated: September 5, 2017                    Respectfully submitted,

                                            Alan Gura (D.C. Bar No. 453449)
                                            Gura PLLC
                                            916 Prince Street, Suite 107
                                            Alexandria, VA 22314
                                            703.835.9085/Fax 703.997.7665


                                    By: /s/ Alan Gura_____
                                            Alan Gura

                                            Attorney for Plaintiff

22