TYPE−E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: <u>1:16−cv−00121−BAH</u>

LIBERTARIAN NATIONAL COMMITTEE, INC. v.
FEDERAL ELECTION COMMISSION
Assigned to: Chief Judge Beryl A. Howell
Demand: $0
Cause: 02:437 Federal Election Commission

Date Filed: 01/25/2016
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**LIBERTARIAN NATIONAL
COMMITTEE, INC.**

represented by **Alan Gura**
GURA PLLC
916 Prince Street
Suite 107
Alexandria, VA 22314
(703) 835−9085
Fax: (703) 997−7665
Email: alan@gurapllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**FEDERAL ELECTION
COMMISSION**

represented by **Harry Jacobs Summers**
FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
(202) 694−1650
Fax: (202) 219−0260
Email: hsummers@fec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jacob Stephen Siler**
FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
202−694−1623
Fax: (202) 219−0260
Email: jsiler@fec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Deeley**
FEDERAL ELECTION COMMISSION
1050 First Street, NE

Washington, DC 20463
(202) 694−1650
Fax: (202) 219−3923
Email: kdeeley@fec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kevin Paul Hancock**
FEDERAL ELECTION COMMISSION
1050 First Street, NE
Washington, DC 20463
(202) 694−1630
Fax: (202) 219−0620
Email: khancock@fec.gov
*TERMINATED: 02/14/2018*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 01/25/2016 | 1 | | COMPLAINT against All Defendants *Federal Election Commission* ( Filing fee $ 400 receipt number 0090−4388648) filed by LIBERTARIAN NATIONAL COMMITTEE, INC.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Defendant Federal Election Commission, # 3 Summons Attorney General, # 4 Summons U.S. Attorney' Office)(Gura, Alan) (Entered: 01/25/2016) |
| 01/25/2016 | 2 | | Corporate Disclosure Statement by LIBERTARIAN NATIONAL COMMITTEE, INC.. (Gura, Alan) (Entered: 01/25/2016) |
| 01/25/2016 | | | Case Assigned to Judge Beryl A. Howell. (sth) (Entered: 01/27/2016) |
| 01/27/2016 | 3 | | SUMMONS (3) Issued Electronically as to FEDERAL ELECTION COMMISSION, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Summons, # 2 Summons, # 3 Summons)(sth) (Entered: 01/27/2016) |
| 01/27/2016 | 4 | | STANDING ORDER. Signed by Judge Beryl A. Howell on January 27, 2016. (lcbah1) (Entered: 01/27/2016) |
| 02/17/2016 | 5 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. FEDERAL ELECTION COMMISSION served on 2/2/2016, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 2/3/2016., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/3/2016. ( Answer due for ALL FEDERAL DEFENDANTS by 4/3/2016.) (Gura, Alan) (Entered: 02/17/2016) |
| 04/06/2016 | 6 | | NOTICE of Appearance by Kevin Paul Hancock on behalf of FEDERAL ELECTION COMMISSION (Hancock, Kevin) (Entered: 04/06/2016) |
| 04/06/2016 | 7 | | NOTICE of Appearance by Kevin Deeley on behalf of FEDERAL ELECTION COMMISSION (Deeley, Kevin) (Entered: 04/06/2016) |
| 04/06/2016 | 8 | | NOTICE of Appearance by Harry Jacobs Summers on behalf of FEDERAL ELECTION COMMISSION (Summers, Harry) (Entered: 04/06/2016) |
| 04/06/2016 | 9 | | |

| | | MOTION to Dismiss for Lack of Jurisdiction by FEDERAL ELECTION COMMISSION (Hancock, Kevin) (Entered: 04/06/2016) |
|---|---|---|
| 04/12/2016 | 10 | Consent MOTION for Extension of Time to File Response/Reply as to 9 MOTION to Dismiss for Lack of Jurisdiction by LIBERTARIAN NATIONAL COMMITTEE, INC. (Attachments: # 1 Text of Proposed Order)(Gura, Alan) (Entered: 04/12/2016) |
| 04/13/2016 | | MINUTE ORDER (paperless) GRANTING the plaintiff's 10 Consent Motion to Modify Briefing Schedule. Accordingly, the plaintiff shall, by May 2, 2016, file any opposition to the defendant's 9 motion to dismiss; and the defendant shall, by May 19, 2016, file any reply. Signed by Chief Judge Beryl A. Howell on April 13, 2016. (lcbah1) (Entered: 04/13/2016) |
| 04/13/2016 | | Set/Reset Deadlines: Plaintiff's Opposition to Dispositive Motions due by 5/2/2016; Defendant's Reply due by 5/19/2016. (tg) (Entered: 04/13/2016) |
| 05/02/2016 | 11 | Consent MOTION to file supplemental declaration by LIBERTARIAN NATIONAL COMMITTEE, INC. (Attachments: # 1 Declaration of Robert Kraus, # 2 Text of Proposed Order)(Gura, Alan) (Entered: 05/02/2016) |
| 05/02/2016 | 12 | Memorandum in opposition to re 9 MOTION to Dismiss for Lack of Jurisdiction filed by LIBERTARIAN NATIONAL COMMITTEE, INC.. (Attachments: # 1 Exhibit A, FEC Advisory Opinion 2004−02, # 2 Exhibit B, FEC Advisory Opinion 1999−14, # 3 Exhibit C, FEC Advisory Opinion 2015−05, # 4 Declaration of Robert Kraus, # 5 Text of Proposed Order)(Gura, Alan) (Entered: 05/02/2016) |
| 05/03/2016 | | MINUTE ORDER (paperless) GRANTING the plaintiff's 11 Consent Motion to File Supplemental Declaration. Signed by Chief Judge Beryl A. Howell on May 3, 2016. (lcbah1) (Entered: 05/03/2016) |
| 05/03/2016 | 13 | SUPPLEMENTAL Declaration filed by LIBERTARIAN NATIONAL COMMITTEE, INC. (zrdj) (Entered: 05/03/2016) |
| 05/19/2016 | 14 | REPLY to opposition to motion re 9 MOTION to Dismiss for Lack of Jurisdiction filed by FEDERAL ELECTION COMMISSION. (Attachments: # 1 Exhibit A (LP.org solicitation for $500,000 in Segregated Account funds))(Hancock, Kevin) (Entered: 05/19/2016) |
| 08/17/2016 | 15 | ENTERED IN ERROR.....NOTICE of Firm Change by LIBERTARIAN NATIONAL COMMITTEE, INC. (Gura, Alan) Modified on 8/18/2016 (zrdj). (Entered: 08/17/2016) |
| 08/18/2016 | | NOTICE OF CORRECTED DOCKET ENTRY: re 15 Notice (Other) was entered in error and counsel is instructed to refile said pleading using proper pleading format, i.e. case caption, document title and signature. (zrdj) (Entered: 08/18/2016) |
| 08/24/2016 | 16 | NOTICE of Firm Change by LIBERTARIAN NATIONAL COMMITTEE, INC. (Gura, Alan) (Entered: 08/24/2016) |
| 09/20/2016 | 17 | NOTICE of Appearance by Jacob Stephen Siler on behalf of FEDERAL ELECTION COMMISSION (Siler, Jacob) (Entered: 09/20/2016) |
| 09/20/2016 | 18 | |

| | | |
|---|---|---|
| | | NOTICE *of Supplemental Jurisdictional Facts* by FEDERAL ELECTION COMMISSION (Hancock, Kevin) (Entered: 09/20/2016) |
| 09/29/2016 | 19 | REPLY re 18 Notice (Other) *of Supplemental Jurisdictional Facts* filed by LIBERTARIAN NATIONAL COMMITTEE, INC.. (Gura, Alan) (Entered: 09/29/2016) |
| 01/03/2017 | 20 | ORDER DENYING the defendant's 9 Motion to Dismiss for Lack of Jurisdiction. See Order for further details. Signed by Chief Judge Beryl A. Howell on January 3, 2017. (lcbah1) (Entered: 01/03/2017) |
| 01/03/2017 | 21 | MEMORANDUM OPINION regarding the defendant's 9 Motion to Dismiss for Lack of Jurisdiction. Signed by Chief Judge Beryl A. Howell on January 3, 2017. (lcbah1) (Entered: 01/03/2017) |
| 01/03/2017 | | Set/Reset Deadlines: Joint proposed order to govern further proceedings due by 1/23/2017 Status Report due by 1/23/2017. (tg) (Entered: 01/03/2017) |
| 01/17/2017 | 22 | ANSWER to Complaint by FEDERAL ELECTION COMMISSION.(Siler, Jacob) (Entered: 01/17/2017) |
| 01/23/2017 | 23 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order by Plaintiff LNC, # 2 Text of Proposed Order by Defendant FEC)(Gura, Alan) (Entered: 01/23/2017) |
| 01/24/2017 | | MINUTE ORDER (paperless) ISSUING, upon consideration of the parties' 23 Joint Status Report, the following SCHEDULING ORDER to control further proceedings in this matter: The parties shall, by February 24, 2017, make their initial disclosures. Any parties shall be joined, or the pleadings amended, by March 24, 2017. All discovery shall close by August 4, 2017. The plaintiff shall, by September 5, 2017, file any motion for certification to the D.C. Circuit, pursuant to 52 U.S.C. § 30110, and proposed findings of fact, which shall include references to the parts of the record relied upon to support such proposed findings. The defendant shall, by October 5, 2017, file any dispositive motion and/or opposition to the plaintiff's motion for certification, as well as proposed findings of fact, which shall identify any of the plaintiff's proposed findings that are disputed and any supplemental proposed findings of fact, and shall include references to the parts of the record relied upon. The plaintiff shall, by October 19, 2017, file any opposition to a dispositive motion filed by the defendant and any reply in support of the plaintiff's motion for certification. The defendant shall, by October 26, 2017, file any reply in support of its dispositive motion. Signed by Chief Judge Beryl A. Howell on January 24, 2017. (lcbah1) (Entered: 01/24/2017) |
| 01/24/2017 | | Set/Reset Deadlines: Initial Disclosures due by 2/24/2017; Joinder of parties/Amended Pleadings due by 3/24/2017; Discovery due by 8/4/2017; Motion for certification to the D.C. Circuit due by 9/5/2017; Dispositive Motion due by 10/5/2017; Opposition to Dispositive Motion due by 10/19/2017; Reply due by 10/26/2017. (tg) (Entered: 01/24/2017) |
| 09/05/2017 | 24 | MOTION for Certificate of Appealability by LIBERTARIAN NATIONAL COMMITTEE, INC. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit A, Proposed Facts, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 |

| | | | |
|---|---|---|---|
| | | | Exhibit N, # 17 Declaration of Nicholas Sarwark, # 18 Declaration of Robert Kraus, # 19 Declaration of Chris Rufer, # 20 Declaration of Michael Chastain, # 21 Declaration of William Redpath, # 22 Declaration of Paul Clark, # 23 Declaration of Alan Gura)(Gura, Alan)(Entered: 09/05/2017) |
| 10/05/2017 | 25 | | MOTION to Dismiss for Lack of Jurisdiction by FEDERAL ELECTION COMMISSION (Attachments: # 1 Text of Proposed Order)(Siler, Jacob) (Entered: 10/05/2017) |
| 10/05/2017 | 26 | | Memorandum in opposition to re 24 MOTION for Certificate of Appealability filed by FEDERAL ELECTION COMMISSION. (Attachments: # 1 Text of Proposed Order, # 2 Response to Pl.'s Facts Submitted For Certification, # 3 Statement of Facts, # 4 Exhibit Index, # 5 Exhibit 1, # 6 Exhibit 2, # 7 Exhibit 3, # 8 Exhibit 4, # 9 Exhibit 5, # 10 Exhibit 6, # 11 Exhibit 7, # 12 Exhibit 8, # 13 Exhibit 9, # 14 Exhibit 10, # 15 Exhibit 11, # 16 Exhibit 12, # 17 Exhibit 13, # 18 Exhibit 14, # 19 Exhibit 15, # 20 Exhibit 16, # 21 Exhibit 17, # 22 Exhibit 18, # 23 Exhibit 19, # 24 Exhibit 20, # 25 Exhibit 21, # 26 Exhibit 22, # 27 Exhibit 23, # 28 Exhibit 24, # 29 Exhibit 25, # 30 Exhibit 26, # 31 Exhibit 27, # 32 Exhibit 28, # 33 Exhibit 29, # 34 Exhibit 30, # 35 Exhibit 31, # 36 Exhibit 32, # 37 Exhibit 33, # 38 Exhibit 34, # 39 Exhibit 35, # 40 Exhibit 36, # 41 Exhibit 37, # 42 Exhibit 38)(Siler, Jacob) (Entered: 10/05/2017) |
| 10/19/2017 | 27 | | Memorandum in Opposition re 25 MOTION to Dismiss for Lack of Jurisdiction filed by LIBERTARIAN NATIONAL COMMITTEE, INC.. (Attachments: # 1 Response to FEC's Proposed Findings of Facts, # 2 Text of Proposed Order)(Gura, Alan) Modified event title on 10/20/2017 (znmw). (Entered: 10/19/2017) |
| 10/19/2017 | 28 | | REPLY to opposition to motion re 24 MOTION for Certificate of Appealability filed by LIBERTARIAN NATIONAL COMMITTEE, INC.. (See Docket Entry 27 to view document). (znmw) (Entered: 10/20/2017) |
| 10/26/2017 | 29 | | REPLY to opposition to motion re 25 MOTION to Dismiss for Lack of Jurisdiction filed by FEDERAL ELECTION COMMISSION. (Siler, Jacob) (Entered: 10/26/2017) |
| 12/11/2017 | 30 | | NOTICE OF SUPPLEMENTAL AUTHORITY by LIBERTARIAN NATIONAL COMMITTEE, INC. (Gura, Alan) (Entered: 12/11/2017) |
| 12/22/2017 | 31 | | RESPONSE re 30 NOTICE OF SUPPLEMENTAL AUTHORITY filed by FEDERAL ELECTION COMMISSION. (Summers, Harry) (Entered: 12/22/2017) |
| 02/14/2018 | 32 | | NOTICE OF WITHDRAWAL OF APPEARANCE as to FEDERAL ELECTION COMMISSION. Attorney Kevin Paul Hancock terminated. (Hancock, Kevin) (Entered: 02/14/2018) |
| 04/02/2018 | 33 | | NOTICE of Change of Address by Jacob Stephen Siler (Siler, Jacob) (Entered: 04/02/2018) |
| 06/29/2018 | 34 | 7 | ORDER GRANTING IN PART and DENYING IN PART the petitioner's 24 Motion for Certificate of Appealability and DENYING the defendant's 25 Motion to Dismiss for Lack of Jurisdiction. See Order for further details. Signed by Chief Judge Beryl A. Howell on June 29, 2018. (lcbah1) (Entered: 06/29/2018) |

| 06/29/2018 | 35 | 9 | MEMORANDUM OPINION regarding the petitioner's 24 Motion for Certificate of Appealability and the defendant's 25 Motion to Dismiss for Lack of Jurisdiction. Signed by Chief Judge Beryl A. Howell on June 29, 2018. (lcbah1) (Entered: 06/29/2018) |

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIBERTARIAN NATIONAL COMMITTEE,
INC.,

               Plaintiff,

               v.

FEDERAL ELECTION COMMISSION,

               Defendant.

Civil Action No. 16-121 (BAH)

Chief Judge Beryl A. Howell

## ORDER

Upon consideration of the petitioner Libertarian National Committee, Inc.'s Motion to Certify Facts & Questions, ECF No. 24, the defendant Federal Election Commission's Motion to Dismiss for Lack of Jurisdiction, ECF No. 25, the related legal memoranda in support and in opposition, the exhibits and declarations related thereto, and the entire record herein, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the defendant's Motion to Dismiss is DENIED; and it is further

**ORDERED** that the petitioner's Motion to Certify is GRANTED IN PART and DENIED IN PART; specifically, the petitioner's motion is granted with respect to the petitioner's first question and with respect to the petitioner's second and third questions as reformulated below, and denied with respect to the petitioner's second and third questions as originally formulated; and it is further

**ORDERED** that the following questions of law, as well as the findings of fact contained in the Appendix to the accompanying Memorandum Opinion, are certified to the U.S. Court of Appeals for the District of Columbia Circuit pursuant to 52 U.S.C. § 30110:

1. Does imposing annual contribution limits against the bequest of Joseph Shaber violate the First Amendment rights of the Libertarian National Committee?

2. Do 52 U.S.C. §§ 30116(a)(1)(B), (a)(9), and 30125(a)(1), on their face, violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend its contributions above § 30116(a)(1)(B)'s general purpose contribution limit to those specialized purposes enumerated in § 30116(a)(9)?

3. Do 52 U.S.C. §§ 30116(a)(1)(B), (a)(9), and 30125(a)(1) violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend that portion of the bequest of Joseph Shaber that exceeds § 30116(a)(1)(B)'s general purpose contribution limit to those specialized purposes enumerated in § 30116(a)(9)?

**SO ORDERED.**

Date: June 29, 2018

_____
BERYL A. HOWELL
Chief Judge

LIBERTARIAN NATIONAL COMMITTEE,
INC.,

              Petitioner,

              v.

FEDERAL ELECTION COMMISSION,

              Defendant.

Civil Action No. 16-cv-00121 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The petitioner, the Libertarian National Committee, Inc. ("LNC"), has challenged for over seven years the constitutionality of certain contribution limits, under the Federal Election Campaign Act of 1971 ("FECA"), Pub. L. No. 92-225, 86 Stat. 3, as amended (codified at 52 U.S.C. § 30101 *et seq.*), that regulate how the LNC may accept and use testamentary bequests. In this latest round of litigation, the LNC raises one facial and two as-applied constitutional challenges to the statutory limits on the amount of money a person may contribute per year "to the political committees established and maintained by a national political party." 52 U.S.C. § 30116(a)(1)(B); *see also id.* § 30116(a)(9); Pet.'s Mot. Certify Facts & Questions ("Pet.'s Mot. Cert.") at 1, ECF No. 24. The role of a district court under FECA's statutory scheme is not to resolve constitutional challenges to the statute in the first instance, but merely to certify to the U.S. Court of Appeals those challenges that are meritorious. *See* 52 U.S.C. § 30110. Now pending before the Court is the LNC's motion to certify for resolution by the U.S. Court of Appeals for the District of Columbia Circuit three questions: whether LNC's First Amendment rights are violated by (1) applying the annual contribution limits to "the bequest of Joseph

Shaber," (2) "restricting the purposes for which the [LNC] may spend its money," in general, and (3) "restricting the purposes for which the [LNC] may spend the bequest of Joseph Shaber," in particular. Pet.'s Mot. Cert. at 1.[1]  The defendant Federal Election Commission ("FEC"), in opposing certification, has moved to dismiss the case, pursuant Rule 12(b)(1) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction. Def.'s Mot. Dismiss ("Def.'s Mot.") at 1, ECF No. 25. For the reasons that follow, the LNC's motion is granted in part and denied in part, and the FEC's motion is denied.

## I.    BACKGROUND

The LNC, a nonprofit organization incorporated under District of Columbia law, is the national committee of the Libertarian Party of the United States, which Party has 15,031 active paid sustaining donors, and 137,451 members, in all 50 states and the District of Columbia. App'x, Findings of Fact ¶¶ 1, 3. In addition, forty-eight partisan officeholders and 111 non-partisan officeholders are affiliated with the Libertarian Party nationwide, and over half a million registered voters identify with the Libertarian Party in the states in which voters can register as Libertarians. *Id.* ¶ 3. The LNC describes its purpose "to field national Presidential tickets, to support its state party affiliates in running candidates for public office, and to conduct other political activities in furtherance of a libertarian public policy agenda in the United States." *Id.* ¶ 5. This is the second round of litigation brought by the LNC against the FEC regarding the constitutionality of the FECA's limits on monetary contributions to political parties. The details of the prior litigation bear directly on the present dispute and are recounted below, followed by an overview of the underlying facts.

---

[1]    The FECA imposes differing contribution limits depending on the source, recipient and use of the contribution. Unless otherwise specified, the phrase "challenged contribution limits" as used in this Memorandum Opinion refers to the limits, under 52 U.S.C. § 30116(a)(1)(B), (a)(9), on the amounts of money that a person may donate per year to a national political party committee.

## A. The Previous Litigation

The FECA establishes limits on the amount of money a person may donate per year to national political party committees. *See* 52 U.S.C. § 30116(a)(1)(B). In *Buckley v. Valeo*, the Supreme Court rejected a facial challenge to the FECA's "limitation on total contributions by an individual during any calendar year," describing contribution limits as one of the FECA's "primary weapons against the reality or appearance of improper influence stemming from the dependence of candidates on large campaign contributions." 424 U.S. 1, 58 (1976). "The contribution ceilings . . . serve the basic governmental interest in safeguarding the integrity of the electoral process," *Buckley* held, "without directly impinging upon the rights of individual citizens and candidates to engage in political debate and discussion." *Id. Buckley* did not address an as-applied challenge to the contribution limits.

Ten years ago, Raymond Burrington died and left the LNC a residuary bequest of $217,734. *See Libertarian Nat'l Comm., Inc. v. FEC* ("*LNC I*"), 930 F. Supp. 2d 154, 156 (D.D.C. 2013) (Wilkins, J.). The FEC, consistent with longstanding policy, determined that the FECA's limits on contributions to national political party committees applied to Mr. Burrington's bequest, and thus, that the Burrington estate could contribute to the LNC, in any year, no more than the contribution limit amount. *Id.* The Burrington estate contributed to the LNC the amount of the annual contribution limit and, in agreement with the LNC, deposited the balance of Mr. Burrington's bequest "into an escrow account, from which the escrow agent . . . would distribute annual contributions from the Estate to the LNC in amounts equal to FECA's contribution limit." *Id.* at 176.

The LNC sued the FEC to "enjoin application of the Party Limit to the contribution, solicitation, acceptance, and spending of decedents' bequests, as said application violates the

3

LNC's First Amendment speech and associational rights and those of its supporters." *Id.* at 156.

The LNC moved to certify to the D.C. Circuit the following question: "Does imposing annual contribution limits against testamentary bequests directed at, or accepted or solicited by political party committees, violate First Amendment speech and associational rights?" *Id.* The Court declined to certify the LNC's question as overbroad, reasoning that the LNC's challenge "would not apply solely to [the LNC], but would extend to other entities not before this Court." *Id.* at 165. The Court further explained that under certain circumstances, "it is possible for a bequest to raise valid anti-corruption concerns." *Id.* at 166. For example, the Court reasoned, "making one's bequest known before death could be treated just as a contribution is." *Id.* Likewise, "[a] bequest may also help friends or family of the deceased have access to political officeholders and candidates." *Id.* These examples were supported by witness testimony and other factual evidence of how political "groups treat such bequests." *Id.* The Court thus recognized that even contributions by the dead may, in certain contexts, raise concerns about actual or apparent corruption justifying a contribution limit's application. *Id.* at 166–67.[2] Furthermore, with the testators being dead and their estates having no First Amendment rights of association or expression, the Court concluded that the LNC could challenge the contribution limits only as to its own First Amendment rights, not as to testators' rights. *Id.* at 169–171.[3] Given these legal conclusions, the Court then narrowed and certified the following question: "Does imposing

---

[2]     Independent expenditures likewise might be thought capable of exerting corrupting influence on political officeholders under proper circumstances. In *SpeechNow.org v. FEC*, however, the D.C. Circuit concluded that "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption," 599 F.3d 686, 694 (D.C. Cir. 2010), but without any apparent discussion or analysis of the myriad possible factual circumstances under which such contribution may be made. As explained further below, *SpeechNow* does not support a conclusion that testamentary contributions categorically cannot create actual or apparent corruption. *See infra* Part III.B.2.

[3]     The Court also determined that the LNC's proposed question encompassed another issue, namely, whether a separate provision of the FECA prevented the LNC from "solicit[ing] bequests over the maximum even if they were parsed out annually at the legal limit," but the parties' briefs had mooted the issue. *LNC I*, 930 F. Supp. 2d at 167–68. That issue is not relevant to the pending motion for certification.

4

annual contribution limits against the bequest of Raymond Groves Burrington violate the First Amendment rights of the Libertarian National Committee?" *Id.* at 171.

The FEC moved, pursuant to Federal Rule of Civil Procedure 59(e), to alter or amend the Court's order, arguing, among other things, that while "as-applied First Amendment challenges seeking *categorical* exceptions to FECA's contribution limits are proper under the statute," a petitioner may not, as a matter of law, raise "a First Amendment challenge to an *individual* contribution" without identifying a categorical basis to exempt an entire class of contributions from the contribution limits' application. *Libertarian Nat'l Comm., Inc. v. FEC* ("*LNC II*"), 950 F. Supp. 2d 58, 60 (D.D.C. 2013) (Wilkins, J.) (emphasis added). In denying the FEC's motion, the Court rejected this argument, concluding that § 30110 requires a district court to certify "individualized as-applied challenges to contribution limits." *Id.* at 62.

The D.C. Circuit summarily affirmed *LNC I*'s reformulation and certification of the LNC's question, determining that "[t]he district court properly declined to certify the broad proposed question of law, as framed by appellant." *Libertarian Nat'l Comm., Inc. v. FEC*, No. 13-5094, 2014 WL 590973, at *1 (D.C. Cir. Feb 7, 2014). The escrow account fully distributed Mr. Burrington's bequest to the LNC before the D.C. Circuit could hear the certified question on the merits, however. *See* Pet.'s Mem. Supp. Pet.'s Mot. Certify Facts & Questions ("Pet.'s Mem.") at 2, ECF No. 24-1; Def.'s Mem. Supp. Mot. Dismiss & Opp'n Pet.'s Mot. Certify Facts & Questions ("Def.'s Opp'n") at 9, ECF No. 26. Consequently, the D.C. Circuit dismissed the certification as moot and vacated the district court's order. Order, *Libertarian Nat'l Comm., Inc. v. FEC* ("*LNC* Dismissal Order"), No. 13-5088, 2014 U.S. App. LEXIS 25108, at *1 (D.C. Cir. Mar. 26, 2014).

**B. Joseph Shaber's Bequest**

5

Joseph Shaber, a prior donor to the LNC, died in August 2014. Def.'s Opp'n at 9; Factual Findings ¶¶ 109–10, 117. Upon his death, Mr. Shaber bequeathed, with no restrictions, the LNC an amount determined to be $235,575.20 from a living trust. *Id.* ¶¶ 115, 117, 121. The LNC accepted an amount from the bequest equal to the annual contribution limits, and placed the remainder of the bequest in an escrow account, to distribute the maximum allowable contribution to the LNC on an annual basis. *Id.* ¶ 128.

The LNC sued to enjoin the FEC from enforcing the contribution limits "either generally or in relation to the Shaber Bequest," and to obtain declaratory relief, costs, attorney's fees, and other "just and appropriate" relief. Compl. at 10–11, ECF No. 1. The FEC moved to dismiss the LNC's complaint for lack of subject matter jurisdiction, Def.'s Mot. Dismiss for Lack of Juris., ECF No. 9, which motion was denied, *see* Order Denying Def.'s Mot. Dismiss, ECF No. 20; *Libertarian Nat'l Comm., Inc. v. FEC* ("*LNC III*"), 228 F. Supp. 3d 19 (D.D.C. 2017) (Howell, C.J.). The LNC now seeks to certify the following three questions of law to the D.C. Circuit:

1. Does imposing annual contribution limits against the bequest of Joseph Shaber violate the First Amendment rights of the Libertarian National Committee?

2. Do 52 U.S.C. §§ 30116(a)(1)(B) and 30125, on their face, violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend its money?

3. Does restricting the purposes for which the Libertarian National Committee may spend the bequest of Joseph Shaber violate the Committee's First Amendment rights?

Pet.'s Mot. Cert. at 1. The FEC opposes the LNC's motion, and has moved to dismiss for lack of jurisdiction, which motion parrots in substance the FEC's opposition to LNC's certification motion. *See* Def.'s Mot.[4] The parties' motions are now ripe for consideration.

---

[4]     This Memorandum Opinion references both the FEC's opposition and motion to dismiss with citations exclusively to the FEC's motion to dismiss, as these documents are identical in substance.

## II.    LEGAL STANDARD

Under the FECA, "the national committee of any political party . . . may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act." 52 U.S.C. § 30110.[5]  "The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." *Id.*  A district court's role in the certification process is to (1) "[i]dentify constitutional issues in the complaint, (2) "[t]ake . . . evidence . . . to the extent not controverted in material and substantial degree," (3) "[m]ake findings of fact with reference to those issues," and (4) "[c]ertify to [the D.C. Circuit] constitutional questions arising from steps 1, 2, and 3." *Buckley v. Valeo*, 519 F.2d 817, 818 (D.C. Cir. 1975).  A district court does not certify questions under § 30110 that "are 'wholly insubstantial,' 'obviously frivolous,' and 'obviously without merit,'" which means that satisfying this standard is "a 'low bar.'"  *Holmes v. FEC*, 823 F.3d 69, 71–72 (D.C. Cir. 2016) (quoting *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015)).  In applying this standard, the fact that a proposed question presents a legal argument foreclosed by binding precedent does not, in and of itself, "make the question obviously frivolous, or wholly insubstantial, or obviously without merit," at least "so long as the [petitioner] mounts a non-frivolous argument in favor of overturning that precedent."  *Id.* at 74 (internal quotation marks omitted).[6]

---

[5]    The term "Act," as used in § 30110, "means the Federal Election Campaign Act of 1971 as amended," 52 U.S.C. § 30101(19), and covers the specialized purpose contribution limit regime that came into existence in 2015.
[6]    The FEC cites *Johnson v. Comm'n on Presidential Debates*, 869 F.3d 976 (D.C. Cir. 2018), for the proposition that "claims 'foreclosed by prior decisions of the Supreme Court deprive the lower courts of jurisdiction to hear the claim." Def.'s Opp'n at 18 (quoting *Johnson*, 869 F.3d at 984 (alterations omitted)). *Johnson* did not, however, address a situation where a petitioner "mounts a non-frivolous argument in favor of overturning that precedent," and so is reconcilable with *Holmes*'s holding that § 30110 allows certification of claims that existing precedent forecloses when a petitioner argues, on some non-frivolous basis, that the precedent should be overruled. 823 F.3d at 74.

A district court's discretion under § 30110 is not limited to certifying or dismissing a question exactly as formulated by a petitioner, but allows the court to reformulate a proposed question prior to certification. *See LNC I*, 930 F. Supp. 2d at 168 ("[L]ongstanding precedent supports this Court's discretion in crafting and/or amending any questions certified to the Court of Appeals."). Indeed, before *Buckley v. Valeo* reached the Supreme Court, the D.C. Circuit initially had remanded the case to the district court to "formulat[e] [the] constitutional questions to be certified." *LNC I*, 930 F. Supp. 2d at 168 (citing *Buckley*, 387 F.2d at 835 (emphasis omitted)). "*Buckley*'s history strongly suggests the district court has an active, rather than passive, role in the certification process under [§ 30110]." *Id.* at 168–69; *see also Khachaturian v. FEC*, 980 F.2d 330, 332 (5th Cir. 1992) ("If [the district court] concludes that colorable constitutional issues are raised from the facts, it should certify those questions to us."); *Bread Political Action Comm. v. FEC*, 635 F.2d 621, 625 n.4 (7th Cir. 1980) (noting with approval that "[t]he district court polished plaintiffs' draft questions into their present form"); *Cao v. FEC*, 688 F. Supp. 2d 498, 542 (E.D. La. 2010) ("Although the Court finds the substance of Questions Three and Six non-frivolous, the plaintiffs, in their briefing, put a much finer point on the questions than those originally proposed in the motion to certify. As such, the Court will exercise its discretion in fashioning a question for the Fifth Circuit that more precisely captures the Constitutional difficulty raised by the plaintiffs' arguments."), *dismissal order aff'd, certified questions answered*, *In re Cao*, 619 F.3d 410, 414 (5th Cir. 2010) ("The district court, abiding by its proper role . . . identified the constitutional issues in the complaint . . . .").

## III.  DISCUSSION

The LNC contends the challenged contribution limits violate this national political committee's First Amendment rights by restricting how it may receive and spend the bequest of

Mr. Shaber, in particular, and the purposes for which it may spend contributions generally. *See* Pet.'s Mot. Cert. at 1. As noted, the LNC challenges as unconstitutional, in the first question, the contribution limits as applied to Mr. Shaber's bequest; in the second question, the FECA's specialized purpose regime, which permits contributions to a national political party committee over the maximum annual general purpose contribution limit, but only for one of three specific government-approved purposes; and, in the third question, the FECA's specialized purpose regime as applied to Mr. Shaber's bequest. *Id.* A brief overview of the governing statutory and regulatory framework is provided before turning to an analysis of each proposed question's fitness for certification under § 30110.

### A. Legal and Regulatory Framework

The FECA provides that "no person shall make contributions . . . to the political committees established and maintained by a national political party, which are not the authorized political committees of any candidate, in any calendar year which, in the aggregate, exceed $25,000." 52 U.S.C. § 30116(a)(1)(B). This amount is indexed for inflation, *id.* § 30116(c), and now stands, under current regulations, at $33,900, *see* Price Index Adjustments for Contribution and Expenditure Limitations and Lobbyist Bundling Disclosure Threshold, 82 Fed. Reg. 10,904, 10,905–06 (Feb. 16, 2017). The FEC has long construed the term "person" in § 30116(a)(1) to encompass a testamentary estate, a construction not challenged here. *See, e.g.*, FEC Advisory Op. 2015-05 (Shaber), 2015 WL 4978865, at *2 (Aug. 11, 2015) (citing advisory opinions dating back to 1983); *see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–46 (1984) (holding that courts shall defer to agencies' reasonable interpretations of ambiguities in statutes they administer); *LNC I*, 930 F. Supp. 2d at 165 ("The FEC's interpretation of the statute to include a testamentary bequest appears reasonable, is not seriously challenged by the LNC in its briefs, and is entitled to deference under *Chevron*.").

Notwithstanding the general limit on contributions to national political party committees, the FECA, as amended, provides that "contributions made to" any "separate, segregated account of a national committee of a political party" established for one of three specialized purposes may "exceed 300 percent of the amount otherwise applicable" in any calendar year. 52 U.S.C. §§ 30116(a)(1), 30116(a)(9)(A)–(C). These specialized purposes are (1) "to defray expenses incurred with respect to a presidential nominating convention (including the payment of deposits) or to repay loans the proceeds of which were used to defray such expenses, or otherwise to restore funds used to defray such expenses, except that the aggregate amount of expenditures the national committee of a political party may make from such account may not exceed $20,000,000 with respect to any single convention;" (2) "to defray expenses incurred with respect to the construction, purchase, renovation, operation, and furnishing of one or more headquarters buildings of the party or to repay loans the proceeds of which were used to defray such expenses, or otherwise to restore funds used to defray such expenses;" and (3) "to defray expenses incurred with respect to the preparation for and the conduct of election recounts and contests and other legal proceedings." *Id.* § 30116(a)(9)(A)–(C). In other words, while a person may contribute only $33,900 per year to a national political party's committee for unrestricted use, *see* 82 Fed. Reg. at 10,905–06, an individual may contribute up to $101,700 to each account established by a national political party committee to pay expenses incurred with respect to (1) a presidential nominating convention, (2) a party headquarters building, or (3) an election recount, *see* 52 U.S.C. § 30116(a)(9)(A)–(C). Altogether, then, an individual may contribute $339,000 per year to accounts established and maintained by national political parties—$101,700 to each of three specialized purpose accounts, plus $33,900 for general purposes. *Id.* § 30116(a)(1)(B).

Finally, the FECA provides that "[a] national committee of a political party . . . may not solicit, receive, or direct to another person a contribution, donation, or transfer of funds or any other thing of value, *or spend any funds*, that are not subject to the limitations, prohibitions, and reporting requirements of this Act." *Id.* § 30125(a)(1) (emphasis added).

## B. The LNC's Argument That The Contribution Limits Are Unconstitutional As Applied To Mr. Shaber's Bequest Warrants Certification

The LNC's first question—"Does imposing annual contribution limits against the bequest of Joseph Shaber violate the First Amendment rights of the Libertarian National Committee?"— is identical in substance to the question that *LNC I* certified, merely substituting the name "Joseph Shaber" for "Raymond Burrington." Pet.'s Mot. Cert. at 1; *LNC I*, 930 F. Supp. 2d at 171. Collateral estoppel thus would seem to require the instant question's certification. The FEC argues, however, that *LNC I* does not compel certification here, because *LNC I* did not have the benefit of adequate briefing on whether the contribution limits were unconstitutional as applied to Mr. Burrington's particular bequest, as the FEC had expected to litigate only whether the contribution limits constitutionally may apply to bequests in general. *See* Def.'s Opp'n at 30. The FEC acknowledges that the opportunity to address this issue was presented through a post-certification motion to alter or amend, which *LNC II* denied. *See id.* at 30–31; *see also* 950 F. Supp. 2d 58. Nonetheless, the FEC posits that *LNC II* does not compel certification either, since this issue was resolved under the demanding clear error standard of review rather than *de novo*. *See* Def.'s Opp'n at 31; 950 F. Supp. 2d at 60 (reciting applicable standard of review for motions under Fed. R. Civ. P. 59(e), which "need not be granted unless the district court finds that there is an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." (quoting *Messina v. Krakower*, 439 F.3d 755, 758 (D.C. Cir. 2006))); *see* Def.'s Opp'n at 31. Even indulging the FEC's contention that the

11

collateral estoppel doctrine does not compel certification of the first question here after *LNC I* and *II*, as discussed next, the Court reaches the same result as *LNC I* and *II* that certification of the first question is warranted.

As noted earlier, *supra*, a constitutional challenge to the FECA under § 30110 warrants certification unless the challenge is "'wholly insubstantial,' 'obviously frivolous,' [or] 'obviously without merit,'" *Holmes*, 823 F.3d at 71 (quoting *Shapiro*, 136 S. Ct. at 456). The FEC makes a convoluted and barely comprehensible argument that the instant question flunks this test because *LNC I* itself forecloses the LNC's claim. *See* Def.'s Opp'n at 25–30.[7] The gist of the FEC's argument for why *LNC I* bars the first question's certification seems reducible to three points. The FEC argues that (1) *LNC I* held "that it is []constitutional to apply campaign contribution limits to testamentary bequests as a general matter." *Id.* at 24.[8] The FEC further argues that (2) the contribution limits may apply to Mr. Shaber's bequest to combat the mere appearance, rather than only the reality, of corruption. *See id.* at 25, 28. Finally, the FEC argues that (3) Mr. Shaber's bequest evinces sufficiently weighty concerns as to both the reality and appearance of

---

[7]    The FEC in essence asks the Court simultaneously to conclude that *LNC I* (1) is binding insofar as *LNC I* held that the contribution limits are constitutional as applied to bequests in general, and (2) must be ignored insofar as *LNC I* recognized that the contribution limits may be unconstitutional as to particular bequests that raise no corruption concerns—all this, despite that the instant question, which is limited to Mr. Shaber's bequest, is more akin to the question *LNC I* did in fact certify than to the question *LNC I* declined to certify. The FEC seeks to have it both ways, citing those aspects of *LNC I* that are helpful to the FEC's position while rejecting those aspects that are inconvenient. Such efforts to treat precedent like a buffet, picking out the tasty bits and ignoring the rest, are rightly viewed with healthy skepticism.

[8]    One response to this part of the FEC's argument simply would be to assert that *LNC I* was wrongly decided and should be disregarded. A district court, after all, may not "decline to certify a constitutional question simply because the LNC is arguing against . . . precedent so long as the LNC mounts a non-frivolous argument in favor of overturning that precedent." *Holmes*, 823 F.3d at 74. The LNC, however, concedes that collateral estoppel forecloses this argument. *See* Pet.'s Mem. at 11 ("The LNC unfortunately lost that battle in the previous litigation."); Pet.'s Opp'n Def.'s Mot. Dismiss & Reply Supp. Mot. Certify Facts & Questions ("Pet.'s Reply") at 14, ECF No. 27 ("[T]he LNC acknowledges the reality of what has already been won and lost."). The LNC also could go further and say that *Buckley*, which upheld contribution limits' facial constitutionality, itself should be overturned. The LNC, however, declines to advance this argument. *See* Pet.'s Mem. at 17 ("[T]he LNC merely seeks to apply the current state of First Amendment precedent."). Thus, the LNC must argue that *LNC I* does not control.

corruption to justify the contribution limits' application. *See id.* at 31–32. For the following reasons, the FEC's argument fails at every turn.[9]

### 1. *LNC I* Did Not Hold That Contribution Limits Constitutionally May Apply To Bequests As A General Matter.

Based on a fundamental misreading of *LNC I*, the FEC argues that the first question does not merit certification because *LNC I* held that the contribution limits generally may apply to bequests and the LNC has failed to distinguish Mr. Shaber's bequest from any other bequest. *See id.* at 24–30. The FEC characterizes *LNC I* as having concluded that "it is []constitutional to apply contribution limits to bequeathed contributions." *Id.* at 25; *see also id.* at 26 ("Of course, the LNC did lose its claim that the party contribution limit may not be constitutionally applied to testamentary bequests in general."); *id.* at 28 ("[T]he LNC has lost the battle over whether it is unconstitutional to apply any campaign contribution to testamentary bequests." (alterations and internal quotation marks omitted)). *LNC I* did not hold, as the FEC wrongly asserts, "that it is []constitutional to apply campaign contribution limits to testamentary bequests as a general

---

[9]     The FEC does not dispute that the instant question is distinguishable from the question that *LNC I* declined to certify insofar as the LNC challenges the contribution limits only as to the LNC's own First Amendment rights, rather than as to Mr. Shaber's rights as well. The FEC argues, however, that "[t]he LNC's framing of its legal arguments around a supposed First Amendment right to receive campaign contributions cannot save its first proposed certified question" because "any First Amendment interest the LNC has in receiving contributions is already reflected in the constitutional test the Supreme Court has applied to uphold FECA's contribution limits," which "already accounts for the rights of individuals and entities on the receiving end of contributions by asking if contribution limits are so low that they prevent recipients from amassing the resources necessary for effective advocacy." Def.'s Opp'n at 32 (citing *Buckley*, 424 U.S. at 21 (internal quotation marks omitted)). As an initial matter, the instant question requires no "sav[ing]," *id.*, because, as explained further below, the FEC has failed to show that the instant question does not merit certification. More fundamentally, the FEC's argument completely misses the point of the LNC's claim, which is not that applying the contribution limits to Mr. Shaber's bequest would burden the LNC's ability to "amass[] the resources necessary for effective advocacy," *Buckley*, 424 U.S. at 21; *see* Pet.'s Mem. at 17 ("The LNC does not claim in this litigation that the current contribution limit . . . is too low."), but rather, that Mr. Shaber's bequest raises no corruption concerns necessary to justify the contribution limits' application in the first place. Even a modest burden on one's ability to raise funds may be undue if such burden serves no corruption concern whatsoever. *See SpeechNow*, 595 F.3d at 695 (concluding, in "weighing the First Amendment interests implicated by contributions . . . against the government's interest in limiting such contributions," that "something outweighs nothing every time." (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) (alterations and internal quotation marks omitted))). That existing doctrine already prohibits contribution limits set too low to enable recipients to amass resources necessary for effective electioneering is simply irrelevant to the issue presented by the LNC.

matter." *Id.* at 24. *LNC I*'s actual holding is much more limited: *LNC I* merely held "that it is possible for a bequest to raise valid anti-corruption concerns." 930 F. Supp. 2d at 166. This is a far cry from holding that the contribution limits constitutionally may apply to most bequests or to bequests as a general matter, that a bequest must somehow be unusual for an as-applied challenge to lie, or that a petitioner challenging a contribution limit's application to a particular bequest must identify a "categorical basis to differentiate" a particular contribution "from any other potential bequeathed contribution." Def.'s Opp'n at 26, 30. Indeed, *LNC I*'s recognition of the mere "possib[ility]" that a bequest may "raise valid anti-corruption concerns," 930 F. Supp. 2d at 166, suggests if anything that most bequests do *not* raise valid corruption concerns, and that bequests only rarely raise the corruption concerns necessary to justify the contribution limits' application. At the very least, *LNC I* did not hold that the contribution limits presumptively are constitutional as to individual bequests. The FEC's argument to the contrary fails to understand what *LNC I* actually said.

### 2. The LNC Makes a Non-Frivolous Argument that Only Evidence of Actual Corruption, Rather Than the Appearance of Corruption, Can Justify the Contribution Limits' Application to Mr. Shaber's Bequest.

The FEC argues that no evidence of actual corruption is needed to justify the contribution limits' application to Mr. Shaber's bequest because contribution limits are designed to combat the appearance as well as the reality of corruption. *See* Def.'s Opp'n at 25–28.[10] The FEC is

---

[10]    The parties spill much ink arguing over which side bears the burden "to show evidence of corruption," or a lack thereof, as to a particular contribution to justify the contribution limits' application. Def.'s Opp'n at 27. The FEC argues that the LNC must offer a "categorical" basis to "differentiate the Shaber bequest . . . . from any other potential beque[st]," to which the FEC presumes the contribution limits constitutionally may apply, *id.* at 26–27, 30, but this argument is flawed in at least two ways. First, as explained above, *LNC I* did not hold that the contribution limits are constitutional as to an ordinary bequest, only that the contribution limits can apply to some bequests, at least in theory. Second, the government bears the burden to show a contribution limit's constitutionality. *See Buckley*, 424 U.S. at 25 (holding that contribution limits "may be sustained *if the State demonstrates* a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms" (emphasis added)). Chief Justice Roberts's opinion, joined by Justice Alito, in *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007), which held that the government bore the burden to show that a facially-valid expenditure limit

14

correct that existing doctrine recognizes the prevention of apparent corruption, not just of actual corruption, as an interest that justifies contribution limits. *See Citizens United v. FEC*, 558 U.S. 310, 357 (2010) ("[R]estrictions on direct contributions are preventative, because few if any contributions to candidates will involve quid pro quo arrangements . . . . The *Buckley* Court, nevertheless, sustained limits on direct contributions in order to ensure against the reality or appearance of corruption."); *Buckley*, 424 U.S. at 29–30 (1976) (observing that "most large contributors do not seek improper influence over a candidate's position or an officeholder's action," but that this "does not undercut the validity of the $1,000 contribution limitation . . . . Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated.").

The LNC responds that even if contribution limits may as a general matter "bar many contributions that are not, in fact, tainted by corruption, . . . . the dead are different, and thus raise different indicia of potential corruption and a different level of concern from that raised by the living." Pet.'s Opp'n Def.'s Mot. Dismiss & Reply Supp. Mot. Certify Facts & Questions ("Pet.'s Reply") at 16, ECF No. 27. This is so, the LNC asserts, because "[w]ith a bequest, the

---

could apply to a particular expenditure, is instructive. An anti-abortion group raised an as-applied challenge to a statute criminalizing "broadcast, shortly before an election, [of] any communication that names a federal candidate for elected office and is targeted to the electorate." *Id.* at 456. The government argued that because the statute in question had already been held "facially valid," the anti-abortion group "should be required to demonstrate that [the statute] is unconstitutional as applied to the ads" in question. *Id.* at 464. Chief Justice Roberts rejected this argument, reasoning that whether the statute (1) was constitutional as a facial matter and (2) "may constitutionally be applied to these specific ads" were entirely "separate question[s]." *Id.* Chief Justice Roberts determined that "[b]ecause [the statute] burdens political speech, . . . . the *Government* must prove that applying [the statute] to [the anti-abortion group's] ads furthers a compelling interest and is narrowly tailored to achieve that interest." *Id.* (emphasis in original). The same reasoning applies here. The FEC seeks to apply the contribution limits to Mr. Shaber's specific bequest, and so must bear the burden of showing the contribution limits' constitutionality as to that bequest. That *Wisconsin Right to Life* applied strict scrutiny, rather than "closely drawn" scrutiny, *see Buckley*, 424 U.S. at 25, is of no moment, as the government bears the burden to show a law's constitutionality under either standard. *See id.*; *Wisc. Right to Life*, 551 U.S. at 464. To the extent the FEC suggests that *LNC I* requires a different result, Def.'s Opp'n at 24–30, the FEC, as explained above, fundamentally misreads *LNC I*.

corruption inquiry is wholly retrospective, and barring supernatural intervention, the potential for quid pro quo activity is rather more limited, as is its enforcement." *Id.* at 16–17. The LNC thus seeks to recognize a limited exception, applicable only to bequests, to the general rule that the government's interest in preventing the appearance of corruption justifies contribution limits.

Neither party identifies any authority either recognizing or rejecting such an exception. Thus, whether preventing the appearance, rather than the reality, of corruption may justify a contribution limit's application to a bequest appears to be a question of first impression.[11] The absence of any authority foreclosing the LNC's argument persuades the Court that such argument is not frivolous.

### 3. The LNC Makes a Non-Frivolous Argument that Mr. Shaber's Bequest Raises No Corruption Concerns.

---

[11] In *SpeechNow.org*, the D.C. Circuit concluded that "contributions to groups that make only independent expenditures" as a matter of law "cannot corrupt *or create the appearance of corruption*," regardless of the factual circumstances under which such contributions are made. 599 F.3d at 694 (emphasis added). The LNC does not argue that *SpeechNow* supports a conclusion that testamentary contributions, like contributions to independent expenditure organizations, categorically cannot corrupt or create the appearance of corruption, regardless of the factual circumstances under which such contributions are made, nor would such an argument be sound. *SpeechNow* rested on *Citizens United*, which the D.C. Circuit read to have held "as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption." 599 F.3d at 694. *Citizens United*, in turn, "conclude[d]" as a matter of law "that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption," reasoning that "[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." 558 U.S. at 345, 357.

      *Citizens United*'s legal conclusion, however, must be understood in the context of the judicial proceedings from which it emerged. In *Citizens United*, the government presented "only scant evidence that independent expenditures even ingratiate," much less give rise to *quid pro quo* corruption or the appearance thereof. *Id.* at 360. As Justice Stevens observed, however, "Congress and outside experts" had in fact "generated significant evidence" that independent expenditures "give rise to *quid pro quo* corruption or the appearance of corruption." *Id.* at 457 (Stevens, J., dissenting). The "only reason" the Supreme Court did "not have any of the relevant materials before" it was "that the Government had no reason to develop a record at trial for a facial challenge the plaintiff had abandoned" in the district court. *Id.* On appeal, however, the Supreme Court *sua sponte* directed the parties to litigate the independent expenditure limit's constitutionality, without providing the government any opportunity to develop a factual record necessary to support the position that corporate independent expenditures can give rise to *quid pro quo* corruption or the appearance thereof. *Id.* *Citizens United* did not reject the relevance or value of factual evidence as to corporate independent expenditures' corrupting effect; *Citizens United* simply had little such evidence available to it. Here, in contrast, *LNC I*'s recognition that testamentary contributions can, under certain conditions, create actual or apparent corruption rested on extensive record evidence of the sort unavailable in *Citizens United*. *See LNC I*, 930 F. Supp. 2d at 166–67. As such, *SpeechNow* and *Citizens United* do not support a conclusion that testamentary contributions cannot corrupt or create the appearance of corruption, at least where evidence that testamentary contributions have an actual or apparent corrupting effect exists.

16

Finally, the FEC argues that even if the government bears the burden to show that the contribution limits are constitutional as applied to Mr. Shaber's bequest, and regardless of whether evidence of only actual or also apparent corruption may justify the contribution limits' application, Mr. Shaber's bequest evinces sufficient "factual markers of the potential for apparent or actual corruption" to justify applying the contribution limits. Def.'s Opp'n at 31.[12] The LNC, however, raises non-frivolous arguments to the contrary.

*LNC I* identified two circumstances in which "the anti-corruption rationale for limiting contributions from bequests is" beyond "theoretical." 930 F. Supp. 2d at 166 (alterations omitted). First, *LNC I* observed that "making one's bequest known" to a recipient "before death could be treated just as a contribution is," such that "a political committee could feel pressure to continue to ensure that a (potential) donor is happy with the committee's actions lest they revoke the bequest." *Id.* at 166–67. Second, *LNC I* observed that "[a] bequest may also help friends or family of the deceased have access to political officeholders and candidates," such that "political committees could offer access to the donor's heirs or representatives upon the production of a generous will." *Id.* Bequests that do not arise under these circumstances, *LNC I* suggested, thus are unlikely to "raise the anti-corruption concerns that motivated the *Buckley* and *McConnell* [*v. FEC*, 540 U.S. 93 (2003)] Courts to dismiss a facial attack on contribution limits." *Id.* at 166.

The LNC asserts that both of the above factors weigh toward concluding that Mr. Shaber's bequest raises no corruption concerns. First, according to the LNC, Mr. Shaber did not make his bequest known to the LNC prior to death. Pet.'s Reply at 16 (citing Pet.'s Proposed Facts ¶ 70). Second, neither Mr. Shaber nor any of his associates and loved ones had any known

---

[12]     These "factual markers" include that Mr. Shaber "gave 47 times and more than $3,000 to the LNC, was eligible to become a life member of the party, and received regular solicitations and invitations to events from the LNC, including a VIP reception." Def.'s Opp'n at 31 (internal quotation marks omitted).

relationship to the LNC or its board members, officers, or candidates apart from Mr. Shaber's donations themselves. *Id.* (citing Pet.'s Proposed Facts ¶ 84). Moreover, Mr. Shaber gave little to the LNC during his life—only $3,315 over the course of 24 years, an average of $138.13 per year—and the LNC has given nothing tangible of value to Mr. Shaber or his associates and loved ones. *Id.* (citing Pet.'s Proposed Facts ¶ 85; *see* Mot. Cert., Ex. E, Joseph Shaber Gift History, ECF No. 24-7). Thus, the LNC raises a non-frivolous argument that the government cannot meet the burden to show that Mr. Shaber's bequest raises any concerns as to the appearance or reality of corruption to justify the contribution limits' application.

*LNC I* supports the LNC's argument.[13] *LNC I* determined that the LNC had "ma[de] a persuasive argument that the Burrington bequest does not implicate any valid anti-corruption concerns" given that "the only known interaction between Burrington and the LNC occurred in 1998 when the former donated $25.00 to the Libertarian Party" and that "the LNC had no idea that Burrington planned to leave any money to the organization in his will." 930 F. Supp. 2d at 170. While the total $3,315 that Mr. Shaber contributed to the LNC in parts on 46 separate occasions during his life, *see* Joseph Shaber Gift History, is nearly 133 times the $25 that Mr. Burrington contributed to the LNC during his life, *see LNC I*, 930 F. Supp. 2d at 170, neither the amount nor frequency of Mr. Shaber's contributions are so great as to make frivolous the claim that Mr. Shaber's contributions do not raise corruption concerns. The amount of $3,315 donated over 24 years is a drop in the bucket relative to current law's annual limit of $33,900 for individuals to contribute for any purpose to national political party committees, and an even

---

[13] While, as discussed above, the Court presumes that *LNC I* has no collateral estoppel effect insofar as it certified a challenge to the contribution limits as to Mr. Burrington's request, *LNC I* remains at least persuasive authority in this regard.

smaller drop relative to the limit of $339,000 that individuals may contribute for either general or specialized purposes. *See* 52 U.S.C. § 30116(a)(1)(B), (a)(9); 82 Fed. Reg. at 10,905–06.

* * *

For the reasons explained above, (1) *LNC I* did not hold that the contribution limits constitutionally may apply to bequests as a general matter, and the LNC has raised non-frivolous arguments that (2) the FEC's only interest in applying the contribution limits to Mr. Shaber's bequest is an interest in combatting the reality, as opposed to the mere appearance, of corruption, and (3) Mr. Shaber's bequest does not raise corruption concerns so as to justify the contribution limits' application. As such, the LNC's first question—"Does imposing annual contribution limits against the bequest of Joseph Shaber violate the First Amendment rights of the Libertarian National Committee?," Pet.'s Mot. Cert. at 1—warrants certification under § 30110.

### C. The LNC's Arguments that the FECA's Specialized Purpose Regime Impermissibly Limits Speech On the Basis of Content is Not Frivolous

The LNC's second question—"Do 52 U.S.C. §§ 30116(a)(1)(B) and 30125, on their face, violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend its money?," *id.*—asserts that the FECA's specialized purpose regime "directly limit[s] how the LNC may express itself, in preparation for and during political campaigns, based on the subject matter, function, or purpose of the LNC's speech," in violation of the First Amendment. Pet.'s Mem. at 16. The LNC argues that once a donor has contributed to the LNC $33,900, the maximum annual legally-allowed general-purpose contribution, 52 U.S.C. § 20116(a)(1)(B); 82 Fed. Reg. at 10,905–06, any further contributions to the LNC by that donor, and the LNC's use of such contributions, are lawful only if made or used "towards the purposes and in the amounts ordained by Congress." Pet.'s Mem. at 16. These government-approved purposes are presidential nominating conventions, party

19

headquarters buildings, and recount expenses, *see* 52 U.S.C. § 30116(a)(9), "all [of which] convey or enable expression in some way or to some degree."  Pet.'s Mem. at 16.  Thus, the LNC argues, "the amount of speech a political party may exercise turns on the content of that speech," creating an impermissible content-based restriction on speech.  *Id.*[14]

"[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972); *accord Act Now to Stop War & End Racism Coal. v. District of Columbia*, 846 F.3d 391, 403 (D.C. Cir. 2017).  "[T]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office," *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989), as "'[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation' of our system of government," *id.* (quoting *Buckley*, 424 U.S. at 14).

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015).  "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," meaning that a court must "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys."  *Id.* at 2227 (quoting *Sorrell v. IMS Health, Inc.*, 131 S. Ct.

---

[14]    The LNC asserts that the contribution limits "are especially problematic, because they largely, if not only, disable minor parties," in that larger parties tend to need more money than smaller parties to fund presidential nominating conventions, party headquarter buildings, and recount proceedings.  Pet.'s Mem. at 18.  The LNC emphasizes that "[t]his is not to say that the LNC' claims sound in equal protection, or are based on some yardstick of competitive ability," but merely to show that the contribution limits are "irrational" and cannot "meet the rigors of strict scrutiny."  *Id.*

20

2653, 2663–2664 (2011)). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* However, "[b]oth are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.*

### 1. The Specialized Purpose Regime Should Be Reviewed as a Contribution Limit Rather Than as an Expenditure Limit.

As a threshold matter, the parties dispute whether the specialized purpose regime should be reviewed as a contribution limit or expenditure limit. *Compare* Pet.'s Mem. at 17 ("[T]he []omnibus expressive purpose restrictions are expenditure limits—content-based restrictions on speech."), *with* Def.'s Opp'n at 15 ("[T]here is no credible argument that the segregated account limits at issue here restrict expenditures."). The distinction between contribution limits and expenditure limits is legally significant, given the more demanding constitutional test to which expenditure limits are subject. *See, e.g.*, *Randall v. Sorrell*, 548 U.S. 230, 242 (recognizing that expenditure limits generally are "constitutionally invalid"). The specialized purpose regime is neither a pure contribution limit nor a pure expenditure limit, but contains elements of both, establishing higher limits on contributions directed toward one of three government-approved purposes than on contributions directed toward other purposes, *see* 52 U.S.C. § 30116(a)(1)(B), (9), and directing that national political parties "may not . . . spend any funds, that are not subject to the limits [and] prohibitions . . . of this Act," *id.* § 30125(a)(1).

Binding precedent forecloses the LNC's argument that the specialized purpose regime should be reviewed as an expenditure limit rather than as a contribution limit. *McConnell* held that provisions of the Bipartisan Campaign Reform Act ("BCRA") prohibiting "national parties from receiving or spending [soft] money" and state parties "from spending [soft] money on federal election activities," in addition to prohibiting persons from making such contributions,

were akin to contribution limits rather than expenditure limits because "neither provision in any way limits the total amount of money parties can spend," but "simply limit the source and individual amount of donations." 540 U.S. at 139. "That they do so by prohibiting the spending of soft money," *McConnell* reasoned, "does not render them expenditure limitations." *Id.* The same reasoning applies here.

The specialized purpose regime's characterization as a contribution limit, however, does not necessarily mean that mere "closely drawn," rather than strict, scrutiny applies to the LNC's challenge here. Typically, a challenge to a contribution limit asserts that the limit prevents a person from contributing as much money as the person would like to give, *see, e.g.*, *Buckley*, 424 U.S. at 20, but Congress's discretion to set contribution limits' specific dollar amounts is well-established, *see, e.g.*, *Randall*, 548 U.S. at 248 ("[T]he legislature is better equipped to make such empirical judgments, . . . . [t]hus ordinarily we have deferred to the legislature's determination of such matters." (quoting *McConnell*, 540 U.S. at 137)), *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 433 (2001) ("[T]he limit's dollar amount need not be fine tuned."); *Buckley*, 424 U.S. at 30 ("Congress' failure to engage in such fine tuning does not invalidate the legislation."). The LNC's argument here is different.

The LNC asserts not "that the current contribution limit . . . to political parties is too low," Pet.'s Mem. at 17; *see also id.* ("This is not a challenge to any contribution limit."), but rather, that the specialized purpose regime unconstitutionally conditions the lawfulness of a contribution on the content of the speech for which the contribution is used, *id.* at 18 ("When a political party can have money, and use it for some expression, but not other expression, that is an expression-restriction, not merely a contribution limit."). In this way, the LNC's second question raises an issue less akin to a traditional challenge to a contribution limit than to a

22

challenge to a statute alleged to restrict speech on the basis of content. *See, e.g.*, *Reed*, 135 S. Ct. at 2226. As such, the appropriate framework for review is that governing content-based restrictions on speech, requiring narrow tailoring to serve a compelling state interest, *see id.*, rather than the contribution limit framework.

### 2. Whether the Specialized Purpose Regime Unconstitutionally Restricts Speech Based On Content.

The FEC makes several arguments as to why the specialized purpose regime does not impermissibly restrict speech on the basis of content. First, the FEC denies that the specialized purpose regime imposes a content-imposed restriction at all. *See* Def.'s Reply Mem. Supp. Mot. Dismiss ("Def.'s Reply") at 7, ECF No. 29. Second, even if the specialized purpose regime amounts to a content-based restriction, the FEC contends this regime is sufficiently tailored to achieve a sufficiently important governmental interest. *See* Def.'s Opp'n at 18-22. Third, the FEC argues that existing authority establishes that Congress may allow contributions to particular recipients and those recipients' expenditure of such contributions for certain purposes but not for others. *See id.* at 20. Each of these arguments are addressed in turn.

### i. Whether The Specialized Purpose Regime Imposes Content-Based Restrictions

The FEC argues that the specialized purpose regime does not constitute a content-based restriction on speech because "the ability of a national political party committee to use funds contributed to the segregated accounts depends not on the content of any message but rather the category of expenses at issue." Def.'s Reply at 7. This, however, is not so. As the LNC correctly observes, the LNC cannot lawfully spend the entirety of a contribution in an amount above $33,900 "distributing pamphlets about the party's ideology or supporting a non-presidential candidate," but must spend at least some portion of that contribution, if at all, "broadcasting its presidential nominating convention, hanging a sign on its building, or litigating

23

an election contest." Pet.'s Mem. at 16. Thus, the lawfulness of a particular expenditure by the LNC may indeed turn on the message that the expenditure conveys. The FEC argues that the LNC can spend specialized purpose account funds for any purpose so long as the LNC does so at the LNC's presidential nominating convention, *see* Def.'s Reply at 7, but to condition an expenditure's lawfulness on whether the expenditure is made in connection with a convention itself arguably constitutes a content-based restriction on speech. *See Reed*, 135 S. Ct. at 2227 (identifying laws that "defin[e] regulated speech by its function or purpose" as imposing content-based restrictions. At the very least, the LNC's argument to this effect is not frivolous.

### ii. *Whether the Specialized Purpose Regime Is Sufficiently Tailored To Serve A Sufficiently Important Government Interest*

The FEC next argues that any disparate treatment of general purpose and specialized purpose contributions passes constitutional muster given that (1) Congress, having ended public funding of presidential nominating conventions in 2014, sought "to ensure that national parties would maintain access to sufficient funds to continue their [convention] operations after one source of funds was no longer available," (2) party headquarters and recount expenses "tend to be less directly connected to most candidates or campaigns for federal office," and thus to raise lesser corruption concerns than contributions toward expenses more directly connected to individual candidates and campaigns, and (3) "political parties and their candidates tend to place more value on unrestricted contributions than those that may only be used for certain expenses," meaning that general purpose contributions "create a higher risk of corruption or its appearance than" specialized purpose contributions, requiring more restrictive limits to prevent corruption or the appearance thereof. *See* Def.'s Opp'n at 18–20, 22.

The LNC counters, somewhat ironically, that specialized purpose contributions raise corruption concerns at least equal to those that general purpose contributions raise, and thus, that

24

setting higher limits on specialized purpose contributions undermines the anti-corruption rationale used to justify the general purpose contribution limits. *See* Pet.'s Mem. at 5. "[D]onations received for a segregated purpose potentially free up other money that would have been spent out of a party's general account, to be used for unrestricted purposes," the LNC observes, given that "money is fungible." *Id.* Thus, the LNC posits, "[s]o long as a party would have spent a sufficient amount on a segregated purpose, a segregated purpose donation is effectively an unrestricted donation." *Id.*

Whether the specialized purpose regime is sufficiently tailored, under the circumstances, to achieve a sufficiently important interest under the applicable standard of scrutiny is a question for the D.C. Circuit to resolve in the first instance. At this stage, the LNC's arguments are not so clearly frivolous, and the merits of the FEC's argument so overwhelmingly obvious, as to make certification unwarranted.

### iii. *Whether Existing Authority Establishes that Congress May Allow Contributions to Particular Recipients, and Those Recipients' Expenditure of Such Contributions, For Certain Purposes But Not For Others*

The FEC further argues that binding precedent establishes "that differing contribution limits may apply to distinct categories of expenses." Def.'s Opp'n at 20. The FEC cites *McConnell*, which upheld a BCRA provision, currently codified at 52 U.S.C. § 30125(b)(1), that prohibits state, district, and local political party committees from using "soft-money . . . funds for activities that affect federal elections," while allowing soft money "[d]onations made solely for the purpose of influencing state or local elections," as support. 540 U.S. at 122, 133–34, 173.[15]

---

[15] Section 30125(b)(1) provides that "an amount that is expended or disbursed for Federal election activity by a State, district, or local committee of a political party . . . shall be made from funds subject to the limitations, prohibitions, and reporting requirements of this Act." 52 U.S.C. § 30125(b)(1). Although § 30125(b)(1) is framed as a limitation on state and local party "*expend*[*itures*] *or disburse*[*ments*] for Federal election activity," *McConnell* characterized the law as a contribution limit rather than an expenditure limit because the statute does not "limit[] the total amount of money parties can spend," but "simply limit[s] the source and individual amount of donations." 540 U.S. at 139. "That [§ 30125(b)(1)] do[es] so by prohibiting the spending of soft money," *McConnell* said, "does not

The FEC thus construes *McConnell* to hold that Congress generally may allow contributions to be made for certain purposes but not for others. *See* Def.'s Opp'n at 20–21.

This reading of *McConnell* is too broad. There, the plaintiffs challenged § 30125(b)(1) on the ground that the statute "will prevent them from engaging in effective advocacy." 540 U.S. at 173. The plaintiffs did not raise the argument that § 30125(b)(1) unconstitutionally conditioned a contribution's lawfulness on the purpose for which the contribution was made, *see id.*, which is the argument the LNC raises here, *see* Pet.'s Mem. at 16. As such, *McConnell* cannot be read to foreclose the LNC's claim. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (internal quotation marks omitted)).

Moreover, even if *McConnell* had expressly held that § 30125(b)(1)'s distinction between contributions to fund "Federal election activity" and contributions to fund state and local election activities were constitutional, such a holding would not foreclose the LNC's claim. Content-based restrictions on speech must be "narrowly tailored to serve compelling state interests." *Reed*, 135 S. Ct. at 2226. Section 30125(b)(1)'s distinction between contributions to fund federal election activities and contributions to fund state and local activities may be said to (1) reflect Congress's judgment that the federal government has a compelling interest in preventing the reality or appearance of corruption as to federal elections but not as to state or local elections, and (2) be narrowly tailored to serve only the former interest. In other words, § 30125(b)(1) might be understood to reflect the view that any corruption, in fact or appearance, of state and

---

render [it an] expenditure limitation[.]" *Id.* Section 30125(b)(1) also applies to expenditures or disbursements for the purpose of "Federal election activity . . . by an association or similar group of candidates for State or local office or of individuals holding State or local office." 52 U.S.C. § 30125(b)(1). For ease of reference, § 30125(b)(1) is described simply as a limitation on federal electioneering by state, district, or local political committees.

local political processes just is not the federal government's business, not that soft money contributions to fund state and local election activity give rise to no real or apparent corruption.

The FEC also argues that prior to the BCRA, federal law allowed national political parties to accept unlimited soft money contributions to fund state and local election activities, notwithstanding that such activity "could simultaneously influence federal elections." Def.'s Opp'n at 21 (quoting *Republican Nat'l Comm. v. FEC*, 698 F. Supp. 2d 150, 153 (D.D.C. 2010)). The FEC cites no decision of any court affirming this aspect of the pre-BCRA regime's constitutionality, however, *id.*; the issue apparently never arose.[16] The pre-BCRA soft money regime simply does not establish that the FECA's current specialized purpose regime passes constitutional muster. Moreover, as with § 30125(b), the pre-BCRA rules allowing national parties to accept unlimited soft money contributions to fund state and local, but not federal, election activities, might be said to be reflect a proper congressional judgment that corruption of state or local elections is not the federal government's concern. As such, any conclusion that the pre-BCRA soft money regime were constitutional would not foreclose the LNC's claim.

The parties debate the relative corruption concerns that various types of contributions raise, but keeping score to determine this debate's winner is a job for the D.C. Circuit, not this Court. For example, pointing to the fact that "an individual may give $2,700 to any candidate

---

[16] The FEC cites *FEC v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431, 458 (2001), for the proposition that "the pre-BCRA contribution limits applicable to funds raised by national political parties for use in federal elections remained constitutional even though different rules applied to funds raised for use in those state and local elections." Def.'s Opp'n at 21. The FEC's reliance on *Colorado Republican* is baffling. That decision upheld the constitutionality of limits on the amount of money a national political party may expend in coordination with a political candidate, but did not address any disparity in treatment of funds intended for use in federal or state and local election activity. *See generally Colo. Republican*, 533 U.S. 431. The FEC further argues that *Colorado Republican* shows that restrictions on "how parties may use funds" merit "closely drawn" rather than strict scrutiny. Def.'s Reply at 5. The FEC reads *Colorado Republican* far too broadly. *Colorado Republican* stands for nothing more than the unremarkable proposition that contribution limits are subject to mere closely drawn scrutiny, and that coordinated expenditures, as functional equivalents to contributions, constitutionally may be subject to contribution limits. 533 U.S. at 447, 456. *Colorado Republican* certainly did not hold that Congress may limit the amount that political parties spend toward particular purposes outside the narrow set of circumstances where such spending effectively amounts to a contribution to a political candidate.

27

committee for each election, $5,000 annually to any political action committee, and $10,000 annually to any state or local party committee," Def.'s Reply at 4 (citing 52 U.S.C. § 30116(a)(1)(A)-(D); 82 Fed. Reg. at 10,905), the FEC argues that "[f]rom such an individual's perspective, those contribution limits apply 'depending on how' the individual wishes to spend money," *id.* Such restrictions on "how much money a donor may contribute to a particular candidate or committee" have been upheld to "serv[e] the permissible objective of combatting corruption." *McCutcheon v. FEC*, 134 S. Ct. 1434, 1442 (2014). Nevertheless, the LNC argues that limiting the purposes toward which a person may contribute to a political committee serves no anti-corruption interest because money is fungible, meaning that the more specialized purpose funds available to a committee, the less general purpose funds the committee will need to spend toward specialized purposes, and thus, will have available to spend toward other purposes. *See* Pet.'s Mem. at 20–21. The FEC counters that restricted contributions pose less corruption concern than unrestricted contributions, justifying higher contribution limits for restricted contributions, because "political parties and their candidates tend to place more value on unrestricted contributions than those that may only be used for certain expenses." Def.'s Opp'n at 22. The LNC, in turn, asserts that restricted and unrestricted contributions are more fungible to large parties with large specialized purpose expenses, but less fungible to small parties that spend less toward specialized purposes. *See* Pet.'s Mem. at 20–21. The LNC's argument that the specialized purpose regime serves no anti-corruption interest given money's fungibility, whether correct or not on the merits, plainly is not so frivolous or insubstantial as to be unworthy of certification under § 30110.

* * *

For the reasons given above, the LNC's claim in the second question that the specialized purpose regime unconstitutionally conditions certain speech's lawfulness on that speech's content is not "wholly insubstantial, obviously frivolous, [or] obviously without merit," and so satisfies § 30110's "low bar." *Holmes*, 823 F.3d at 71–72 (quoting *Shapiro*, 136 S. Ct. at 456). Moreover, because the LNC's second question merits certification, it logically follows that the LNC's third question—"Does restricting the purposes for which the Libertarian National Committee may spend the bequest of Joseph Shaber violate the Committee's First Amendment rights?," Pet.'s Mot. Cert. at 1—challenging the specialized purpose regime as to Mr. Shaber's particular bequest, also warrants certification.

### D. Reformulating The LNC's Proposed Questions

The FEC argues that should the LNC's second and third proposed questions be certified, these questions should be reformulated because, in their current form, they are phrased in argumentative, question-begging, and overbroad terms. *See* Def.'s Opp'n at 33. While the Court declines to adopt the FEC's proposed formulations of these questions, which themselves are argumentative and question-begging, for the reasons that follow, the LNC's questions two and three are reformulated to address the FEC's concerns.

At the outset, the FEC contends that the LNC's second and third proposed questions "go far beyond the claims asserted in the LNC's complaint." *Id.* According to the FEC, "Counts II and III of the LNC's complaint focused on the constitutionality of the segregated account limits," which "appeared to be the only aspect of the limit on contributions to political parties that the [LNC] challenged in its complaint." *Id.* Yet, the FEC continues, "the LNC's proposed questions two and three are not expressly targeted at the segregated account structure, but instead broadly assert that the contribution limits applicable to national committees 'restrict the purposes for

29

which the LNC may spend' its money." *Id.* at 34 (quoting Pet.'s Mem. at 3 (alterations omitted)). Contrary to the FEC's description, Counts II and III of the LNC's complaint clearly allege that § 30125, which prohibits "[a] national committee of a political party" from "spend[ing] any funds, that are not subject to the limitations [and] prohibitions . . . of this Act," 52 U.S.C. § 30125(a)(1), "violate[s] the First Amendment speech and associational rights of the LNC and its supporters," Compl. ¶ 31; *accord id.* ¶ 34. In short, the FEC's criticism of questions two and three for lack of notice is baseless, as the LNC's complaint targets § 30125's restriction on the LNC's ability to spend specialized purpose account funds.

As to the framing of questions two and three, the FEC deems these questions to be "argumentative because [they] beg[] the question [of] whether the segregated account limits actually restrict the LNC's spending." Def.'s Opp'n at 34. The second question asks whether the specialized purpose regime facially "violate[s] the First Amendment rights of the [LNC] by restricting the purposes for which the [LNC] may spend its money." Pet.'s Mot. Cert. at 1. This question can be understood to ask not only whether restricting the purposes for which the LNC may spend its money violates the First Amendment, but also whether the specialized purpose regime in fact imposes such a restriction. The second question thus requires no reformulation.

The third question asks whether "restricting the purposes for which the [LNC] may spend the bequest of Joseph Shaber violates the [LNC's] First Amendment Rights." *Id.* The third question, unlike the second question, seemingly presumes that the specialized purpose regime does in fact restrict the purposes for which the LNC may spend its money. The third question's phrasing thus is argumentative and question-begging: whether the specialized purpose regime, in fact, restricts the purposes for which the LNC may spend its money is an issue that must be decided, and may not be presumed. As such, the Court reformulates the third question to mirror

30

the second question, a reformulation to which the LNC hardly can take issue given that the LNC itself formulated the second question's phrasing.

Finally, the FEC argues that the second and third questions "are not limited to the segregated account structure," Def.'s Opp'n at 34, but rather, "implicate whether national party committees may be subject to contribution limits *at all*," Def.'s Reply at 13. To the extent any ambiguity exists as to which aspects of the FECA are subject to challenge here, the second and third questions are reformulated to clarify that only the specialized purpose regime created by § 30116(a)(1)(B), (a)(9), and § 30125(a)(1) are subject to challenge, and only on the ground that the specialized purpose regime conditions the lawfulness of contributions above § 30116(a)(1)(B)'s general purpose contribution limit on whether the contribution is directed toward one of § 30116(a)(9)'s three enumerated specialized purposes.

Accordingly, the second question is reformulated as follows: "Do 52 U.S.C. §§ 30116(a)(1)(B), (a)(9), and 30125(a)(1), on their face, violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend its contributions above § 30116(a)(1)(B)'s general purpose contribution limit to those specialized purposes enumerated in § 30116(a)(9)?" The third question is reformulated as follows: "Do 52 U.S.C. §§ 30116(a)(1)(B), (a)(9), and 30125(a)(1) violate the First Amendment rights of the Libertarian National Committee by restricting the purposes for which the Committee may spend that portion of the bequest of Joseph Shaber that exceeds § 30116(a)(1)(B)'s general purpose contribution limit to those specialized purposes enumerated in § 30116(a)(9)?"

At the same time, the Court declines to adopt the FEC's proposed formulations of the second and third questions. The FEC would reformulate the these questions as follows:

> **Question 2**: "Do 52 U.S.C. § 30116(a)(1)(B) and (9) violate the First Amendment rights of the Libertarian National Committee by permitting it to accept 300% of the

otherwise applicable contribution limit into segregated accounts used to defray expenses with respect to its presidential nominating conventions, headquarters buildings, and election recounts and contests and other legal proceedings?" Def.'s Opp'n at 34–35;

**Question 3**: "Do 52 U.S.C. § 30116(a)(1)(B) and (9) violate the First Amendment rights of the Libertarian National Committee by permitting it to accept 300% of the otherwise applicable contribution limit from the bequest of Joseph Shaber into segregated accounts used to defray expenses with respect to its presidential nominating conventions, headquarters buildings, and election recounts and contests and other legal proceedings?" *Id.* at 35.

Framing the specialized purpose regime as one that "permit[s]" the LNC "to accept 300% of the otherwise applicable contribution limit" is argumentative and question-begging. As discussed earlier, the crux of the LNC's challenge is not that the specialized purpose regime restricts the LNC from raising or spending sufficient funds, but that the specialized purpose regime imposes a content-based restriction on speech by conditioning the lawfulness of certain contributions, and of the LNC's acceptance and expenditure of such contributions, on whether the contribution was made for a particular enumerated government-approved purpose.

## IV.    CONCLUSION

For the reasons given above, the FEC's motion to dismiss is denied and the LNC's motion to certify is granted in part and denied in part. An appropriate Order accompanies this Memorandum Opinion. Findings of fact are set out in the Appendix.

**Date:** June 29, 2018

_____
BERYL A. HOWELL
Chief Judge

**FINDINGS OF FACT**[17]

## I.   The Parties

1. The Plaintiff, Libertarian National Committee, Inc. ("LNC"), is the national committee of the Libertarian Party of the United States. Pet.'s Mot. Cert., Decl. of Nicholas Sarwark, Chair, LNC, Inc. ("Sarwark Decl.") ¶ 1, ECF No. 24-17; Def.'s Answer & Affirmative Defenses ("Def.'s Answer") ¶ 1, ECF No. 22.

2. The Defendant, Federal Election Committee ("FEC"), is the federal government agency charged with the administration and enforcement of the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30101 *et seq.* Pet.'s Complaint ("Compl.") at 3, ECF No. 1. The FEC has exclusive jurisdiction with respect to the civil enforcement of such provisions. *Id.* §§ 30106(b)(1), 30109. The FEC also has the authority to make rules and regulations necessary to carry out the FECA, *id.* §§ 30107(a)(8), 30111(a)(8), 30111(d), and to issue advisory opinions concerning the application of FECA and prescribed regulations, *id.* §§ 30107(a)(7), 30108.

3. The LNC is a "not-for-profit organization incorporated under the laws of the District of Columbia." Sarwark Decl. ¶ 1. "The LNC has 15,031 active paid sustaining donors, and 137,451 members, in all 50 states and the District of Columbia." *Id.* at ¶ 2. "Over half a million registered voters identify with the Libertarian Party in the states in which voters can register as Libertarians." *Id.*

---

[17] The Court's findings of fact are taken from the parties' proposed findings of fact and responses thereto. *See* Pet.'s Mot. Cert., Ex. A, Pet.'s Facts Submitted for Cert. ("Pet.'s Proposed Facts"), ECF No. 24-3; Def.'s Opp'n, Attach. 2, Def.'s Resps. Pet.'s Proposed Facts, ECF No. 26-2; Def.'s Opp'n, Attach. 3, Def.'s Proposed Findings of Fact ("Def.'s Proposed Facts"), ECF No. 26-3; Pet.'s Reply, Attach. 1, Pet.'s Resps. Def.'s Proposed Facts, ECF No. 27-1. To the extent that objections were lodged to any proposed factual finding, those objections are sustained, denied, or resolved as reflected in the factual findings included in this Appendix.

"[Forty-eight] partisan officeholders and 111 non-partisan officeholders across the country are affiliated with the Libertarian Party." *Id.*

4. "Founded in 1971, the Libertarian Party has yet to elect a federal office holder, and no current federal office holder is affiliated with the Libertarian Party." *Libertarian Nat'l Comm., Inc. v. FEC* ("*LNC I*"), 930 F. Supp. 2d 154, 172 (D.D.C. 2013) (Wilkins, J.) (citation omitted).

5. "The LNC's purpose is to field national Presidential tickets, to support its state party affiliates in running candidates for public office, and to conduct other political activities in furtherance of a libertarian public policy agenda in the United States." *LNC I*, 930 F. Supp. 2d at 172 (citation omitted); Sarwark Decl. ¶ 3.

6. The LNC "facilitates mutual contacts between contributors and federal candidates," and "assists candidates in their efforts to win federal office." Def.'s Opp'n, Ex. 2, Pet.'s Resps. Def.'s First Set Requests for Admissions at 10, ECF No. 26-6.

7. To achieve its political goals, the LNC organizes affiliate parties in all fifty states and runs candidates for public office "with the goal of reducing government control over individuals' lives." Def.'s Opp'n, Ex. 6, Dep. of Nicholas Sarwark ("Sarwark Dep.") at 28:4–10, ECF No. 26-10. The LNC nominates candidates for president and vice president on behalf of the Libertarian Party every four years. *Id*. at 48:2–7, 49:8–11.

8. "Even if a Libertarian Party candidate does not win a federal election, the LNC generally views it as positive if its candidate gets more votes than the margin of

victory between the two major-party candidates and thus affects the outcome of the election." *LNC I*, 930 F. Supp. 2d. at 173 (citation omitted). That is because such a result might cause a candidate of a major party to listen to the Libertarian Party's position in the future or reconsider his or her own position, "since the party would have demonstrated that a sizeable percentage of the electorate agrees with the Libertarian Party and wants to see more Libertarian public policies." *Id.* (internal quotations omitted).

9. In a 2006 letter to prospective donors, the LNC stated that

> [o]ne of the most significant achievements of the year was our candidates being identified as the deciding factor in control of the U.S. Senate. This led to positive press coverage in the *Washington Post* and many other news outlets. Our impact in these important elections even led to an article in *The Economist* titled "Libertarians Emerge as a Force." Clearly, it was a good year for our party.

*Id.* at (citation omitted).

## II.     The LNC's Fundraising and Spending On Segregated Account Expenses

10. In some of its fundraising solicitations, the LNC has told potential contributors that their contributions will only be used for specific expenses. Sarwark Dep. at 13:8–14:6, 40:11–21. Some donors have informed the LNC that they will only give money if they are told what the money will be used for. *Id*. at 21:18–22:3. Such project-based fundraising is often more effective for the LNC than asking for "unearmarked" money. *Id.* at 22:18–23:4.

11. The LNC "earmarks" certain contributions to specify that those contributions are only to be used for particular categories of expenses. *Id*. at 13:20–14:6. Those earmarks include funds for "ballot access." *Id*. at 14:14–15:19. This may include

litigation over whether the Libertarian candidate will appear on a ballot in a particular election. *See id.* at 15:7–19.

12. The LNC maintains a "Legal Offense Fund" that is used to finance "proactive litigation" on behalf of the LNC. *Id*. at 40:11–14; *see also* Def.'s Opp'n, Ex. 8, LNC Legal Offense Fund Email, ECF No. 26-12. To raise money for this fund, the LNC has sent solicitations to potential contributors asking them specifically to donate to finance proactive litigation. LNC Legal Offense Fund Email at 2. In one such solicitation, LNC Chair Nicholas Sarwark wrote: "I promise you that every dollar we receive from this fundraiser will be spent on legal offense." *Id*. at 3.

13. The LNC also maintains a segregated account for a "building fund," which it operates pursuant to 52 U.S.C. § 30116(a)(9)(B). Sarwark Dep. at 14:14–15; Sarwark Decl. ¶ 29.

14. The LNC does not place donations into its segregated purpose building account unless the donors specifically earmark their donations for building purposes. *Id.* "Of course, mortgage payments and payments for other expenses related to the building may be made from LNC's general account as circumstances warrant." *Id.*

15. "The Libertarian Party's headquarters building makes an architectural statement that is consistent with the party's mission. LNC would not occupy a headquarters building that would make an unsuitable architectural statement." *Id.* ¶ 30.

16. "The Libertarian Party occasionally places political signs in its headquarters windows, or on the lawn in front of the building, but is prohibited by city ordinance from placing outdoor signage on its building." *Id.* ¶ 31.

17. News reports indicate that major cities typically bid to host the presidential nominating conventions of the two major legacy parties. *See, e.g.*, Chris Brennan, *Democrats to Convene in Philly in 2016*, PHILADELPHIA INQUIRER (Feb. 13, 2015), http://www.philly.com/philly/news/politics/20150213_Source__Philadelphia_to_host_2016_Democratic_Convention.html; Andrew J. Tobias, *Cleveland Chosen to Host 2016 Republican National Convention*, CLEVELAND PLAIN DEALER (July 8, 2014), https://www.cleveland.com/open/index.ssf/2014/07/cleveland_gop_convention_annou.html.

18. The LNC solicits directly for the building fund. Def.'s Opp'n, Ex. 30, LNC Building Fund Solicitation Letter, ECF No. 26-34. On April 26, 2014, the LNC sent a solicitation to contributors asking for contributions to this fund, which the LNC has also referred to as the David F. Nolan Memorial Headquarters Office Fund. *Id.* at 1. The solicitation explained that "[a]ll funds raised go into a separate account and are dedicated to the Nolan Memorial Headquarters Office, and will be restricted for use toward the associated purchase, furnishing, renovation, and moving expenses." *Id.* at 3.

19. On April 4, 2013, the LNC sent an email to potential contributors soliciting contributions to its building fund that explained that "every dollar contributed to

37

the David F. Nolan Memorial Building Fund must, by law, be spent on buying an office or associated expenses – or it must be returned to you, the donor." Def.'s Opp'n, Ex. 32, LNC Building Fund Email at 2, ECF No. 26-36. The email noted "that means your donation is guaranteed to be used <u>only</u> for the Building Fund." *Id.* (emphasis in original).

20. The LNC has offered recognition for people who contributed to the building fund at certain levels. Sarwark Dep. at 20:1–11. Specifically, the LNC offered to allow contributors to the building fund to name certain rooms in the LNC's headquarters or place their name on plaques to be displayed in those rooms. *Id*. at 18:15–19:1.

21. The LNC has accepted money into an account authorized by 52 U.S.C. § 30116(a)(1)(B) and (a)(9) that it could not have accepted prior to the specialized purpose regime's creation because the donor had already contributed the maximum amount in unrestricted funds. *See, e.g.*, Sarwark Dep. at 12:10–13:1; Pet.'s Proposed Facts.

22. As of December 31, 2016, the LNC accepted a total of $31,508 in contributions to a segregated account for its headquarters. Def.'s Opp'n, Ex. 1, Decl. of Paul C. Clark II, Federal Election Commission ("Clark Decl.") ¶ 13 tbl.2, ECF No. 26-5; Pet.'s Mot. Cert., Attach. 22, Decl. of Paul C. Clark II ¶ 13 tbl.2, ECF No. 24-22. One donor, Michael Chastain, donated $26,410.01 into the LNC's segregated building fund in 2017. Pet.'s Mot. Cert., Attach. 20, Decl. of Michael Chastain ("Chastain Decl.") ¶ 4, ECF No. 24-20.

23. The purpose of the LNC's headquarters "is to provide full-time, professional support for the on-going political activities of the [p]arty." Def.'s Opp'n, Ex. 11, LNC Policy Manual at 48, ECF No. 26-15. The activities of the LNC's headquarters include record keeping, member services, development activities, external communications, and political action. *Id*. at 48–49.

24. In 2014, the LNC purchased a building to serve as its headquarters. LNC Building Fund Solicitation Letter at 1. The purchase price was $825,000. *Id*. at 2.

25. "Among the LNC's goals is to completely pay off the headquarters building as quickly as possible, and in any case prior to the 2024 due date of a balloon payment. [To] that end, the LNC budgets at least $60,000 in . . . odd-numbered year[s] to pay down the principal, and undertakes fundraising efforts dedicated specifically towards that purpose. Accordingly, LNC expects that it would pay off the mortgage well before 2024. However, the LNC's goals at times exceed its budget, and budget targets are not always met." Sarwark Decl. ¶ 28.

26. The LNC holds a presidential nominating convention once every four years immediately preceding a presidential election. Sarwark Dep. at 48:2–4. The purpose of these conventions is to conduct party business, including hearing reports from various LNC committees regarding changes to the national party bylaws, changes to the national party platform, election of officers and at-large members of the LNC, the election of the judicial committee, and occasional adoption of public policy resolutions. *See id*. at 48:12–49:7. In addition, Libertarian candidates for president and vice president are nominated at presidential nominating conventions. *Id.* at 49:8–11.

39

27. The LNC engages in fundraising specific to expenses that would be incurred for presidential nominating conventions. *Id*. at 49:12–50:13.

28. "All, or very nearly all, of the Libertarian Party's expenses for holding its presidential nominating conventions are incurred and paid for in the year in which the convention is held. Occasionally . . . minor expenses related to presidential nominating conventions . . . are pre-paid in the year preceding the presidential nominating conventions. No expenses related to holding presidential nominating conventions are incurred in the two years following a year in which the [LNC] holds a presidential nominating convention." Sarwark Decl. ¶ 34.

29. During discovery, the LNC provided an expense report for years 2013 through 2016. Def.'s Opp'n, Ex. 7, LNC Account QuickReport, ECF No. 26-11. While the description of costs were not specifically tailored to the exact language of the segregated account provision in FECA, in general, the LNC spent roughly $467,251.58 on 52 U.S.C. § 30116(a)(9)-sanctioned expenses in 2016. *Id.* at 30.

30. The LNC's total budget for program expenses and cost of support and revenue, including fundraising, was $1,406,400 in 2014, Def.'s Opp'n, Ex. 22, LNC 2014 Budget, ECF No. 26-26, $1,304,246.33 in 2015, Def.'s Opp'n, Ex. 9, LNC 2015 Budget, ECF No. 26-13, and $2,263,183 in 2016, Def.'s Opp'n, Ex. 10, LNC 2016 Budget, ECF No. 26-14.

31. Between December 16, 2014, and December 31, 2016, national party committees have accepted a total of $129,997,590 into their specialized purpose accounts. Clark Decl. ¶ 13 tbl.2. The national party committees affiliated with the Democratic Party have accepted a total of $41,510,551; the national party

committees affiliated with the Republican Party have accepted a total of $88,455,532; and the LNC has accepted $31,508. *Id.* No other national committee of any political party reported segregated account contributions as of December 31, 2016. *Id.* ¶ 14.

### III. The FECA's Specialized Purpose Regime

32. Potential donors may forego making a contribution to the national committee of a political party, or reduce the amount of their contribution, if the uses of that contribution are restricted. *See* Sarwark Decl. ¶ 10; *see, e.g.*, Pet.'s Mot. Cert., Attach. 19, Decl. of Chris Rufer ("Rufer Decl.") ¶¶ 5–7, ECF No. 24-19; Chastain Decl. ¶¶ 5–7; Pet.'s Mot. Cert., Attach. 21, Decl. of William Redpath ("Redpath Decl.") ¶ 5, ECF No. 24-21.

33. "LNC is unaware of any documentary evidence comparing the corrupting potential of restricted, [specialized-purpose] contributions with the corrupting potential of unrestricted, general purpose contributions." Sarwark Decl. ¶ 11.

34. During discovery in this litigation, the LNC posed the following interrogatory to the FEC: "[P]lease describe in detail all evidence tending to support the proposition that a maximum allowable contribution to one of the separate, segregated accounts provided for in 52 U.S.C. § 30116(a)(9) is less corrupting than a contribution that exceeds the unrestricted, general purpose contribution limits by one dollar." Pet.'s Mot. Cert., Ex. B, Def.'s Objections & Resps. Pet. LNC's First Discovery Requests ("Def.'s First Objections & Resps.") at 15, ECF 24-4. The FEC responded: "The FEC cannot respond to this interrogatory because it rejects the premise that a contribution of any particular dollar value is

'corrupting' but that lower values are not 'corrupting.' Moreover, the FEC cannot completely answer this interrogatory, as discovery is ongoing. Nevertheless, the FEC is aware of case law, publicly available secondary material, and simple logic which dictates that parties may prefer unrestricted contributions to those that may only be used in connection with particular expenses. The FEC is also aware of LNC's allegations that 'the LNC has comparatively less use for funds intended to support national conventions, a headquarters building, or attorney fees' and therefore 'needs' unrestricted funds 'in order to directly speak to the electorate.' Compl. ¶ 13. Additional evidence may be uncovered through continuing discovery in this case." *Id.* at 15–16.[18]

35. During discovery in this litigation, the LNC posed the following interrogatory to the FEC: "Please describe the likelihood that an individual's contribution of $101,700 to the national committee of a political party, restricted for the purpose of funding a headquarters building, election contests, or a presidential nominating convention, would create the same or greater appearance of corruption as an unrestricted contribution in the amount of $33,901 by that individual to the same national committee of a political party." Pet.'s Mot. Cert., Ex. C, Def.'s Objections & Resps. Pet.'s Second Discovery Requests ("Def.'s Second Objections & Resps.") at 6, ECF 24-5. The FEC responded: "[L]arger contributions [to political parties] are generally more likely to lead to actual or

---

[18]     The LNC proposed to certify only the following fact: "The FEC . . . rejects the premise that a contribution of any particular dollar value is 'corrupting' but that lower values are not 'corrupting.'" Pet.'s Proposed Facts ¶ 30 (citation omitted). The FEC noted that the LNC's proposed fact excerpted from a longer interrogatory response, and argued that "[t]o the extent this proposed fact is certified . . . the FEC's full response should in fairness be included. *See* FED. R. EVID. 106." Def.'s Resps. Pet.'s Proposed Facts at 15.

42

apparent quid pro quo arrangements and can do so regardless of how the funds are ultimately used, but unrestricted funds contributed to a political party may be used for activities that maximally benefit federal candidates and thus may pose a relatively more acute danger of actual and apparent corruption." *Id.* at 7.[19]

36. During discovery in this litigation, the LNC posed the following interrogatory to the FEC: "Please explain why a maximum allowable contribution to one of the separate, segregated accounts provided for in 52 U.S.C. § 30116(a)(9) may be less corrupting than a contribution that exceeds the unrestricted, general purpose contribution limits by one dollar." Def.'s First Objections & Resps. at 17. The FEC responded in part: "Although *all* contributions to political parties can create the risk of corruption or its appearance regardless of the way that money is ultimately spent, Congress could have permissibly concluded that contributions to a political party that directly benefit a particular candidate or can be spent directly on a particular election contest pose an especially acute risk warranting a lower dollar limit." *Id.*[20]

37. The FEC takes the position that "Congress could have permissibly concluded" that unrestricted donations to a political party pose greater risk than restricted donations, Def.'s First Objections & Resps. at 17, as it believes that "unrestricted

---

[19]     The LNC proposed to certify only the following fact: "'[L]arger contributions [to political parties] are generally more likely to lead to actual or apparent *quid pro quo* arrangements and can do so regardless of how the funds are ultimately used . . . .'" Pet.'s Proposed Facts ¶ 31 (alteration in original) (citation omitted). The FEC objected that the proposed fact "omits the context of the FEC's interrogatory response," and argued that "[t]o the extent this proposed fact is certified, the FEC's full response should in fairness be included. *See* FED. R. EVID. 106." Def.'s Resps. Pet.'s Proposed Facts at 15–16.

[20]     The LNC proposed to certify only the following fact: "[*A*]*ll* contributions to political parties can create the risk of corruption or its appearance regardless of the way that money is ultimately spent." Pet.'s Proposed Facts ¶ 32 (emphasis in original) (citation omitted). The FEC objected that the proposed fact "omits the context of the FEC's interrogatory response," and argued that "[t]o the extent this proposed fact is certified, the FEC's full response should in fairness be included. *See* FED. R. EVID. 106." Def.'s Resps. Pet.'s Proposed Facts at 16.

funds contributed to a political party may be used for activities that maximally benefit federal candidates and thus may pose a relatively more acute danger of actual and apparent corruption," Def.'s Second Objections & Resps. at 7.

38. "Every dollar received through the separate, segregated accounts provided for in 52 U.S.C. § 30116(a)(9) potentially frees up another dollar in the recipient's general account for unrestricted spending." Def.'s First Objections & Resps. at 12; Sarwark Decl. ¶ 12.

39. "[A] political party may in some circumstances value a contribution with use restrictions more highly than a smaller contribution without such restrictions." Sarwark Decl. ¶ 13; *see also* Def.'s Second Objections & Resps. at 4.

40. During discovery in this litigation, the LNC posed the following interrogatory to the FEC: "Please describe the likelihood that a political party would value a contribution with use restrictions more highly than a smaller contribution without such restrictions." Def.'s Second Objections & Resps. at 7. The FEC responded in part: "[U]nrestricted funds contributed to a political party may be used for activities that maximally benefit federal candidates and thus will generally be more highly valued. A political party may value a higher contribution with use restrictions in some circumstances, however, such as in the case of a contribution that the party may use to defray expenses for which it knows it must pay and for which it would otherwise have trouble raising funds. The party may value that contribution more than a smaller contribution that comes with no use restrictions but is easier to replicate through other fundraising efforts."[21] *Id.* at 8.

---

[21] The LNC proposed to certify only the following fact: "A political party may value a higher contribution with use restrictions in some circumstances . . . such as in the case of a contribution that the party may use to defray

41. During discovery in this litigation, the LNC requested that the FEC admit the following: "An individual's contribution of $101,700 to the national committee of a political party, even if restricted for the purpose of funding a headquarters building, election contests, or a presidential nominating convention, may create the same or greater appearance of corruption as an unrestricted contribution in the amount of $33,901 by that individual to the same national committee of a political party." Def.'s Second Objections & Resps. at 5. The FEC "denie[d] that the requested admission is true as a general matter but admit[ted] that the hypothetical scenario described in the request may occur in some circumstances, for the reasons provided and subject to the general caveats in the response to Request 27." *Id.* In responding to the LNC's Request 27, the FEC asserted:

> Given the close connection and alignment of interests between national party committees and federal officeholders, larger contributions are generally more likely to lead to actual or apparent *quid pro quo* arrangements and can do so regardless of how the funds are ultimately used. *See, e.g.*, *Republican Party of La. v. FEC*, 219 F. Supp. 3d 86, 97 (2016) (citing *McConnell v. FEC*, 540 U.S. 93, 154-55 (2003)), *aff'd* 137 S. Ct. 2178 (2017). The danger of actual and apparent quid pro quo corruption can, however, be relatively more acute when funds are used for activities that provide direct benefits to federal candidates. *Id.* at 96 (citing *McConnell*, 540 U.S. at 166–71). Because unrestricted funds contributed to a political party may be used for activities that maximally benefit federal candidates, including campaign advertisements in coordination with candidate campaigns, political parties will generally value them higher and such contributions pose a relatively more acute danger of quid pro quo corruption. Subject to those general caveats, the Commission admits that a political party may in

---

expenses for which it knows it must pay and for which it would otherwise have trouble raising funds. The party may value that contribution more than a smaller contribution that comes with no use restrictions but is easier to replicate through other fundraising efforts." Pet.'s Proposed Facts ¶ 39 (alteration in original) (citation omitted). The FEC "object[ed] to this proposed fact to the extent that it omits the full context of the FEC's interrogatory response," and argued that "[t]o the extent this proposed fact is certified, the FEC's full response should in fairness be included. *See* FED. R. EVID. 106." Def.'s Resps. Pet.'s Proposed Facts at 20.

45

some circumstances value a contribution with use restrictions more highly than a smaller contribution without such restrictions."

Def.'s Second Objections & Resps. at 3−4.[22]

42. During discovery in this litigation, the LNC requested that the FEC admit the following: "Were a national committee of a political party planning to spend at least $101,700 from its general account in a given year for any of the purposes for which separate, segregated accounts are provided in 52 U.S.C. § 30116(a)(9), a $101,700 contribution received in one of the separate, segregated accounts would have the same effect as an unrestricted $101,700 contribution." Def.'s Second Objections & Resps. at 5. The FEC "object[ed] to this request for admission as vague and ambiguous insofar as it does not define the 'effect' to which the request alludes." *Id.*

43. During discovery in this litigation, the LNC posed the following interrogatories to the FEC: (1) "Please describe the likelihood that an individual's contribution of $101,700 to the national committee of a political party, restricted for the purpose of funding a headquarters building, election contests, or a presidential nominating convention, would create the same or greater appearance of corruption as an unrestricted contribution in the amount of $33,901 by that individual to the same national committee of a political party," Def.'s Second Objections & Resps. at 6; and (2) "Please describe the circumstances under which an individual's

---

[22] The LNC proposed to certify only the following fact: "An individual's contribution of $101,700 to the national committee of a political party, even if restricted for the purpose of funding a headquarters building, election contests, or a presidential nominating convention, may create the same or greater appearance of corruption as an unrestricted contribution in the amount of $33,901 by that individual to the same national committee of a political party." Pet.'s Proposed Facts ¶ 40. The FEC objected that the proposed fact "omits the full context of the FEC's [] response," and argued that "[t]o the extent this proposed fact is certified, the FEC's full response should in fairness be included. *See* FED. R. EVID. 106." Def.'s Resps. Pet.'s Proposed Facts at 20.

contribution of $101,700 to the national committee of a political party, restricted for the purpose of funding a headquarters building, election contests, or a presidential nominating convention, would create the same or greater appearance of corruption as an unrestricted contribution in the amount of $33,901 by that individual to the same national committee of a political party." *Id.* at 8. The FEC responded to both interrogatories, in part, "that a particular within-limit contribution to the segregated account of a national committee of a political party could appear as corrupt as or more corrupt than a lower contribution to that committee's general account that exceeds the general account limit, depending on circumstances such as the identity of the contributor and the receiver, the policy interests of the contributor, the current status of relevant policies, the financial needs and goals of the receiver including as to the types of spending for which segregated account funds might be used and the public knowledge of those matters, the receiver's relative ability to raise funds for different proposed uses, and whether any relevant policy changes happen close in time to the contribution." *Id.* at 7, 9.[23]

44. No parties, apart from the Libertarian, Democratic, and Republican Parties, have reported any segregated purpose accounts to the FEC. Clark Decl. ¶ 14.

45. Between 2014 and 2016, the Democratic National Committee ("DNC") reported receiving $12,255,964 for its segregated convention account, $3,901,490 for its

---

[23] The LNC proposed to certify only the following facts: (1) "[A] particular within-limit contribution to the segregated account of a national committee of a political party could appear as corrupt as or more corrupt than a lower contribution to that committee's general account that exceeds the general account limit," and (2) "[I]t is . . . possible that a particular contribution below the general account limit may have an appearance of corruption that exceeds that of a higher contribution to a segregated account." Pet.'s Proposed Facts ¶¶ 42, 43 (alterations in original) (citations omitted). The FEC objected to both proposed facts on the ground that they "omit[] needed context from the cited FEC discovery response." Def.'s Resps. Pet.'s Proposed Facts at 21,22.

segregated headquarters account, and $6,764,189 for its segregated recount account.  Clark Decl. at 5 tbl.2.

46.  Between 2014 and 2016, the Republican National Committee ("RNC") reported receiving $23,817,038 for its segregated convention account, $26,367,459 for its segregated headquarters account, and $5,992,015 for its segregated recount account.  Clark Decl. at 5 tbl.2.

47.  Between 2014 and 2016, the DNC's individual contributions, not including many contributions accepted in the segregated purpose accounts, totaled $189,112,962.62.  *See* DNC Year-End FEC Reports at 3, line 11(a)(iii), http://docquery.fec.gov/cgi-bin/fecimg/?_15951133010+0 (last visited June 28, 2018) (for 2014), http://docquery.fec.gov/cgi-bin/fecimg/?_201601299004933424+0 (last visited June 28, 2018) (for 2015), http://docquery.fec.gov/cgi-bin/fecimg/ ?_201706019055202873+0 (last visited June 28, 2018) (for 2016).

48.  Between 2014 and 2016, the RNC's individual contributions, not including many contributions accepted in the segregated purpose accounts, *see supra* ¶ 46, totaled $266,758,900.34.  RNC Year-End FEC Reports at 3, line 11(a)(iii), http://docquery.fec.gov/cgi-bin/fecimg/?_15970244221+0 (last visited June 28, 2018) (for 2014), http://docquery.fec.gov/cgi-bin/fecimg/?_201603229011936493+0 (last visited June 28, 2018) (for 2015); http://docquery.fec.gov/cgi-bin/fecimg/ ?_201701319042260933+0 (last visited June 28, 2018) (for 2016).

49. In 2016, the RNC's individual contributions, not including many contributions accepted in the segregated purpose accounts, *supra* ¶ 46, totaled $89,643,729.23. 2016 RNC Year-End FEC Report at 3, line 11(a)(iii), http://docquery.fec.gov/cgi-bin/fecimg/?_201701319042260933+0 (last visited June 28, 2018).

50. "Unrestricted funds are more valuable to national party committees and their candidates than funds that may only be used for particular categories of expenses." FEC's Proposed Facts at 9.

51. The RNC and Donald J. Trump for President, Inc., entered a joint fundraising agreement during the 2016 presidential election. *See* Def.'s Opp'n, Ex. 34, Excerpt of Production from Republican National Committee to the Def.'s Subpoena to Produce Documents, ECF No. 26-38. According to that agreement, any donations to the joint fundraising committee that exceeded the maximum that could be donated to Trump's campaign would be allocated first to RNC's general operating account up to the General Party Limit. *Id.* at 8. Only after the contributor reached the General Party Limit would contributions be allocated to RNC's segregated accounts pursuant to the Segregated Account Limit. *Id.*

52. The specialized purpose limit applicable to national party committees' legal expenses allows parties to engage in litigation without having to reduce their general political advocacy. For example, RNC spokeswoman Cassie Smedile recently explained that paying for legal expenses "with funds from a pre-existing legal proceedings account [] [did] not reduce by a dime the resources we can put towards our political work." Def.'s Opp'n, Ex. 35, Matea Gold, *RNC Taps Legal*

49

*Account to Help Pay for Lawyers for President Trump and Son Donald Jr. in Russia Probes*, WASH. POST. (Sept. 20, 2017), ECF No. 26-39.

## IV. Political Parties and Quid Pro Quo Corruption

53. Because of the close relationship between parties and candidates, contributions to parties can lead to the actuality and appearance of quid pro quo corruption. National political parties are "inextricably intertwined" with their federal officeholders and candidates, with whom they "enjoy a special relationship and unity of interest." *McConnell v. FEC*, 540 U.S. 93, 145, 155 (2003) (internal quotation marks and citation omitted), *overruled by Citizens United v. FEC*, 558 U.S. 310 (2010). In fact, "[t]here is no meaningful separation between the national party committees and the public officials who control them." *Id.* at 155 (citations omitted).

54. "Once elected to legislative office, public officials enter an environment in which political parties-in-government control the resources crucial to subsequent electoral success and legislative power. Political parties organize the legislative caucuses that make committee assignments." *Id.* at 156 (internal quotation marks and citation omitted). Thus, "officeholders' reelection prospects are significantly influenced by attitudes of party leadership," *id.* (citing Krasno & Sorauf Expert Report), and an individual Member's stature and responsibilities vary dramatically depending on whether his party is in the majority or in the minority.

55. Parties are not like regular political committees. Non-connected committees "do not select slates of candidates for elections," "determine who will serve on legislative committees, elect congressional leadership, or organize legislative

50

caucuses," but these activities count among the parties' core responsibilities. *Id.* at 188 ("Political parties have influence and power in the Legislature that vastly exceeds that of any interest group. . . . [P]arty affiliation is the primary way . . . voters identify candidates," and therefore parties have special relationships with those who hold public office.). "A primary goal of all the major political parties is to win elections." *Cao v. FEC*, 688 F. Supp. 2d 498, 527 (E.D. La.), *aff'd sub nom. In re Cao*, 619 F.3d 410 (5th Cir. 2010); *see also id.* ("The ultimate goal of a political party is to get as many party members as possible into elective office, and in doing so to increase voting and party activity by average party members." (quoting declaration of former Representative Meehan)).

56. This overriding purpose makes political parties particularly susceptible to contributors who want to create a quid pro quo relationship with an officeholder. As the Supreme Court has explained:

> Parties are []necessarily the instruments of some contributors whose object is not to support the party's message or to elect party candidates across the board, but ratherto support a specific candidate for the sake of a position on one narrow issue, or even to support any candidate who will be obliged to the contributors.

*FEC v. Colo. Republican Fed. Campaign Comm'n*, 533 U.S. 431, 451–52 (2001); *see also id.* at 452 ("[W]hether they like it or not, [parties] act as agents for spending on behalf of those who seek to produce obligated officeholders."); *id.* at 455 ("In reality, parties . . . function for the benefit of donors whose object is to place candidates under obligation, a fact that parties cannot escape. Indeed, parties' capacity to concentrate power to elect is the very capacity that apparently

opens them to exploitation as channels for circumventing contribution and coordinated spending limits binding on other political players.").

57. The national committees of the two major parties—the Democratic Party and the Republican Party—are "both run by, and largely composed of, federal officeholders and candidates." *McConnell*, 540 U.S. at 155. "The President typically controls his party's national committee, and once a favorite has emerged for the presidential nomination of the other party, that candidate and his party's national committee typically work closely together." *McConnell v. FEC*, 251 F. Supp. 2d 176, 697 (D.D.C. 2003) (Kollar-Kotelly, J.). The leaders of the two major parties are also the parties' federal candidates, officeholders, and important Congressional leaders. *Id.* at 469 ("[T]he internal structure of parties permits, for example, former U.S. Senator D'Amato, who chaired the [RSCC] from 1995–97, to at the same time serve as chair of the Senate Banking, Housing, and Urban Affairs Committee.") (alterations in original) (citation omitted).

58. Similarly, LNC officials have run for federal office as Libertarian Party candidates while holding their offices with the LNC. For example, William Redpath is currently an at-large member of the LNC, and he previously served as the LNC's national chair from July 2006 through May 2010 and as the LNC's treasurer three times. Redpath Decl. ¶ 1. Redpath ran as a Libertarian Party candidate for United States Senate in 2008 and for United States House of Representatives in 2010 and 2014. *Id.* As national chair, Redpath was the LNC's "chief executive officer . . . with full authority to direct [the LNC's] business and

affairs." *LNC I*, 930 F. Supp. 2d at 178 (citation omitted).  The LNC's rules do not bar its leaders from also running for federal office.  *Id.*

59.   The public record contains significant evidence of actual and apparent quid pro quos involving contributions to national, state, and local parties.  In the 1930s, Congress enacted restrictions on contributions to national political parties in light of the notorious "Democratic campaign book" scandal, in which federal contractors were forced to buy books at hyper-inflated prices from the Democratic party to assure that they would continue to receive government business.  84 CONG. REC. 9598-99 (1939) (statement of Rep. Taylor); *see also Wagner v. FEC*, 793 F.3d 1, 11–12 (D.C. Cir. 2015) (en banc) ("Congressman J. Will Taylor pointed to the coercion of contractors in the celebrated Democratic campaign book scandal as a prime example of political immorality and skullduggery that should not be tolerated.  84 CONG. REC. 9598-99 (1939).  Representative Taylor recounted that, at the behest of the Democratic National Committee, party representatives paid visits to government contractors, reminding each one of the business he had received from the Government and explaining that the contractor was expected to buy a number of the party's souvenir convention books—at $250 each—in proportion to the amount of Government business he had enjoyed." (internal quotation marks omitted)).

60.   In 1976, Armand Hammer was fined and placed on probation after pleading guilty to making an illegal contribution to President Nixon's reelection campaign. David Rampe, *Armand Hammer Pardoned by Bush*, N.Y. TIMES (Aug. 15, 1989), http://www.nytimes.com/1989/08/15/us/armand-hammer-pardoned-by-bush.html.

53

Mr. Hammer contributed $54,000 to the Nixon re-election campaign in the names of others, friends of a subordinate at Occidental Petroleum. *Id.* The subordinate was convicted of concealing the source of the contribution. *Id.* In 1989, Mr. Hammer made contributions exceeding $100,000 to the Republican Party and another $100,000 to the Bush-Quayle Inaugural Committee. Marc Lacey, *Political Memo; Resurrecting Ghosts of Pardons Past*, N.Y. TIMES (Mar. 4, 2001), http://www.nytimes.com/2001/03/04/us/political-memo-resurrecting-ghosts-of-pardons-past.html. Shortly afterward, on August 14, 1989, President George H.W. Bush pardoned Mr. Hammer for his illegal contribution to President Nixon's reelection campaign. *Id.*; David Hoffman, *Bush Signs Pardon for Armand Hammer*, WASH. POST (Aug. 15, 1989), https://www.washingtonpost.com/archive/politics/1989/08/15/bush-signs-pardon-for-armand-hammer/b6cb4260-bbb1-40ae-a9d6-7f67ef4a7226/. In comparing the pardon to President Bill Clinton's later pardon of Marc Rich, Representative Henry Waxman observed that "'[t]he appearance of a quid pro quo is just as strong in the Hammer case as in the Rich case, if not stronger, since Mr. Hammer himself gave the contribution.'" Lacey, *supra*.

61. In 1988, Edwin Cox, Jr. pled guilty to bank fraud by falsifying collateral on an $80 million loan. *Bank Fraud Guilty Plea*, N.Y. TIMES (June 17, 1988), http://www.nytimes.com/1988/06/17/business/bank-fraud-guilty-plea.html. According to CNN's matching of Cox family members with contribution records, from 1980 to 2000 that family contributed approximately $200,000 to campaigns of President George H.W. Bush, his relatives, and Republican campaign

54

committees. Kelly Wallace, *Former President Bush Granted Last Minute Pardon to Contributor's Son*, CNN (Mar. 7, 2001, 1:57 PM), http://www.cnn.com/2001/ALLPOLITICS/03/07/bush.pardon/.  In addition to contributing to these various campaigns, Cox's father, Texas oilman Edwin L. Cox, Sr., coordinated political support for the pardon.  *See id.*  On November 24, 1992, former White House chief of staff James Baker wrote to the White House counsel, copying the president, that "[f]ormer Texas Gov. Bill Clements called me and asked me whether or not the president would consider a pardon for Edwin Cox, son of Ed Cox, who is a longtime supporter of the president's."  *Id.*  On January 18, 1993, two days before leaving the White House, President Bush pardoned Mr. Cox for his bank fraud conviction.  *Id.*  After the pardon, Edwin Cox, Sr. donated at least $100,000 to the George Bush Presidential Library.  *Id.*; Michael Weisskopf, *A Pardon, a Presidential Library, a Big Donation*, TIME (Mar. 6, 2001), http://content.time.com/time/nation/article/0,8599,101652,00.html (noting that Edwin Cox, Sr.'s "name is etched in gold as a 'benefactor,' those whose donations amount to between $100,000 to $250,000").

62. In *McConnell*, the record documented that, as one former senator described, "'[l]arge soft money contributions in fact distort the legislative process.  They affect what gets done and how it gets done. . . . [M]ake no mistake about it—this money affects outcomes.'"  251 F. Supp. 2d at 496 (quoting Sen. Rudman).

63. As another Senator testified:

> It is not unusual for large contributors to seek legislative favors in exchange for their contributions.  A good example of that which stands out in my mind because it was so stark and recent occurred on the next to last day of the 1995-96 legislative session.  Federal

> Express wanted to amend a bill being considered by a Conference Committee . . . . This was clearly of benefit to Federal Express, which according to published reports had contributed $1.4 million in the last 2-year cycle to incumbent Members of Congress and almost $1 million in soft money to the political parties. I opposed this in the Democratic Caucus, arguing that even if it was good legislation, it should not be approved without holding a hearing, we should not cave in to special interests. One of my senior colleagues got up and said, 'I'm tired of Paul always talking about special interests; we've got to pay attention to who is buttering our bread.' I will never forget that. This was a clear example of donors getting their way, not on the merits of the legislation, but just because they had been big contributors. I do not think there is any question that this is the reason it passed.

*McConnell*, 251 F. Supp. 2d at 482 (quoting former Sen. Simon); *see also Colo. Republican*, 533 U.S. at 451 n.12 (quoting Senator Simon's statement that "I believe people contribute to party committees on both sides of the aisle for the same reason that Federal Express does, because they want favors. There is an expectation that giving to party committees helps you legislatively.").

64. In July 1995, the Department of Interior denied an application by three bands of Wisconsin Indian tribes to open a casino in Hudson, Wisconsin. S. REP. NO. 105-167, pt. 1, at 44–45 (1998). Initially, the application was approved by a branch office of the Bureau of Indian Affairs ("BIA"). *Id.* at 44. A wealthy group of neighboring tribes in Minnesota, who operated a competing casino, hired a prominent lobbyist and former DNC treasurer, who spoke personally with President Clinton and officials of the DNC. *Id.* Following their meeting, DNC officials promised to talk to the White House and have them contact Secretary of the Interior Bruce Babbitt. *Id.* at 45. Meanwhile, a career BIA employee had drafted "a 17-page analysis recommending approval of the Hudson application." *Id.* According to testimony provided to a Senate Committee, Secretary Babbitt

56

felt pressure from the White House to make a determination quickly on the application and was aware of tribal "political contributions" to the DNC and state Democratic parties. *Id.* (recalling that Secretary Babbitt remarked to the applicant tribes' attorney, "Do you have any idea how much these Indians, Indians with gaming contracts . . . have given to Democrats? . . . [H]alf a million dollars."). Ultimately, the application was denied. *Id.* In the four months following the application's denial, "the opposition tribes contributed $53,000 to the DNC and the DSCC . . . an additional $230,000 to the DNC and the DSCC during 1996, and . . . more than $50,000 in additional money to the Minnesota Democratic Party." *Id.* "There is strong circumstantial evidence that the Interior Department's decision to deny the Hudson application was caused in large part by improper political considerations, including the promise of political contributions from opposition tribes." *Id.*, pt. 2, at 3168; *see also id.* at 3193 ("From all the circumstances, there appears to be a direct relationship between the activities of the Department of the Interior and contributions received by the DNC and DSCC from the opposition tribes."). Political donations to the DNC and the Minnesota Democratic Party "apparently *succeeded* in purchasing government policy concessions." *Id.*, pt. 1, at 45 (emphasis in original); *see also McConnell*, 540 U.S. at 164–65,165 n.61 (discussing the episode in connection with of the governmental interests underlying § 30125(b)).

65. Between 1995 and 1996, Roger Tamraz contributed approximately $300,000 to the DNC and various state Democratic parties to gain support for an oil-pipeline project in the Caucuses, which was opposed by the National Security Council

57

("NSC") and other executive branch agencies. *See generally* S. REP. NO. 105-167, pt. 2, at 2907–31. NSC staff developed a policy of denying Mr. Tamraz "high-level U.S. Government access" to discuss the pipeline. *Id.* at 2911. To circumvent this policy, Mr. Tamraz met with DNC officials and began contributing to the DNC and state Democratic parties. *See id.* at 2912–13. All told, "by the end of March 1996 Tamraz had made contributions totaling $100,000 to the Virginia Democratic Party, $25,000 to the Virginia Legislative Conference, $20,000 to [Richard] Molpus['s] campaign [for governor of Mississippi], $25,000 to the Louisiana Democratic Party, and $130,000 to the DNC." *Id.* at 2913–14. In addition, Mr. Tamraz contributed "'10 [or] 20' thousand dollars either to Senator [Ted] Kennedy's campaign or to the Massachusetts Democratic Party." *Id.* at 2915. DNC officials "went to great lengths in an attempt to provide Tamraz the 'political leverage' he sought in his Caspian ventures." *Id.* at 2913. Their efforts included providing pressure from White House and Department of Energy officials to change the U.S. Government's position on the pipeline. *See id.* at 2928–30. While Mr. Tamraz was not ultimately successful "in persuading the U.S. Government to support his pipeline," the Committee Report notes he "succeeded through his political contributions, and apparently the promise of additional donations, in enlisting senior United States officials in his attempt to change the working group's policy on Caspian energy issues." *Id.* at 2930. Undeterred by his White House rebuke, Mr. Tamraz also approached officials at the Overseas Private Investment Corporation, an independent U.S. Government agency whose president was Ruth

58

Harkin.  *Id.* at 2929.  Mr. Tamraz contributed "$35,000 to the Iowa Democratic Party at the request of Ruth Harkin's husband, Senator Tom Harkin of Iowa."  *Id.*

66.  As explained by the D.C. Circuit in *Wagner v. FEC*, there were a "series of quid pro quos" made by the former lobbyist Jack Abramoff and former Representative Bob Ney.  793 F.3d 1, 15 (D.C. Cir. 2015).

67.  Abramoff, who pled guilty in 2006 to corruption charges and served time in prison, has written a book about how he and fellow lobbyists made campaign contributions to a range of political committees as part of a strategy to obtain political favors.  *See generally* JACK ABRAMOFF, CAPITOL PUNISHMENT: THE HARD TRUTH ABOUT WASHINGTON CORRUPTION FROM AMERICA'S MOST NOTORIOUS LOBBYIST (2011).

68.  Abramoff's book describes a 1995 meeting involving former House Majority Whip Tom DeLay and executives from Microsoft.  *Id.* at 64–65.  The issue being discussed was "software program encryption export."  *Id.*  Once "DeLay expressed his general support for their positions and reminded [the executives] that it was likely to be the Republicans who would defend the freedom they required to develop their company," he made a "soft appeal for political contributions from the company."  *Id.* at 65.  When one of the executives "firmly brushed off" the solicitation, DeLay delivered a "stern message": he told the executives a story about an earlier time when Walmart had suffered by refusing to "'sully their hands'" by making a contribution.  *Id.*  That refusal backfired a year later when Walmart could not get DeLay to "'sully his hands'" with a request to get a highway ramp near one of their stores.  *Id.*  Once DeLay related this story,

the "quivering executives" "finally got the joke." *Id.* "A $100,000 check was soon delivered to the [National] Republican Congressional Committee, and Microsoft's relationship with the American right commenced." *Id.*

69. In 2002, in exchange for former Representative Ney's commitment to add to the Help America Vote Act ("HAVA") language to reopen a casino owned by the Tiguas, a Texas Indian tribe that Abramoff represented, Abramoff arranged for lavish contributions to be made by tribal officials to or on Ney's behalf, including at least $32,000 in contributions "to Ney's campaign and political . . . committees." James V. Grimaldi & Susan Schmidt, *Lawmaker From Ohio Subpoenaed in Abramoff Case*, WASH. POST (Nov. 5, 2005), http://www.washingtonpost.com/wp-dyn/content/article/2005/11/04/AR2005110401197.html; FEC Opp'n, Ex. 38, Factual Basis for Plea of Robert W. Ney ("Ney Factual Proffer") ¶ 10(a)(ii), ECF No. 26-42; *see* FEC Opp'n, Ex. 37, Factual Basis for Plea of Jack A. Abramoff ("Abramoff Factual Proffer") ¶¶ 20, 22, ECF No. 26-41. On March 20, 2002, Ney agreed to "move forward" with the plan to slip into the HAVA an "abstruse" sentence drafted by Abramoff's office that "would magically open the doors to the Tigua casino." ABRAMOFF, *supra*, at 197–198, 205–06; *id.* at 198 (referencing the abstruse sentence: "Public Law 100-89 is amended by striking section 207 (101 Stat. 668, 672)"); *see also* Ney Factual Proffer ¶ 10(a)(ii). Abramoff had the Tiguas make "substantial campaign contributions." Ney Factual Proffer ¶ 9(d) (admitting receipt of substantial campaign contributions from Abramoff's clients in exchange for performing official acts). Furthermore, on March 22, 2002, two

60

days after the agreement, the Tiguas donated another $30,000 to the National Republic Senatorial Committee ("NRSC"). NRSC Report of Receipts and Disbursements at 871, http://docquery.fec.gov/cgi-bin/fecimg/?22020272668 (last visited June 28, 2018); *see also* ABRAMOFF, *supra*, at 197 (noting a strategy to prepare for a "backlash" through a strategy of "Tigua contributions to the Republican Party," which would help "construct a cadre of supporters"). According to Abramoff, Senator Christopher Dodd gave his "assent" in mid-April 2002 to the plan "and a request for a $50,000 contribution to the Democrats in Dodd's name." ABRAMOFF, *supra*, at 206; *see also id.* at 206, 210 (explaining that Abramoff's associate assured Abramoff that he would cover the requested contribution "from the budget the Tiguas had provided him," and that neither of them considered that this "'contribution' was, in fact, merely a bribe;" according to Abramoff, Senator Dodd reneged when he later got "cold feet").

70. In his book, Abramoff described his approach to lobbying:

> As a lobbyist, I thought it only natural and right that my clients should reward those members who saved them such substantial sums with generous contributions. This quid pro quo became one of the hallmarks of our lobbying efforts. . . . Since the tribes I represented lived and died by what the Congress did to and for them, and since they had comparatively unlimited funds, we were in the position to deliver millions of dollars in legal political contributions, and did.

ABRAMOFF, *supra*, at 90; *see also McConnell*, 251 F. Supp. 2d at 495 (quoting an affidavit of the lobbyist Daniel Murray: "I advise my clients as to which federal office-holders (or candidates) they should contribute and in what amounts, in order to best use the resources they are able to allocate to such efforts to advance their legislative agenda. Such plans also would include soft money contributions

61

to political parties and interest groups associated with political issues."); *id.* ("To have true political clout, the giving and raising of campaign money for candidates and political parties is often critically important." (quoting lobbyist Wright Andrews)).

71. Abramoff also explained:

> The regularity with which my staff would return from congressional offices with request for funds, on the heels of our asking for help should have disturbed me, but it didn't. It was illegal and wrong, but it didn't register as abnormal in any way. I was so used to hearing senator so-and-so wants $25,000 for his charity, or representative X wants $50,000 for the Congressional Campaign Committee, that I would actually double check with my staff when they didn't request lucre for the legislators. The whole process became so perfunctory it actually seemed natural.

ABRAMOFF, *supra*, at 206.

## V. The LNC's Major Donor Network

72. "Just like the major parties, the LNC offers its donors membership in various major-donor groups that provide 'certain perks' and benefits. For example, an LNC donor can become a member of the 'Chairman's Circle' for $25,000 annually or $2,500 monthly, and in return, receive '[d]irect contact with [the] National Chair, POTUS [President of the United States] nominee, or significant L[ibertarian] P[arty] candidate during [the] campaign season.' Chairman's Circle members also receive 'VIP Seating . . . with [the] National Chair, LNC officer, special guest, or POTUS nominee at [the] National Convention banquet or other events.' The LNC also offers membership in major-donor groups for annual donors of $15,000 ('Select Benefactor'), $5,000 ('Beacon of Liberty'), $2,500 ('Pioneer of Freedom'), or $1,500 ('Lifetime Founder'). In addition to

predetermined benefits, LNC staff has the 'discretion to create and bestow additional benefits' upon its major-donor group members." *LNC I*, 930 F. Supp. 2d at 179–80 (citations omitted); *see also* LNC Policy Manual at 36–38.

73. "The LNC offers a monthly pledge program in which donors can agree to give a recurring monthly contribution to the LNC, and the LNC will automatically charge the donor's credit card or checking account. The monthly pledges continue indefinitely until the donor decides to end the donations." *LNC I*, 930 F. Supp. 2d at 180 (citations omitted).

74. "Members of the LNC's top five major-donor groups are also granted membership in the LNC's 'Torch Club,' which entitles members to attend a special Torch Club event at the LNC's national convention. The Libertarian Party's federal candidates can attend this special event so long as they are also Torch Club members, and William Redpath attended the event while serving as the LNC's national chair and running as a Libertarian Party candidate for federal office." *LNC I*, 930 F. Supp. 2d at 180 (citations omitted); *see also* LNC Policy Manual at 38.

75. "The LNC offers the benefits of major-donor-group membership as an inducement to hopefully have people increase their contributions. And the inducement has worked, as the groups have been effective in attracting larger donations for the LNC. Donations from the relatively small group of donors who are members of the LNC's major-donor groups account for a substantial percentage of LNC revenue." *LNC I*, F. Supp. 2d at 181 (internal quotations and citations omitted).

76. "The LNC could potentially grant someone membership in one of its major-donor groups, such as the Chairman's Circle, if the person showed the LNC his or her will providing for a bequest large enough to qualify for membership or if the person threatened to revoke such a bequest." *Id.* at 187 (citation omitted).

77. "If individuals informed the LNC that they intended to leave the LNC a bequest upon death, the LNC would be thankful to them for possibly leaving a gift for the LNC someday, since the LNC needs more money. And the LNC would be grateful to these potential future donors for the possible contributions even though the donors could revoke their bequests before death." *Id.* (internal quotations omitted and citation omitted).

78. "[I]ndividuals have bequeathed very large amounts of money to non-profit organizations. For example, in 2005, the National Rifle Association received a $1 million bequest from a member and donor. And in 2003, philanthropist Joan Kroc bequeathed more than $200 million to National Public Radio, an amount almost double its then-annual budget." *Id.* at 182 (citations omitted).

79. "Philanthropists recognize that there is potential to raise great sums of money via bequests. For example, in 2009, Bill Gates and Warren Buffet started an effort to convince the 400 wealthiest Americans to pledge 'at least 50% of their net worth to charity during their lifetimes or at death.'" *Id.* (citation omitted). In 2015, Facebook founder Mark Zuckerberg and his wife committed to giving 99% of their Facebook shares—then valued at more than $45 billion—to charity during their lives. Vindu Goel & Nick Wingfield, *Mark Zuckerberg Vows to Donate 99% of His Facebook Shares for Charity*, N.Y. TIMES (Dec. 1, 2015),

64

https://www.nytimes.com/2015/12/02/technology/mark-zuckerberg-facebook-charity.html.

80. "Many non-profit organizations have sophisticated planned-giving programs that solicit bequests and other forms of planned giving, such as the National Rifle Association, the Nature Conservancy, the American Civil Liberties Union, and the NAACP Legal Defense Fund. Planned-giving consultants advise groups looking to increase their fundraising on how to more effectively solicit bequests." *LNC I*, F. Supp. 2d at 182–83 (citations omitted).

81. "Political parties are 'primarily concerned with electing their candidates' to office." *Id.* at 178 (quoting *McConnell*, 251 F. Supp. 2d at 469 (Kollar-Kotelly, J.)). "They have no economic interests apart from this ultimate goal, and thus 'the money they raise is spent assisting their candidates' campaigns.'" *Id.* (quoting *McConnell*, 251 F. Supp. 2d at 469−70 (Kollar-Kotelly, J.)). As a former member of Congress explained:

> The ultimate goal of a political party such as the Democratic Party is to get as many Party members as possible into elective office, and in doing so to increase voting and Party activity by average Party members. The Party does this by developing principles on public policy matters the Party stands for, and then by finding candidates to run for the various political offices who represent those principles for the Party. When the Party finds its candidates, it tries to raise money to help get like-minded people to participate in the elections, and to try to get the Party's candidates the resources they need to get their message out to voters.

*Id.* at 178–79.

82. "Similarly, it is the LNC's mission to move public policy in a Libertarian direction by . . . nominating candidates for political office that are Libertarian and trying to get them elected. It is the LNC's goal to have a Libertarian president

and a Libertarian Congress and Libertarians elected to governorships and state general assemblies, state legislatures. As the LNC told a donor in 2003, the LNC is in the business of winning elections and the donor's gift goes towards making that happen." *LNC I*, 530 F. Supp. 2d at 179 (internal quotations and citations omitted).

83. "The LNC spends the bulk of its resources on obtaining access to the ballot for its candidates. Obtaining ballot access is probably the most important thing the [LNC] does, since the LNC's role in this electoral system is to field as many candidates . . . as possible for federal and state and local offices[.]" *Id.* (internal quotations and citations omitted). "Thus, the LNC funds petition drives for the party's federal candidates and works closely with its presidential candidate's campaign on ballot-access issues." *Id.* (citations omitted).

84. "In order to receive financial support from the LNC, Libertarian Party candidates must be certified as Libertarian candidates by the governing board of the party in their state and must not support any Presidential ticket other than the Libertarian Party's presidential ticket. The LNC has the power to take the Libertarian Party nomination away from a presidential ticket that fails to conduct its campaign in accordance with the party's platform." *LNC I*, 930 F. Supp. 2d at 179 (citations omitted); *see also* LNC Policy Manual at 43.

85. "Individuals have bequeathed contributions directly to federal candidates and their authorized political committees." *LNC I*, 930 F. Supp. 2d at 190 (citation omitted). "Such contributions are subject to FECA's limit on contributions to

'any candidate and his authorized political committees.'" *Id.* (quoting 52 U.S.C. § 30116(a)(1)(A)).

86. For example, the Estate of Louise Welch made a $2,600 contribution to Yarmuth for Congress in 2013. Clark Decl., Ex. B, FEC Form 3X, ECF No. 24-22. In 2007, the Estate of Shirley Bogs made a $2,100 contribution to Kucinich for President 2008. Clark Decl. ¶ 15, tbl.6. And in 2006, the Estate of William G. Helis made a $2,100 contribution to Committee to Re-Elect Bobby Jindal. *Id.*

87. "Before BCRA banned soft-money donations to national party committees in 2002, the committees could accept the full amount of a bequest from an estate so long as the committees designated the amount in excess of FECA's contribution limit as soft money—that is, funds purportedly to be used for non-federal-election purposes." *LNC I*, 930 F. Supp. 2d at 183.

88. "As a result, when soft-money donations to national party committees were legal, estates were able to donate the entire amount of a large bequest in one lump sum. For example, in 2002, the Estate of Martha Huges donated $390,000 from a bequest to the DNC. In 1999, the Estate of Lola Cameron donated $141,988 from a bequest to the RNC. In 1997, the Estate of Gwendolyn Williams donated $133,829 from a bequest to the DNC. And in 2002, the Estate of Joan Shepard donated $80,000 to the RNC." *Id.* at 183 (citations omitted).

## VI.    The Specialized Purpose Regime's Impact on the LNC

89. "The Libertarian Party's ability to influence elections is in some measure related to its ability to raise and expend money." Sarwark Decl. ¶ 53. "The LNC needs, and would prefer, to spend its funds in order to directly speak to the electorate

about its ideology and political mission, to support its candidates, and to build its institutional capability, including its ability to regularly qualify for the ballot in various states." *Id.*

90. "LNC's ability to solicit donations depends in part on having adequate financial resources on hand." *Id.* at ¶ 54. "Donors, voters, and prospective political candidates who might be attracted to the party's ideology are nonetheless dissuaded from supporting the party by its lack of resources." *Id.*

91. Absent the annual contribution limit, the LNC would utilize donations exceeding such limit for political expression, including improving the party's access to ballots, promoting awareness of the party and its ideology, and supporting candidates for state and federal office. *Id.* ¶ 56.

92. "The LNC is confident that it could identify and develop additional donors who would give beyond the base annual contribution limit (currently $33,900), but refrain from doing so because it is illegal to give larger amounts without restriction and they do not perceive sufficient value in donations that carry the government's purpose restrictions." *Id.* ¶ 58. "The LNC would also be better able to attract larger testamentary bequests if the donors would know that a larger portion of their bequest would be immediately effective." *Id.*

VII. **Testamentary Contributions**

93. "[I]t is possible for a bequest to raise valid anti-corruption concerns," as the LNC has "concede[d]." *LNC I*, 930 F. Supp. 2d at 166.

94. As a general matter, nothing prevents a living person from informing the beneficiary of a planned bequest about that bequest. FEC's Proposed Facts at 8.

68

95. In the past, "associates of a decedent who has left a bequest for a national party committee [have] inform[ed] specific federal officeholders or candidates of the bequest." *LNC I*, 930 F. Supp. 2d at 188. "In 2009, an attorney representing the co-trustees of a trust holding a bequest of over $100,000 for the Democratic Party wrote a letter to United States Senator Frank Lautenberg informing him of the bequest." *Id.* "The attorney stated that his 'good friend and accountant' who 'had interactions with [the Senator] in his role as a director of Holy Name Hospital' suggested that he alert the Senator to the bequest." *Id.* at 189 (alteration in original) (citations omitted). "The attorney sent Senator Lautenberg a copy of the trust documents and in doing so highlighted the fact that the bequest was for more than $100,000." *Id.*

96. "In April 2009, the LNC learned that it was to receive a $10,000 bequest from the estate of James Kelleher." *Id.* "Upon learning of the bequest in an e-mail, the LNC's then-national chair asked, 'Whom do we thank?,' even though Kelleher was deceased." *Id.* (citations omitted). "According to the LNC, in the case of a bequest it 'would be reasonable to thank anybody who was helping to [e]ffect the donation' to the LNC, including '[p]ossibly the executor. Possibly the estate administrator or the estate attorney.'" *Id.* (alterations in original) (citations omitted). "As the LNC sees it, '[s]omebody is doing something to give $10,000 to the [LNC], even if a penny is not coming out of their pocket, it is not inappropriate and mighty inexpensive to say thank you.'" *Id.* (alterations in original) (citations omitted). "For the Kelleher bequest, the LNC's director of

69

operations directed a colleague to send a thank you note to the executor of the Kelleher estate." *Id.* (citations omitted).

97. The LNC has been informed by living persons that those persons planned to make large bequests to the LNC. Those persons include Michael Chastain (value of bequest estimated to be between $500,000 and $1,000,000) and Dominick Frollini (value of bequest estimated to be between $25,000 and $75,000). Chastain Decl. ¶ 8; Def.'s Opp'n, Ex. 12, Frollini LNC Estate Planning Email, ECF No. 26-16.

98. Another living person, William Redpath, has informed the LNC that he would leave a large bequest, with a value estimated at $1.1 million, to fund a trust charged with furthering ballot access and electoral reform, but that he would prefer to leave an unrestricted contribution if it would not be subject to the current FECA contribution limits. Redpath Decl. ¶¶ 3–5.

99. "If a national party committee discovered that an individual planned to bequeath it a contribution or donation, the national party committee, its candidates, or officeholders could, in exchange, grant that individual political favors." *LNC I*, 930 F. Supp. 2d at 186. "A bequest may also help friends or family of the deceased in securing meetings with federal officeholders and candidates." *Id.* at 166.

100. "An individual can revoke a request before death, and . . . this possibility creates an incentive for a national party committee to limit the risk that a planned bequest will be revoked." *Id.* at 186. "An individual's revocable promise to bequeath a contribution" in the future "could cause that political party, its candidates, or its office holders to grant political favors to the individual in the hopes of preventing

the individual from revoking his or her promise." FEC's Proposed Facts at 7. Political committees "could feel pressure to . . . ensure that a (potential) donor is happy with the committee's actions lest [that donor] revoke the bequest." *LNC I*, 930 F. Supp. 2d at 167.

101. "A living person may alter his or her estate planning documents at any time before death for any reason, including that a candidate, office holder, or political party votes or takes a political position contrary to the person's wishes." FEC's Proposed Facts at 8.

102. Estates have contributed more than $3.7 million in bequeathed funds to recipients that must file reports with the FEC, according to FEC records dating from 1978 through August 2, 2017. Clark Decl. ¶¶ 1–4. The actual amount of bequeathed funds is likely even higher, because reporting entities are not required to inform the FEC that a particular contribution they received came from a bequest, and if they choose to do so anyway, they are not required to report this information in any standardized manner. *Id.* ¶ 5. For example, the LNC's disclosures regarding the Shaber bequest at issue in this litigation do not indicate that the contributions are the result of a bequest. *Id.* "As a result, Shaber's bequest to the LNC is not reflected in the totals described above." *Id.* Bequests, therefore, are likely underreported to the FEC. *See id.*

103. National political party committees have reported bequeathed contributions that exceeded the General Party Limit. Clark Decl. ¶ 6 & tbl.1. For example, the Democratic Congressional Campaign Committee ("DCCC") received $206,955.46 between 2014 and 2016 in bequeathed contributions from Robert

Bohna.  *Id.* at tbl.1.  The DCCC "accepted $167,992.06 of the total bequest on December 31, 2014, with $32,400 of that amount going to the DCCC's general account, and the remainder going to the type of segregated accounts described in 52 U.S.C. § 30116(a)(9): $38,392.06 of the contribution went into the DCCC's building fund, and $97,200 went to the DCCC's recount fund."  *Id.* ¶ 7.  "In 2015, the DCCC accepted an additional $32,400 of the bequest into its general fund."  *Id.*  "In 2016, the DCCC accepted an additional $6,563.40 into its general fund."  *Id.*

104. "On January 13, 2017, the [RNC] accepted a total of $100,000 from the Estate of Richard Peter Belden by accepting $33,400 into its general account and $66,600 into its headquarters account."  Clark Decl. ¶ 8.

105. "The [DNC] accepted $32,400 from the Ronald L. Gabriel Trust in 2013 and again in 2014."  Clark Decl. ¶ 9.  "In 2015, DNC accepted $45,243.96 from the same trust by accepting $32,400 into its general account and an additional $12,843.96 into its convention account."  *Id.*

106. The "DNC also accepted $50,000 from the Sarah Weatherbee Trust on April 4, 2015, with $33,400 of that amount going to the DNC's general account and $16,600 going to its convention account."  *Id.* ¶ 10.  "The next year, DNC accepted an additional $9,723.30 into its convention account."  *Id.*

107. The "LNC accepted $30,800 from the Estate of Raymond Groves Burrington in 2012 and again 2013.  In 2014, the LNC accepted $15,744.75 from the same estate."  *Id.* ¶ 11.

72

108. In 2010, the trustee of a trust holding a $200,000 bequest to the DNC wrote a

letter to the then-chair of the DNC stating:

> Due to the fact that mid-term elections are upon us, I [am] working
> to get this [contribution from the decedent's bequest] out to you as
> quickly as possible. I know it would be important to my friend,
> Michael Buckley, who we called "Buckley." Of course I cannot
> speak with him, as he is deceased, but both of us were kindred spirits
> with regard to our political views and had many, many discussions
> on politics. As you can see by the fact that he left the [DNC] 25%
> of his estate, it was a very important thing to him. While I believe
> he would want you to use the money in the way you think best, it is
> my heartfelt belief that he would want this year's money going
> towards defeating Carly Fiorina and Meg Whitman in California.
> Buckley was a former employee of Hewlett Packard under the reigns
> of Carly Fiorina and he was not silent with regard to how he felt
> about her. I think he would be actively campaigning against her and
> Meg Whitman, if he were alive today.

*LNC I*, 930 F. Supp. 2d at 188 (alteration in the original) (citation omitted). "The

trustee then asked the DNC to let her know if the money would in fact be used to

help defeat Fiorina and Whitman, because the decedent's 'friends would be

pleased to know.'" *Id.*

## VIII. Joseph Shaber's Bequest

109. Between 1988 and 2011, Joseph Shaber made donations to the LNC in amounts

ranging from $10 to $300. Pet.'s Mot. Cert., Ex. E, Joseph Shaber Gift History,

ECF 24-7. The most that Mr. Shaber donated to the LNC at any time during that

period was $300 in March 1997. *Id.* Between June 2011 and November 2012,

Shaber donated $100 per month to the LNC. *Id.* In May 2012, he donated an

additional $100. *Id.*

110. In total, Mr. Shaber made 46 donations totaling $3,315 to the LNC. *Id.*

111. Mr. Shaber's contributions to the LNC made him eligible to be a life member of

the LNC in 2012. Sarwark Dep. at 78:12–18.

73

112. "On May 20, 2013, LNC sent Joseph Shaber an invitation to attend a VIP reception to be held on July 12, 2013, to raise money for the David F. Nolan Building Fund." Def.'s Opp'n, Ex. 5, Joint Stipulation ¶ 3, ECF No. 26-9; *see also* Def.'s Opp'n, Ex. 14, LNC Invitation, ECF No. 26-18. This event was held in conjunction with FreedomFest, a large, annual convention for conservatives and libertarians. *See* Sarwark Dep. at 81:11−19; LNC Invitation at 3. The LNC typically participates in FreedomFest by having a table at the event and organizing breakout sessions to attempt to recruit and solicit donors. Sarwark Dep. at 82:1–10. Libertarian candidates frequently attend the event. *Id.* at 82:11–13.

113. Mr. Shaber was included on LNC in-house mailing lists, Def.'s Opp'n, Ex. 3, Pet.'s Resps. Def.'s Interrogatories at 1, ECF No. 26-7, to which the LNC sends communications soliciting contributions, Sarwark Dep. at 17:7–21, 70:14–73:12. Mr. Shaber responded to some of these solicitations with contributions to the LNC. *See* Joseph Shaber Gift History.

114. By April 2012, Mr. Shaber had contributed $750 to Ron Paul's campaign in the Republican presidential primary. *See* Def.'s Opp'n, Ex. 21, Shaber Contribution Receipt, ECF No. 26-25. Although Ron Paul was then running for the Republican nomination, he later switched to the Libertarian Party after leaving federal office. *LNC I*, 930 F. Supp. 2d at 173.

115. Without the LNC's knowledge, the LNC was made a beneficiary of the Joseph Shaber Revocable Trust under a trust dated February 11, 2010. Sarwark Decl. ¶ 35.

74

116. The size of Mr. Shaber's gift to the LNC was contingent upon a variety of factors, including the value of Mr. Shaber's property and whether he would have grandchildren at the time of his passing. *See* Pet.'s Mot. Cert., Ex. G, Notice of Irrevocable Trust, ECF No. 24-9.

117. Mr. Shaber died on August 23, 2014, rendering the trust irrevocable. *Id.*; Pet.'s Mot. Cert., Ex. F, Escrow Agreement at 1, ECF No. 24-8; Pet,'s Mot. Cert., Ex. H, FEC Advisory Opinion 2015-05, ECF No. 24-10.

118. Mr. Shaber's death prevents him from engaging in political expression, association, or support. Def.'s First Objections & Resps. at 4; Sarwark Decl. ¶ 43.

119. The LNC first had access to money from Shaber's bequest in 2015, and took the maximum $33,400 allowed for unrestricted purposes, in compliance with the FECA's general purpose limit, in February of that year. Decl. of Robert Kraus, Operations Director, LNC ("Kraus Decl.") ¶¶ 2, 4, ECF No. 12-4; FEC Advisory Opinion 2015-05 at 1–2.

120. By the terms of the trust, the LNC was named as the specific beneficiary of a $50,000 monetary gift, plus a residual beneficiary of 25% of the remaining trust estate after specific distributions were made. Notice of Irrevocable Trust at 4–5. The LNC was also a contingent beneficiary of an additional 25% of the residue of Mr. Shaber's trust estate, which it would receive if Mr. Shaber died with no grandchildren. *Id.* Mr. Shaber did not have any grandchildren at the time of his death. Def.'s Opp'n, Ex. 29, Email from Michelle Lauer to William Hall at 1, ECF No. 26-33.

75

121. It was finally determined in September 2015, that The LNC's share of the Shaber trust was $235,575.20. Escrow Agreement at 1.[24]

122. The LNC had sent Mr. Shaber a fundraising appeal related directly to its headquarters building. Sarwark Decl. ¶ 36.

123. Mr. Shaber specified that the LNC should take his bequest "outright." Notice of Irrevocable Trust at 5.

124. The FEC is unaware of any condition or limitation attached by Mr. Shaber to his bequest to the LNC. Def.'s First Objections & Resps. at 5.

125. The FEC is unaware at this time of any quid pro quo arrangement related to Mr. Shaber's bequest to the LNC. Def.'s First Objections & Resps. at 3.

126. The Trustee of Shaber's Trust could not impose restrictions on Mr. Shaber's bequest that Mr. Shaber did not himself place. FEC Advisory Opinion 2015-05 at 2.[25]

127. The LNC would accept and spend the entire amount of the Shaber bequest for its general expressive purposes, including expression in aid of its federal election efforts. Sarwark Decl. ¶ 38.

128. On September 15, 2015, the Trust and the LNC agreed to deposit the remaining $202,175.20 due to the LNC into an escrow account. Def.'s Opp'n, Ex. 27, Escrow Agreement at 10, ECF No. 26-31. The escrow agent, First International Bank & Trust, has control over the annual distributions to the LNC in amounts

---

[24] Other aspects of the record suggest that the LNC's share of the Shaber trust was $225,000. *See* FEC Advisory Opinion 2015-05 at 1–2. The parties seem to agree that the LNC's share of the trust was $235,575.20, however, *see* Def.'s Resps. Pet.'s Proposed Facts at 33, and thus the Court so finds.

[25] The FEC Advisory Opinion notes that "[t]he request [for an advisory opinion] states that Ms. Shaber, as trustee, has no power to require that the [LNC] accept its share in a way not required by the Settlor," though does not present this assertion as a fact. FEC Advisory Opinion 2015-05 at 2 (alterations omitted).

equal to the limitations of federal campaign finance law, 52 U.S.C §

30116(a)(1)(B).  *Id.* at 1.  The Escrow Agreement instructs the Escrow Agent to

invest the funds in the escrow account in bank accounts or certificates of deposit,

with all interest accruing to the benefit of the national Libertarian Party, and to

annually disburse the funds to LP at the maximum allowed permitted by

contribution limits.  *Id.*; Sarwark Dep. at 93:15-19.  The agreement explicitly

provides that LP may challenge the legal validity of the contribution limit, and

demand payment of the full amount remaining in the account should its challenge

succeed.  Escrow Agreement at 2.

129. To LNC's knowledge, neither Mr. Shaber nor anyone related to him or acting on

his behalf has had any relationship with the LNC, its officers, board members, or

candidates, apart from Mr. Shaber's contribution history.  Sarwark Decl. ¶ 41.

130. The LNC received a contribution of $33,400 on behalf of Mr. Shaber from the

escrow account on January 29, 2016.  Def.'s Opp'n, Ex. 19, 2016 Itemized

Receipts, ECF No. 26-23.

131. The LNC has also received its maximum contribution from the Shaber trust for

2017.  Def.'s Opp'n, Ex. 18, 2017 Itemized Receipts, ECF No. 26-22.

132. The LNC is prohibited from pledging, assigning, or otherwise obligating the

anticipated contributions before they are disbursed.  FEC Advisory Opinion 2015-

05 at 4 n.5 (citing FEC Advisory Opinion 2004-02).

133. Aside from pursuing its ideological and political mission, the LNC has provided

nothing of value to Mr. Shaber, or to anyone else, in exchange for his bequest to

the LNC.  Sarwark Decl. ¶ 42.

134. Upon learning of the Shaber bequest, the LNC removed Mr. Shaber from the membership rolls. Sarwark Decl. ¶ 44.

IX. **Other Potential Donors To The LNC**

135. The LNC solicits potential contributors to include the LNC as a beneficiary in donors' estate planning materials. *See* Def.'s Opp'n, Ex. 25, LNC Legacy Libertarians Email, ECF No. 26-29. On March 27, 2017, the LNC sent an email to 140,322 people on its contact list informing them that the party had started a planned giving program for people who want to designate the Libertarian Party as a beneficiary in their will. Pet.'s Resps. Def.'s Interrogatories at 4. The email noted that the "Libertarian Party will honor these generous supporters by listing their names on a permanent plaque at our headquarters." *Id.*

136. In response to this email, Nick Frollini wrote to the LNC to explain that he had designated the LNC as a beneficiary in his will and that he estimated his bequest would be worth "between $25,000 and $75,000 at the time of [his] passing." Frollini LNC Estate Planning Email at 1. The LNC's Head of Development, Lauren Daugherty, responded to the email with an invitation to have dinner with the LNC's national chair. *Id.* Frollini did not ultimately attend the dinner. Sarwark Dep. at 68:2−4.

137. "If contribution limits did not apply to bequests, the LNC would increase its outreach about its planned giving program to its members who have a high capacity for giving." Pet.'s Resps. Def.'s Interrogatories at 4. "Planned giving would take a more prominent place in the LNC's donor cultivation via in person meetings, online correspondence, and traditional mail." *Id.*

138. "Among the donations that the LNC would solicit and accept in excess of the base annual contribution limit (currently $33,900) would be donations from donors who have already given the base annual contribution limit but stand ready to give more for unrestricted purposes if it were legal to do so, including Chris Rufer, Michael Chastain, the Shaber escrow, the forthcoming Clinard escrow, and, at some point, the Redpath and Chastain estates." Sarwark Decl. ¶ 57.

### a. Chris Rufer

139. Chris Rufer is a Libertarian who desires "to maximize the ideals of the Libertarian Party and to see them implemented through political action." Rufer Decl. ¶ 1.

140. Rufer believes that "the Libertarian Party is the only organization that seeks to directly participate in and control the government, with the aim of steering its functions according to libertarian principles." *Id.* ¶ 1. Therefore, he "regularly donate[s] money to the [LNC], and to Libertarian candidates." *Id.* In 2016 alone, Rufer "donated over $900,000 to directly support the election of the LNC's candidates." *Id.*

141. Rufer "trust[s] the LNC to effectively spend funds advancing its mission, which [he] support[s]." *Id.* ¶ 2. He wishes to "maximize LNC's unrestrained ability to advocate its message, and further [his] participation in the LNC's mission, by donating as much as [he is] comfortably able to the LNC to be spent freely in the LNC's judgment." *Id.* "The government's contribution limitations are below the amount [Rufer] would freely give the LNC this year, and in future years, to be spent as the LNC sees fit." *Id.*

79

142. Rufer says he wishes "to donate money to the [LNC] to advance its mission, not
to obtain access to or the gratitude of any candidates or officeholders." *Id.* ¶ 3.
Rufer has "no expectation of receiving any special access to candidates or
officeholders if [he] were to donate over $33,900 to the [LNC] in any given year,
to be spent for a particular purpose or without restriction." *Id.*

143. Rufer has "donated over $280,000 directly to the LNC over the years, including
the maximum amounts allowed by law for unrestricted purposes this year, and in
2012, 2013, and 2016." *Id.* ¶ 4.

144. Rufer "understand[s] that the government now allows [him] to donate up to
$339,000 to the LNC per year, but not if the money would be spent as the LNC
wishes." *Id.* ¶ 5. "Any additional money [Rufer] would donate this year beyond
the $33,900 he has already donated would come with government-imposed
strings." *Id.* Accordingly, Rufer is "not giving the LNC any additional money for
the year." *Id.*

145. Rufer does "not want any part of [his] contribution this year restricted to spending
on a headquarters building, fees for election contests and other legal proceedings,
and presidential nominating conventions." *Id.* Rufer does "not believe that the
LNC has much use for those spending purposes this year, and any money spent
for those purposes may not communicate the same messages that the LNC would
otherwise communicate with [his] donation." *Id.*

146. Rufer "would donate funds to the [LNC] in excess of the annual contribution
limits for general, non-segregated purposes and the party's spending for
segregated account purposes, this year and . . . in future years, but refrain[s] from

80

doing so owing to the contribution limits and restrictions imposed by the government." *Id.* ¶ 6. Rufer understands that he "face[s] a real threat of prosecution if [he] were to violate the federal laws restricting [his] ability to donate money to the [LNC], and [he is] not willing to risk prosecution." *Id.*

147. "If it is determined that the [LNC] is not subject to the limitation for general, non-segregated purposes, currently $33,900 per year, such that donations exceeding that amount per year need not be dedicated to the segregated purpose accounts, [Rufer] would expect to donate to the Libertarian National Committee in excess of that amount, this year and in future years." *Id.* ¶ 7.

### b. Michael Chastain

148. Michael Chastain is a Libertarian who "desire[s] to maximize the ideals of the Libertarian Party and see them implemented through political action." Chastain Decl. ¶ 1.

149. Chastain believes that the "Libertarian Party is the only organization that seeks to directly participate in and control the government, with the aim of steering its functions according to libertarian principles." *Id.* ¶ 1. Therefore, Chastain "regularly donate[s] money to the [LNC] and to Libertarian candidates." *Id.*

150. Chastain "trust[s] the LNC to effectively spend funds advancing its mission, which [he] support[s]." *Id.* ¶ 2. He "wish[es] to maximize LNC's unrestrained ability to advocate its message, and further [his] participation in the LNC's mission, by donating as much as [he is] comfortably able to the LNC to be spent freely in the LNC's judgment." *Id.* "The government's contribution limitations

are below the amount [Chastain] would freely give the LNC this year, and in future years, to be spent as the LNC sees fit." *Id.*

151. Chastain "wish[es] to donate money to the [LNC] to advance its mission, not to obtain access to or the gratitude of any candidates or officeholders." *Id.* ¶ 3. Chastain has "no expectation of receiving any special access to candidates or officeholders if [he] were to donate over $33,900 to the [LNC] in any given year, to be spent for a particular purpose or without restriction." *Id.*

152. "Thus far in 2017, [Chastain has] donated a total of $60,310.01 to the [LNC]." *Id.* ¶ 4. Chastain has "donated the maximum $33,900 in unrestricted funds, and an additional $26,410.01 to the building fund." *Id.*

153. Chastain "understand[s] that the government now allows him to donate up to $339,000 to the LNC per year, but not if the money would be spent as the LNC wishes." *Id.* ¶ 5. "Any additional money [Chastain] would donate this year beyond the $33,900 he has already donated for unrestricted purposes would come with government-imposed strings." *Id.* Accordingly, Chastain is "not giving the LNC any additional money for the year." *Id.*

154. Chastain does "not want any additional part of his contribution this year restricted to spending on a headquarters building, fees for election contests and other legal proceedings, and presidential nominating conventions." *Id.* Chastain does "not believe that the LNC has much use for those spending purposes this year, and any money spent for those purposes may not communicate the same messages that the LNC would otherwise communicate with [his] donation." *Id.*

155. Chastain "would donate funds to the [LNC] in excess of the annual contribution limits for general, non-segregated purposes and the party's spending for segregated account purposes, this year and in future years, but refrain[s] from doing so owing to the contribution limits and restrictions imposed by the government." *Id.* ¶ 6. Chastain "understand[s] that he face[s] a real threat of prosecution if [he] were to violate the federal laws restricting [his] ability to donate money to the [LNC], and [he is] not willing to risk prosecution." *Id.*

156. "If it is determined that the [LNC]is not subject to the limitation for general, non-segregated purposes, currently $33,900 per year, such that donations exceeding that amount per year need not be dedicated to the segregated purpose accounts, [Chastain] would donate to the [LNC] in excess of that amount, this year and in future years. *Id.* ¶ 7.

157. Chastain is "in the process of revising [his] estate plan," and "plan[s] to make the LNC a contingent beneficiary in the amount of $500,000-$1,000,000." *Id.* ¶ 8.

158. Chastain "would not want the government to impose any strings on how the LNC would spend [his] bequest." *Id.* Chastain "would not want any part of his bequest to LNC restricted to spending on a headquarters building, fees for election contests and other legal proceedings, and presidential nominating conventions." *Id.* Chastain "would want the LNC to have [his] bequest entirely without restriction." *Id.*

159. Chastain "would not bequeath money to LNC in an attempt to remain affiliated with the party after [he is] dead." *Id.* ¶ 9. "The party does not have deceased members." *Id.*

83

160. Chastain has "no idea who would be running as a Libertarian Party candidate for any office at the time [his] estate would disburse his assets to the Libertarian Party." *Id.* ¶ 10. Chastain "cannot predict who will run for office under the Libertarian banner in the future, and [he] hope[s] and expects to live beyond the time through which the party's candidates, and the likely issues they would espouse, may be currently foreseen." *Id.*

161. Chastain has "not received any sort of benefit whatsoever for promising to remember the Libertarian Party in [his] will should the contribution limits change." *Id.* ¶ 11. "The Party does not offer any benefits in exchange for being remembered in an individual's will, apart from perhaps a simple expression of gratitude." *Id.*

### c. William Redpath

162. William Redpath is "currently an at-large member of the [LNC]." Redpath Decl. ¶ 1. He has "served as the Treasurer of the Libertarian Party three times, and served as the National Chair of the Libertarian Party from July, 2006 through May, 2010." *Id.* He has also repeatedly "run for public office as a Libertarian." *Id.*

163. Redpath is a Libertarian who "desire[s] to maximize the ideals of the Libertarian Party and see them implemented through political action." *Id.* ¶ 2. Redpath believes that "the Libertarian Party is the only organization that seeks to directly participate in and control the government, with the aim of steering its functions according to libertarian principles." *Id.* "Therefore, [Redpath] regularly

84

donate[s] money to the [LNC] and to Libertarian candidates." *Id.* "Apart from [his] time, over the years, [he has] contributed over $100,000 to the LNC." *Id.*

164. Redpath's "last will and testament provides that upon [his] death, 40% of his estate—a portion of his anticipated estate that is currently valued at over $1.1 million—would fund a trust charged with furthering ballot access and electoral reform to benefit the Libertarian Party." *Id.* ¶ 3.

165. Redpath "would prefer, however, to leave this seven-figure amount to the LNC as an unrestricted bequest." *Id.* ¶ 4. Redpath "would want [his] death to give expression to the LNC cause that [he has] so steadfastly endorsed and advocated throughout [his] life, and to assist in the LNC's expression of its ideals and political program." *Id.* Redpath "trust[s] the LNC to effectively use [his] bequest for these expressive purposes, and want[s] to maximize the LNC's expression by seeing that [his] bequest is given to the LNC without restriction." *Id.*

166. "But for the current contribution limits, which limit the purposes for which the LNC could spend [Redpath's] bequest, [Redpath] would immediately alter [his] last will and testament to replace the current ballot access and electoral reform trust with an unrestricted donation of that same 40% of [his] estate to the LNC." *Id.* ¶ 5. Redpath "do[es] not want any part of his bequest restricted to spending on a headquarters building, fees for election contests and other legal proceedings, and presidential nominating conventions, and [he] will not leave a sizable gift to the LNC so long as these strings are attached to the LNC's ability to access [his] gift." *Id.* Redpath "do[es] not believe that the LNC has much use for those spending purposes in any given year, and any money spent for those purposes

85

may not communicate the same messages that the LNC might otherwise communicate with [his] donation." *Id.*

167. Redpath "would not bequeath money to LNC in an attempt to remain affiliated with the party after he is dead." *Id.* ¶ 6. "The party does not have deceased members." *Id.*

168. Redpath has "no idea who would be running as a Libertarian Party candidate for any office at the time his estate would disburse assets to the Libertarian Party." *Id.* ¶ 7. Redpath "cannot predict who will run for office under the Libertarian banner in the future, and [he] hope[s] and expect[s] to live beyond the time through which the party's candidates, and the likely issues they would espouse, may be currently foreseen." *Id.*

169. Redpath has "not received any sort of benefit whatsoever for promising to remember the Libertarian Party in [his] will should the contribution limits change." *Id.* ¶ 8. "The Party does not offer any benefits in exchange for being remembered in an individual's will, apart from perhaps a simple expression of gratitude." *Id.*

### d. Frank Welch Clinard, Jr.

170. "LNC has been left a testamentary bequest by one Frank Welch Clinard, Jr. The bequest does not specify any use restriction. Sarwark Decl. ¶ 45; *see also* Pet.'s Mot. Cert., Ex. L, Last Will and Testament of Frank Welch Clinard, Jr. at 3–4, ECF No. 24-14.

171. Between 1988 and 2008, Clinard had sporadically donated to the LNC, in small amounts that totaled $1,625.30 throughout the time period. *See* Pet.'s Mot. Cert.,

Ex. M, Donor Clinard Gift History, ECF No. 24-15. Only three times did his donations meet or exceed $100, with the highest donation amounting to $159. *See id.*[26]

172. "To LNC's knowledge, neither Clinard nor anyone related to him or acting on his behalf has had any relationship with the LNC, its officers, board members, or candidates, apart from Clinard's contribution history." Sarwark Decl. ¶ 47.

173. Clinard's bequest to LNC totals $111,863.52. Pet.'s Mot. Cert., Ex. N, Estate of Frank W. Clinard, Jr. at 12, ECF No. 24-16.

174. "LNC would accept and spend the entire amount of the Clinard bequest for its general expressive purposes, including expression in aid of its federal election efforts." Sarwark Decl. ¶ 48.

175. "LNC is in the process of establishing an escrow account so that it may receive the entirety of Clinard's bequest for general expressive purposes, without restriction." *Id.* ¶ 49.

176. "Aside from pursuing its ideological and political mission, LNC has provided nothing of value to Frank Clinard, or to anyone else, in exchange for his bequest to the LNC." *Id.* ¶ 50.

177. "Frank Clinard's death prevents him from engaging in political expression, association, or support." *Id.* ¶ 51.

178. "The LNC has removed Frank Clinard from its membership rolls on account of his death." *Id.* ¶ 52.

---

[26] The Sarwark Declaration asserts that Clinard donated $1,625.30 to the petitioner between 1996 (rather than 1988) and 2008. Sarwark Decl. ¶ 46. This appears to be a typographical error, which the parties inadvertently repeat, *see* Def.'s Resps. Pet.'s Proposed Facts at 49, as Exhibit M to the petitioner's memorandum shows that Clinard donated $1,625.30 to the petitioner between 1988 and 2008. *See* Donor Clinard Gift History.